UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X
                                  :

UNITED STATES OF AMERICA

                                  :

     -v-

                                  :

BRADLEY PIERRE,
MARVIN MOY,
WILLIAM WEINER,
ARTHUR BOGORAZ, and
JEAN PIERRE,

                                  :

                Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

**SUPERSEDING INDICTMENT**

S2 22 Cr. 19 (PGG)

## COUNT ONE
### (Conspiracy to Commit Healthcare Fraud)

### Overview of the Scheme

The Grand Jury Charges:

1.     From at least in or about 2008 up to and including in or about 2021,

BRADLEY PIERRE, MARVIN MOY, WILLIAM WEINER, ARTHUR BOGORAZ, and JEAN

PIERRE (the "Pierre Conspirators" or the "Conspirators"), the defendants, and others known and

unknown, participated in a criminal scheme to exploit insurance programs designed to protect

motor vehicle accident victims (the "No-Fault Scheme").

2.     As part of the No-Fault Scheme, the Pierre Conspirators fraudulently

owned and controlled five medical professional corporations – including clinics and an MRI

facility – by paying licensed medical professionals to use their licenses to incorporate the

professional corporations (collectively, the "No-Fault Clinics" or the "Clinics"). The Pierre

Conspirators further defrauded automobile insurance companies by billing insurance companies

for unnecessary and excessive medical treatments, falsifying clinical findings of injuries in MRIs, and lying under oath to insurance company representatives.

3.     The Pierre Conspirators promoted the scheme through bribery. The Pierre Conspirators paid hundreds of thousands of dollars to co-conspirators (the "Runners"), who used this money pay bribes to 911 operators, hospital employees, and others (collectively, the "lead sources") for confidential motor vehicle accident victim information.  The Runners then used this information to contact automobile accident victims, lie to them, and induce them to seek medical treatment at, among other places, the No-Fault Clinics.

4.     The Pierre Conspirators laundered the proceeds of the fraud through phony lending agreements, check-cashing entities, and shell companies. All told, the Pierre Conspirators billed insurance companies for more than $70 million in fraudulent medical treatments.

5.     As detailed below, certain of the Pierre Conspirators also engaged in tax evasion by utilizing an accountant that filed false tax returns on their behalf that reduced their taxable net income by hiding income in shell companies, underreporting income, and deducting false personal expenses as business expenses, among other things.

**Overview of No-Fault Motor Vehicle Insurance**

6.     At all times relevant to this Indictment, New York State Law required every vehicle registered in New York State to have no-fault automobile insurance, which enabled the driver and passengers of a vehicle registered and insured in New York State to obtain benefits of up to $50,000 per person for injuries sustained in an automobile accident, regardless of fault (the "No-Fault Law").  The No-Fault Law required payments for medical treatments to be made promptly, thereby obviating the need for vehicle occupants (the "patients") to file personal

injury lawsuits in order to be reimbursed for medical treatment.  Under the No-Fault Law, the

Patients could assign their right to reimbursement from an insurance company to others,

including, but not limited to, medical clinics that provided medical services to treat their injuries.

If such an assignment were made, the medical clinics, or their agents, would bill the insurance

company directly for services rendered and received payments directly from the insurance

company.  Typically, insurance companies compensate the medical practitioners at a fixed rate

for various medical services performed on these accident victims.  In order to obtain damages

separate and apart from the $50,000 allowed by the No-Fault Law, a Patient could file a personal

injury claim and/or lawsuit in order to show that the occupant sustained a "serious injury," as

defined by New York State Law, as a result of the accident.

       7.     At all times relevant to this Indictment, pursuant to New York State Law,

all medical clinics in New York State must have been incorporated, owned, operated, and/or

controlled by a licensed medical practitioner in order to be eligible for reimbursement under the

No-Fault Law. Insurance companies would deny all billings for medical treatments from a

medical clinic that was not actually owned, operated and controlled by a licensed medical

practitioner.

### Entities and Individuals Involved in the Scheme

       8.     **The Pierre Brothers**: BRADLEY PIERRE, the defendant, is the leader

and organizer of the Pierre Conspirators and the No-Fault Scheme. BRADLEY PIERRE – who

is not a licensed medical practitioner – owned, operated, and controlled the No-Fault Clinics that

engaged in the fraudulent billing for unnecessary and excessive medical treatment under the No-

Fault Law, and falsified findings of clinical injury in MRIs. BRADLEY PIERRE engaged in

multiple types of money laundering to conceal the proceeds of the No-Fault Scheme and financed a widespread bribery and kickback scheme to bring patients into the Clinics.

9.      JEAN PIERRE, the defendant, is BRADLEY PIERRE's brother.  JEAN PIERRE participated in the scheme by managing one of the No-Fault Clinics for BRADLEY PIERRE, the defendant.  In addition, JEAN PIERRE opened two "shell company" businesses connected to the scheme, JAP Multi Services ("JAP"), and Tort Cash.  As described further below, the Pierre brothers used JEAN PIERRE's ownership and involvement in these shell companies to, among other things, pay bribes to runners (who funneled the money to 911 operators, hospital employees, and the like), hide income, deduct false tax business expenses, inflate deductibles, and perpetrate a tax avoidance scheme against the Internal Revenue Service ("IRS").

10.      **The No-Fault Physicians**: The No-Fault Physicians are licensed medical physicians who gave control of their medical practices to BRADLEY PIERRE, the defendant, engaged in unnecessary and excessive medical treatments, and falsified clinical findings of injury in reports. The No-Fault Physicians fall into two groups.

a.      **The No-Fault Doctors**: The No-Fault Doctors incorporated the medical clinics that conducted initial evaluations of Patients and prescribed specialized care such as prescription pharmaceuticals, durable medical equipment, and MRIs (the No-Fault Clinics). The No-Fault Doctors include, among others, MARVIN MOY, the defendant, who incorporated the medical clinic Rutland as part of the scheme. MOY conducted unnecessary and excessive medical treatments under the No-Fault Law.

b.      **The Specialists**: The Specialists are licensed physicians who conducted the specialized medical care prescribed by the No-Fault Clinics, such as MRIs and X-

rays. The Specialists include, among others, WILLIAM WEINER, the defendant, who is a licensed doctor of osteopathy who incorporated the MRI facility Nexray Medical Imaging PC ("Nexray" or the "MRI Facility") as part of the scheme. WEINER falsified clinical findings of injury in MRI reports that were submitted to insurance companies.

11.     **The Personal Injury Attorneys**: The Personal Injury Attorneys are licensed attorneys who file personal injury lawsuits on behalf of Patients who sustained "serious injury" because of an accident. The Personal Injury Attorneys typically are not paid upfront by Patients but instead receive a percentage of any settlement or judgment. ARTHUR BOGORAZ, the defendant, is a paralegal and manager at a New York-based personal injury law firm ("Law Firm-1"). BOGORAZ is not an attorney. However, BOGORAZ engaged in a *quid pro quo* whereby BRADLEY PIERRE, the defendant, sent patients from the No-Fault Clinics to Law Firm-1 for legal representation in return for BOGORAZ referring clients to the No-Fault Clinics for medical treatment. In addition, BOGORAZ and BRADLEY PIERRE agreed to jointly pay bribes for patient and client referrals to the No-Fault Clinics and Law Firm-1.

12.     **The Runners**: The Runners pay bribes to employees or agents of hospitals, medical service providers, police officers and 911 operators employed by the New York Police Department ("NYPD"), and other entities (collectively, the "lead sources"). These lead sources in turn unlawfully disclosed the protected, confidential information of tens of thousands of motor vehicle accident victims in New York, New Jersey, and elsewhere.  After obtaining the confidential information of motor vehicle accident victims – which often included victims' names, contact information, and medical information — the Runners contacted the victims and made false representations to steer the victims to receive medical treatment or legal

representation at the No-Fault Clinics, Law Firm-1, and other medical clinics and attorney's offices.

### The Means and Methods of the No-Fault Scheme

13.     The co-conspirators used various means and methods to carry out the scheme.

### The Fraudulent No-Fault Clinics

14.     In order to take advantage of the patient-friendly provisions of the No-Fault Law, BRADLEY PIERRE, the defendant, recruited medical practitioners to open at least five No-Fault Clinics between in or about 2008 up to and including 2021. These Clinics fell into two groups: the No-Fault Clinics that conduct initial evaluations of Patients and prescribed specialized care, and the MRI Facility that provides medical imaging services.

15.     The scheme began with the No-Fault Clinics. While purporting to be legitimate medical care clinics specializing in treating patients, the No-Fault Clinics were not owned, operated, and controlled by licensed medical practitioners as is required by law. Instead, BRADLEY PIERRE, the defendant, was the actual owner, operator, and controller of Clinics. For instance, BRADLEY PIERRE received the majority of the Clinics' proceeds and decided how much the nominal owners would be paid; possessed the checkbooks and pre-signed checks from the Clinic's bank accounts; controlled the debit and credit cards for the Clinics; controlled hiring and firing of the Clinic's employees; invested the initial funds to establish the Clinics; identified the locations for the Clinics; negotiated the rent for the Clinics' leases; and chose the attorneys that would represent the Clinics in arbitration, litigation, and sworn depositions before insurance companies.

16.     BRADLEY PIERRE, the defendant, further arranged for the No-Fault Clinics to use MARVIN MOY, the defendant, to conduct painful and medically unnecessary electrodiagnostic testing on Patients, including electromyography ("EMG") and nerve conduction velocity ("NCV") testing.

17.     BRADLEY PIERRE, the defendant, profited every step of the way. In addition to receiving the majority of the proceeds of the No-Fault Clinics, BRADLEY PIERRE required the No-Fault Clinics to refer Patients to a network of pharmacies, attorneys, and medical specialists handpicked by PIERRE for one reason – they paid BRADLEY PIERRE millions of dollars for illegal referrals.

18.     Although BRADLEY PIERRE, the defendant, had a network of attorneys who paid kickbacks for patients – including Law Firm-1 – BRADLEY PIERRE principally steered patients to a personal injury law firm owned by a family member ("Law Firm-2"). BRADLEY PIERRE conducted much of the No-Fault Scheme from his physical office located in Law Firm-2, where among other things he monitored the No-Fault Clinics using closed circuit TV cameras, communicated with co-conspirators using the Firm's email domain, and met with the No-Fault Doctors in Law Firm-2's offices. BRADLEY PIERRE further openly communicated with Law Firm-2 about the scheme, for instance telling his family member, "I'm going to make sure you ALWAYS make your quota." Law Firm-2 paid BRADLEY PIERRE over $4 million in connection with the No-Fault Scheme – typically from Law Firm-2's Interest on Lawyers Trust Accounts ("IOLA Accounts") – while maintaining no documentation or ledgers identifying the purpose of these payments.

19.     BRADLEY PIERRE, the defendant, further profited by steering hundreds of Patients from the Clinics to Nexray, the MRI Facility under BRADLEY PIERRE's control.

Like the Clinics, Nexray purported to be operated and controlled by a licensed physician –

WILLIAM WEINER, the defendant. In practice, however, BRADLEY PIERRE received the

majority of Nexray's proceeds; controlled Nexray's bank accounts; influenced the hiring and

firing of Nexray's employees; identified the locations for Nexray's facilities; negotiated the rent

for Nexray's leases; and chose the attorneys that would represent Nexray in arbitration,

litigation, and sworn depositions before insurance companies. BRADLEY PIERRE further

arranged for a network of no-fault doctors and attorneys to refer patients to Nexray for medical

care – oftentimes through bribery – in addition to the No-Fault Clinics under his control.

      20.     In order to boost these referrals, BRADLEY PIERRE and WILLIAM

WEINER, the defendants, agreed to falsify clinical findings of injuries on MRI reports and

pressure radiologists working for Nexray to exaggerate findings of injuries in their own reports.

These false clinical findings, in turn, allowed referring physicians and attorneys to bill for

additional benefits under the No-Fault Law and obtain larger legal settlements and judgments.

      21.     BRADLEY PIERRE, the defendant, further arranged for the No-Fault

Physicians, including MARVIN MOY and WILLIAM WEINER, the defendants, to lie under

oath to insurance companies to conceal the healthcare fraud scheme. Under the No-Fault Law,

insurance carriers have the right to subject medical providers to Examinations under Oath

("EUOs") when they suspect that providers have submitted fraudulent claims. During the

process, the physician is placed under oath and asked questions relevant to the claim at hand,

including whether the medical practice is under the control of nonphysicians. BRADLEY

PIERRE and the No-Fault Physicians were aware that insurance companies would deny

reimbursement for the No-Fault Clinics if the No-Fault Physicians testified truthfully about the

medical necessity of treatments and BRADLEY PIERRE's control of the Clinics. PIERRE

accordingly arranged for the No-Fault Physicians to falsely state under oath, among other things, that BRADLEY PIERRE was solely a lender for the No-Fault Clinics and BRADLEY PIERRE played no role in referring patients to the No-Fault Clinics.

### Money Laundering

22.     The Pierre Conspirators laundered the proceeds of the No-Fault Scheme described above to conceal the operation.

23.     In order to conceal the payment of bribes to the Runners, BRADLEY PIERRE, the defendant, arranged for Runners to set up shell companies, which PIERRE then paid using one of the companies he controlled, Marketing 4 You ("M4Y").

24.     In addition, in order to conceal the above-described healthcare fraud scheme, BRADLEY PIERRE, the defendant, caused the No-Fault Clinics to transfer the proceeds from the scheme to Medical Reimbursement Consultants ("MRC"), a company he controlled. The payments were falsely described as loan repayments.

25.     In order to conceal his receipt of the No-Fault Scheme proceeds, BRADLEY PIERRE, the defendant, caused the No-Fault Clinics to transfer the proceeds from the scheme to MRC, a company he controlled. The payments were falsely described as loan repayments.

26.     As part of these phony financing arrangements, BRADLEY PIERRE, the defendant, purportedly gave loans to MARVIN MOY and WILLIAM WEINER, the defendants, in return for a percentage of any money later paid by insurance companies. In reality, MOY and WEINER directly paid BRADLEY PIERRE in excess of at least $2.4 million of what BRADLEY PIERRE was entitled to receive under the phony agreements.

27.     BRADLEY PIERRE, the defendant, further concealed payments from the No-Fault Clinics to MRC by using check cashers, and arranging for funds to be paid to shell companies under the control of JEAN PIERRE, the defendant.

### Conspiracy to Defraud the United States

28.     In addition, from at least in or about 2016, up to and including in or about 2020, BRADLEY PIERRE, JEAN PIERRE, and WILLIAM WEINER, the defendants, conspired to defraud the United States by filing false corporate tax returns. As part of the tax scheme, BRADLEY PIERRE, JEAN PIERRE, and WEINER agreed to falsely overstate business expenses and falsely underreport profits associated with the health care fraud and money laundering schemes to the IRS. BRADLEY PIERRE, JEAN PIERRE, and WEINER facilitated the scheme through a common accountant shared by all three men, "CC-1," who was a knowing and willful participant in the conspiracy. The PIERRE brothers and Weiner, among other things, facilitated the scheme using bank accounts opened and located in the Southern District of New York. In total, BRADLEY PIERRE, JEAN PIERRE, and WEINER conspired to overstate expenses or underreport profits of at least $4 million. For example:

a.     **BRADLEY PIERRE**: BRADLEY PIERRE, the defendant, utilized his companies, MRC and M4Y, to enter into phony financing arrangements with MARVIN MOY and WILLIAM WEINER, the defendants.  In order to "justify" this so-called funding relationship, from at least in or about 2016, up to and including in or about 2020, BRADLEY PIERRE, MOY, and WEINER conspired to falsely over-report the No-Fault Clinics' expenses on tax returns so that the Clinics would look as if they suffered from insufficient cash flow to operate. This agreement to falsely over-report expenses further served to decrease the Clinics' tax payments due to the IRS.

b.      As part of the scheme, BRADLEY PIERRE, the defendant, provided CC-1 books and records that did not include all of the income his businesses generated, and that mischaracterized loans to third parties as personal expenses and payments exchanged for cash, among other things, as deductible business expenses.

c.      **JEAN PIERRE**:  As part of the tax scheme, JEAN PIERRE, the defendant, served at various times as an employee of Rutland and MRC.  Initially, JEAN PIERRE participated in the tax scheme by preparing Rutland's books and records. In or about 2016, JEAN PIERRE switched from being an employee of Rutland to being an employee of MRC, another of the businesses controlled by BRADLEY PIERRE, the defendant.

d.      JEAN PIERRE, the defendant, opened two businesses in connection with the healthcare fraud, bribery, and tax schemes: JAP and Tort Cash, that he wholly owned and controlled. JAP and Tort Cash were shell companies. JEAN PIERRE used JAP to receive funds from Rutland while he was an employee of Rutland and managed one of its facilities. Furthermore, JEAN PIERRE used JAP and Tort Cash to receive funds from MRC when he was an employee of MRC. By receiving funds through JAP, rather than receiving all of his income as a regular W-2 employee, JEAN PIERRE attempted to underreport to the IRS the income he made from the scheme by deducting personal expenses as business expenses.

e.      JEAN PIERRE, the defendant, further agreed that Tort Cash would file blank U.S. Income Tax Returns for an S Corporation, Forms 1120S, for tax years 2017 and 2018 despite Tort Cash having received income from MRC in those years.  JEAN PIERRE approved the blank returns, even though he knew they were materially false. JEAN PIERRE further caused CC-1 to file a materially false tax return for Tort Cash for tax year 2019 that contained false business expenses.

f.     **WILLIAM WEINER**:  WEINER conspired to falsely over-report Nexray's expenses on U.S. Income Tax Returns for S Corporation, Forms 1120S, so that the facility would look as if it suffered from insufficient cash flow to operate. He did this by signing returns prepared by CC-1, that he knew included over-inflated management fees that were directed by BRADLEY PIERRE, the defendant.  This agreement to falsely over-report expenses further served to decrease Nexray's taxable income, which ultimately decreased WEINER's personal taxable income as well. Additionally, WEINER conspired to deduct personal expenses as business expenses on Nexray's Forms 1120S for tax years 2017 through 2019, further reducing Nexray's taxable income.  He did this by knowingly directing CC-1 to improperly deduct these expenses on his tax returns.   In addition, WILLIAM WEINER, the defendant, caused CC-1 to falsely declare on tax returns that certain funds WEINER received from Nexray were shareholder distributions and not taxable income.

g.     Nexray's overinflated management fees – directed by BRADLEY PIERRE, the defendant – and the personal expenses falsely deducted by WILLIAM WEINER, the defendant, on Nexray's tax returns included:

| False Deductions | | | | |
|---|---|---|---|---|
| Tax Year | Overstated "Management Fees" | Golf Course Payments | Car Payments | Payments Toward Personal Credit Card | Total |
| 2017 | $127,873.37 | $23,642.90 | $13,076.32 | $11,529.79 | $176,122.38 |
| 2018 | $249,675.28 | $53,065.26 | $13,560 | $6,808.53 | $323,109.07 |
| 2019 | | $36,282.63 | $11,665.54 | $828.56 | $48,776.73 |
| Total | $377,548.65 | $112,990.79 | $38,301.86 | $19,166.88 | $548,008.18 |

## Bribery

29.    The No-Fault Scheme also depended on the No-Fault Clinics receiving a steady supply of motor vehicle accident victims.

30.     As part of the scheme, BRADLEY PIERRE and ARTHUR BOGORAZ, the defendants, arranged for the Runners to bribe employees or agents of public and private institutions, including hospitals and the NYPD, to unlawfully disclose the protected, confidential information of tens of thousands of motor vehicle accident victims in New York, New Jersey, and elsewhere.

31.     After obtaining the confidential information of motor vehicle accident victims, the Runners contacted the victims and made false representations in order to steer victims to receive medical treatment from the No-Fault Clinics, and legal representation from Law Firm-1 and Law Firm-2.

32.     BRADLEY PIERRE, the defendant, paid the Runners approximately $1,500 to $3,000 per successful "referral" to a No-Fault Clinic, $700 to $1,500 per successful "referral" to Law Firm-2, and $150 per successful "referral" to Nexray. BRADLEY PIERRE arranged for JEAN PIERRE, the defendant, to deliver money to the Runners.

33.     ARTHUR BOGORAZ, the defendant, likewise paid the Runners $700 to $1,500 per successful referral to Law Firm-1. The Runners then took a portion of the kickbacks for themselves and funneled the rest of the money to the lead sources that provided the confidential information.

**Statutory Allegation**

34.     From at least in or about 2008, up to and including in or about 2021, in the Southern District of New York and elsewhere, BRADLEY PIERRE, MARVIN MOY, and WILLIAM WEINER, the defendants, together with others known and unknown, did willfully and knowingly combine, conspire, confederate, and agree together and with each other to commit health care fraud, in violation of Title 18, United States Code, Section 1347.

35.     It was a part and an object of the conspiracy that BRADLEY PIERRE,

MARVIN MOY, and WILLIAM WEINER, the defendants, and others known and unknown,

willfully and knowingly, would and did execute and attempt to execute a scheme and artifice to

defraud a health care benefit program, and to obtain, by means of false and fraudulent pretenses,

representations, and promises, money and property owned by, and under the custody and control

of a health care benefit program in connection with the delivery of and payment for health care

benefits, items and services.

(Title 18, United States Code, Section 1349.)

## COUNT TWO
### (Conspiracy to Commit Money Laundering)

The Grand Jury further Charges:

36.     The allegations set forth in paragraphs 1 through 33 of this Indictment are

repeated and realleged as if fully set forth herein.

37.     From at least in or about 2008, up to and including in or about 2021, in the

Southern District of New York and elsewhere, BRADLEY PIERRE, MARVIN MOY, and

WILLIAM WEINER, the defendants, together with others known and unknown, knowingly

combined, conspired, confederated, and agreed together and with each other to commit money

laundering, in violation of Title 18, United States Code, Section 1956(a)(1)(B)(i).

38.     It was a part and object of the conspiracy that BRADLEY PIERRE,

MARVIN MOY, and WILLIAM WEINER, and others known and unknown, knowing that the

property involved in certain financial transactions represented the proceeds of some form of

unlawful activity, would and did conduct and attempt to conduct such financial transactions

which in fact involved the proceeds of specified unlawful activity as defined in 18 U.S.C. §

1956(c)(7), to wit, the proceeds of healthcare fraud, in violation of 18 U.S.C. § 1347, and the

proceeds of bribery, in violation of New York Penal Law §§ 180.05, 200.00, and 200.10 and

New Jersey Revised Statutes § 2C:27-2, knowing that the transactions were designed in whole or

in part to conceal and disguise the nature, location, source, ownership, and control of the

proceeds of the specified unlawful activity, in violation of Title 18, United States Code, Section

1956(a)(1)(B)(i).

(Title 18, United States Code, Section 1956(h).)

### COUNT THREE
### (Conspiracy to Commit Travel Act Bribery)

The Grand Jury further Charges:

39.     The allegations set forth in paragraphs 1 through 33 of this Indictment are

repeated and realleged as if fully set forth herein.

40.     From at least in or about 2015, up to and including in or about November

2019, in the Southern District of New York and elsewhere, BRADLEY PIERRE and ARTHUR

BOGORAZ, the defendants, together with others known and unknown, did willfully and

knowingly combine, conspire, confederate, and agree together and with each other to commit an

offense against the United States, to wit, a violation of the Travel Act, in violation of Title 18,

United States Code, Section 1952.

41.     It was a part and an object of the conspiracy that BRADLEY PIERRE and

ARTHUR BOGORAZ, the defendants, and others known and unknown, knowingly did travel in

interstate and foreign commerce and did use the mail and a facility in interstate and foreign

commerce, with the intent to promote, manage, establish, carry on, and facilitate the promotion,

management, establishment, and carrying on of an unlawful activity, to wit, a bribery scheme in

violation of New York Penal Law §§ 180.05, 200.00, and 200.10 and New Jersey Revised

Statutes § 2C:27-2, among others, whereby employees or agents of hospitals, the NYPD,

emergency medical services, and other entities disclosed protected, confidential information of tens of thousands of motor vehicle accident victims in New York, New Jersey, and elsewhere in exchange for payment, and thereafter performed and attempted to perform acts to promote, manage, establish and carry on, and to facilitate the promotion, management, and carrying on of such unlawful activity.

## Overt Acts

42.     In furtherance of said conspiracy and to effect its illegal object, the following overt acts, among others, were committed in the Southern District of New York and elsewhere:

a.      On or about August 31, 2017, BRADLEY PIERRE the defendant, had the following conversation over an encrypted messaging application with an individual ("CC-2"):

| Sender | Message |
|--------|---------|
| CC-2 | Got her 🔒<br>Start tonight<br>I guess some didn't leave names 🗿♂ |
| PIERRE | I sent them out already.<br>It's going to take time to perfect. |
| CC-2 | Rp = police car involved<br>Mc/fc<br>Male caller /female caller |
| PIERRE | I know.. |
| CC-2 | Ok<br>I feel like it should be more |
| PIERRE | Nah--chill, let me get you the feedback. Jay's shit wasn't a success overnight!!!<br>Tell her to get at least the last or first.. |
| CC-2 | She said some ppl don't wanna give it<br>She don't take calls<br>She dispatch<br>But the info is fresh right? |
| PIERRE | Seems that way. |

b.    On or about August 2, 2019, PIERRE and BOGORAZ had the

following conversation over an encrypted messaging application about a Runner ("Runner-1"):

| Sender | Message |
|--------|---------|
| PIERRE | I dropped off the intel. Me and Aurthor B have a deal that we worked out. I'll tell you the details when I meet with you<br>He knows<br>10K monthly marketing expense |
| BOGORAZ | That works<br>We just need to figure out a way to make sure he doesn't steal |
| PIERRE | Yo—I ave [sic] him by the balls. I pull this intel. We'll do it ourselves. I also have someone else who's a better business man then [sic] him |

(Title 18, United States Code, Section 371.)

## COUNT FOUR
### (Aggravated Identity Theft)

The Grand Jury further Charges:

43.    The allegations set forth in paragraphs 1 through 33 of this Indictment are

repeated and realleged as if fully set forth herein.

44.    From at least in or about 2015 up to and including November 2019, in the

Southern District of New York and elsewhere, BRADLEY PIERRE the defendant, together with

others known and unknown, knowingly did transfer, possess, and use, without lawful authority, a

means of identification of another person, during and in relation to a felony violation enumerated

in Title 18, United States Code, Section 1028A(c), to wit, PIERRE, during and in relation to the

healthcare fraud conspiracy charged in Count One, caused Runners to bribe 911 operators,

hospital employees, and others for the names and phone numbers motor vehicle accident victims

and use these unlawfully acquired means of identification to induce victims to seek medical

treatment from the No-Fault Clinics.

(Title 18, United States Code, Section 1028A.)

## COUNT FIVE
### (Conspiracy to Defraud the United States)

45.     The allegations set forth in paragraphs 1 through 33 of this Indictment are repeated and realleged as if fully set forth herein.

46.     From at least in or about 2016 through at least in or about 2020, in the Southern District of New York and elsewhere, BRADLEY PIERRE, JEAN PIERRE, and WILLIAM WEINER, the defendants, together with others known and unknown, willfully and knowingly did conspire, combine, confederate, and agree together and with each other to defraud the United States of America and an agency thereof, to wit, the IRS.

47.     It was a part and an object of the conspiracy that BRADLEY PIERRE, JEAN PIERRE, and WILLIAM WEINER, the defendants, together with others known and unknown, willfully and knowingly would and did defraud the United States of America and the IRS for the purpose of impeding, impairing, obstructing, and defeating the lawful governmental functions of the IRS in the ascertainment, computation, assessment, and collection of revenue, to wit, federal income taxes.

### Overt Acts

48.     In furtherance of the conspiracy and to effect the illegal objects thereof, BRADLEY PIERRE, JEAN PIERRE, and WILLIAM WEINER, the defendants, and others known and unknown, committed the following overt acts, among others, in the Southern District of New York and elsewhere:

a.     For tax years 2016 through 2019, BRADLEY PIERRE, the defendant, filed U.S. Individual Income Tax Returns, Forms 1040, as well as U.S. Tax Returns for an S Corporation, Forms 1120S, for MRC and M4Y that were materially false.

b.      For tax years 2016 through 2019, JEAN PIERRE filed U.S. Individual Income Tax Returns, Forms 1040, as well as U.S. Tax Returns for an S Corporation, Forms 1120S, for JAP and Tort Cash that were materially false.

c.      For tax years 2017 through 2019, WILLIAM WEINER, the defendant, filed U.S. Tax Returns for an S Corporation, Forms 1120S, for Nexray and U.S. Individual Income Tax Returns, Forms 1040, for himself and his wife that were materially false.

(Title 18, United States Code, Section 371.)

### Forfeiture Allegation as to Count One
### (Conspiracy to Commit Healthcare Fraud)

49.     As a result of committing one or more of the offense charged in Count One of this Indictment, BRADLEY PIERRE, MARVIN MOY, and WILLIAM WEINER, the defendants, pursuant to Title 18, United States Code, Section 982(a)(7), shall forfeit United States currency, in that such a sum represents any and all property, real and personal, that constitutes or is derived, directly and indirectly, from gross proceeds traceable to the commission of the offense charged in Count One.

### Forfeiture Allegation As to Count Two
### (Conspiracy to Commit Money Laundering)

50.     As a result of committing one or more of the money laundering offense charged in Count Two of this Indictment, BRADLEY PIERRE, MARVIN MOY, and WILLIAM WEINER, the defendants, pursuant to Title 18, United States Code, Section 982(a)(1), shall forfeit United States currency, in that such a sum represents any and all property, real and personal, involved in the offense charged in Two, and any property traceable to such property.

### Forfeiture Allegation As to Count Three
### (Conspiracy to Commit Travel Act Bribery)

51.     As a result of committing the offense alleged in Count Three of this

Indictment, BRADLEY PIERRE and ARTHUR BOGORAZ, the defendants, shall forfeit to the

United States, pursuant to Title 18, United States Code, Section 982(a)(1), any and all property,

real and personal, constituting or derived from proceeds obtained, directly or indirectly, as a

result of said offense; and any and all property, real or personal, that was used or intended to be

used to commit or facilitate the commission of said offense, including but not limited to a sum of

money in United States currency representing the amount of proceeds traceable to the

commission of said offense that the defendant personally obtained.

### Substitute Asset Provision

52.     If any of the above-described forfeitable property, as a result of any act or

omission of the defendant:

> a. cannot be located upon the exercise of due diligence;
>
> b. has been transferred or sold to, or deposited with, a third party;
>
> c. has been placed beyond the jurisdiction of the court;
>
> d. has been substantially diminished in value; or
>
> e. has been commingled with other property which cannot be subdivided

without difficulty;

it is the intention of the United States, pursuant to Title 18, United States Code, Section

982(b)(1), and Title 21, United States Code, Section 853(p), to seek forfeiture of any other

property of the said defendant up to the value of the forfeitable property.

(Title 18, United States Code, Section 982, and
Title 21, United States Code, Section 853.)

_____
FOREPERSON
6/24/23

_____
DAMIAN WILLIAMS
United States Attorney