UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>-against-<br><br>BRADLEY PIERRE,<br>WILLIAM WEINER,<br>ARTHUR BOGORAZ, and<br>JEAN PIERRE<br><br>     Defendants. | **MEMORANDUM<br>OPINION & ORDER**<br><br>22 Cr. 19 (PGG) |
| UNITED STATES OF AMERICA,<br><br>-against-<br><br>ALEXANDER GULKAROV,<br>ROMAN ISRAILOV,<br>PETER KHAIMOV,<br>ROBERT WISNICKI, and<br>ALBERT ARONOV,<br><br>     Defendants. | 22 Cr. 20 (PGG) |

PAUL G. GARDEPHE, U.S.D.J.:

    The Indictments charge Defendants with, inter alia, conspiring to commit

healthcare fraud in violation of 18 U.S.C. §§ 1347 and 1349.  Defendants have moved to dismiss

the healthcare fraud conspiracy counts arguing that – to the extent those counts are predicated on

allegations that Defendants falsely represented to insurers that their medical clinics were owned,

operated, and controlled by physicians in accordance with New York law – they fail to allege a

crime.  According to Defendants, this alleged conduct does not violate the federal healthcare

fraud statutes.

    For the reasons stated below, Defendants' motions to dismiss will be denied.

## BACKGROUND[1]

### I.     THE INDICTMENTS

The <u>Pierre</u> Indictment alleges that

[u]nder the [New York] No-Fault [Insurance] Law, . . . Patients could assign their right to reimbursement from an insurance company to others, including, but not limited to, medical clinics that provided medical services to treat their injuries.  If such an assignment were made, the medical clinics, or their agents, would bill the insurance company directly for services rendered and would receive payments directly from the insurance company. . . .

At all times relevant to this Indictment, pursuant to New York State Law, all medical clinics in New York State must have been incorporated, owned, operated, and/or controlled by a licensed medical practitioner in order to be eligible for reimbursement under the No-Fault Law.  Insurance companies would deny all billings for medical treatments from a medical clinic that was not actually owned, operated, and controlled by a licensed medical practitioner. . . .

While purporting to be legitimate medical care clinics specializing in treating patients, [Defendant Bradley Pierre's] No-Fault Clinics were not owned, operated, and controlled by licensed medical practitioners as is required by law.  Instead, [non-physician] Bradley Pierre, the defendant, was the actual owner, operator, and controller of [the] Clinics. . . .

[Bradley] Pierre accordingly arranged for the No-Fault Physicians to falsely state under oath [in depositions conducted by insurance companies], among other things, that Pierre was solely a lender for the No-Fault Facilities and Pierre played no role in referring patients to the No-Fault Facilities.

(<u>Pierre</u> Indictment (22 Cr. 19, Dkt. No. 1) ¶¶ 5-6, 13, 19)[2]  The <u>Gulkarov</u> Indictment contains nearly identical allegations.  (<u>Gulkarov</u> Indictment (22 Cr. 20, Dkt. No. 1) ¶¶ 6-7, 15, 20)

In language largely tracking the healthcare fraud statute, Count One of each Indictment alleges that

---

[1]  The page numbers of documents referenced in this Opinion correspond to the page numbers designated by this District's Electronic Case Files ("ECF") system.

[2]  On June 26, 2023, while Defendants' motions to dismiss were pending, the Government obtained a superseding indictment in <u>Pierre</u>.  (22 Cr. 19, Dkt. No. 191)  The superseding indictment makes no change to the health care fraud conspiracy charge that is the subject of this opinion.

the defendants, together with others known and unknown, did willfully and knowingly combine, conspire, confederate, and agree together and with each other to commit health care fraud, in violation of Title 18 United States Code, Section 1347 . . . .  It was a part and an object of the conspiracy that . . . the defendants, and others known and unknown, willfully and knowingly, would and did execute and attempt to execute a scheme and artifice to defraud a health care benefit program, and to obtain, by means of false and fraudulent pretenses, representations, and promises, money and property owned by, and under the custody and control of a health care benefit program in connection with the delivery of and payment for health care benefits, items and services.

(Pierre Indictment (22 Cr. 19, Dkt. No. 1) ¶¶ 27-28; Gulkarov Indictment (22 Cr. 20, Dkt. No. 1) ¶¶ 40-41)

## II.    PROCEDURAL HISTORY

The Indictments were filed on January 11, 2022.  (22 Cr. 19, Dkt. No. 1; 22 Cr. 20, Dkt. No. 1)

On October 18, 2022, Defendants moved to dismiss the healthcare fraud conspiracy charges insofar as they rely on Defendants' alleged misrepresentations about the ownership and control of medical clinics.  (22 Cr. 19, Dkt. No. 102; 22 Cr. 20, Dkt. No. 144)[3]

This Court heard oral argument in Gulkarov on April 25, 2023 (Feb. 25, 2023 Tr. (22 Cr. 20, Dkt. No. 221)), and in Pierre on April 28, 2023.  (Apr. 28, 2023 Tr. (22 Cr. 19, Dkt. No. 162))  The Court has also reviewed the parties' post-hearing briefing and submissions.  (22 Cr. 19, Dkt. Nos. 170-71, 176; 22 Cr. 20, Dkt. Nos. 229-30, 234)

---

[3] As to this issue, the briefing concerning the motions to dismiss is essentially identical. Accordingly, for simplicity, the Court cites to Defendant Gulkarov's moving brief.  (22 Cr. 20 (Dkt. No. 146))  Where a document has been filed in both cases, the Court cites the version on the Gulkarov docket.

## DISCUSSION

I.   ## LEGAL STANDARDS

A.   ### Motion to Dismiss an Indictment

Rule 12 of the Federal Rules of Criminal Procedure provides that defendants may "raise by pretrial motion . . . a defect in the indictment or information, including[] . . . [a] failure to state an offense." Fed. R. Crim. P. 12(b)(3)(B)(v). "The dismissal of an indictment is an 'extraordinary remedy,'" however; it is therefore "reserved only for extremely limited circumstances implicating fundamental rights." United States v. De La Pava, 268 F.3d 157, 165 (2d Cir. 2001) (citing United States v. Nai Fook Li, 206 F.3d 56, 62 (1st Cir. 2000) (en banc)). Indeed, dismissal of charges is an "extreme sanction," United States v. Fields, 592 F.2d 638, 647 (2d Cir. 1978), that has been upheld "only in very limited and extreme circumstances," and should be "reserved for the truly extreme cases," "especially where serious criminal conduct is involved." United States v. Broward, 594 F.2d 345, 351 (2d Cir. 1979). In ruling on a motion to dismiss an indictment, a court must assume that the indictment's allegations are true. Boyce Motor Lines v. United States, 342 U.S. 337, 343 n. 16 (1952); New York v. Tanella, 374 F.3d 141, 148 (2d Cir. 2004).

B.   ### Healthcare Fraud

18 U.S.C. § 1347 provides:

(a) Whoever knowingly and willfully executes, or attempts to execute, a scheme or artifice –

(1) to defraud any health care benefit program; or

(2) to obtain, by means of false or fraudulent pretenses, representations, or promises, any of the money or property owned by, or under the custody or control of, any health care benefit program,

in connection with the delivery of or payment for health care benefits, items, or services [commits a crime].

18 U.S.C. § 1347(a).

   "Because of the similarity in the wording of the bank, [mail, wire], and health care fraud statutes, courts rely upon the more ample case law construing the former . . . statutes when interpreting 18 U.S.C. § 1347."  United States v. Mermelstein, 487 F. Supp. 2d 242, 253 n.2 (E.D.N.Y. 2007) (collecting cases).

## II. NEW YORK NO-FAULT INSURANCE

### A. Overview

In 1973, the [New York] Legislature enacted the Comprehensive Automobile Insurance Reparations Act, which supplanted common-law tort actions for most victims of automobile accidents with a system of no-fault insurance.  Under the no-fault system, payments of benefits "shall be made as the loss is incurred." N.Y. Ins. Law 5106(a).  The primary aims of this new system were to ensure prompt compensation for losses incurred by accident victims without regard to fault or negligence, to reduce the burden on the courts, and to provide substantial premium savings to New York motorists.

Med. Society of State of New York v. Serio, 100 N.Y.2d 854, 860 (2003) (further citations omitted).

   Since the Act's passage, "the [New York] Superintendent [of Insurance] has promulgated regulations implementing the No-Fault Law," including Regulation 68, which took effect on April 4, 2002.  Id. at 860; see id. at 862 & n.2.  Codified at 11 N.Y.C.R.R. § 65 et seq., Regulation 68 provides that

[e]very owner's policy of liability insurance issued in satisfaction of the minimum requirements of . . . article 51 of the Insurance Law . . . shall contain provisions providing minimum first-party benefits equal to those set out below in the mandatory personal injury protection endorsement. . . . An insurer shall provide the appropriate endorsement to be used with a policy.

11 N.Y.C.R.R. § 65-1.1(a)-(b).

   Regulation 68 includes the text of the "Mandatory Personal Injury Protection Endorsement":

**MANDATORY PERSONAL INJURY PROTECTION ENDORSEMENT**

**(New York)**

The Company agrees with the named insured, as follows:

**Section I**

Mandatory Personal Injury Protection

The company will pay first-party benefits to reimburse for basic economic loss sustained by an eligible injured person on account of personal injuries caused by an accident arising out of the use or operation of a motor vehicle or a motorcycle during the policy period and within the United States of America, its territories or possessions, or Canada.

First-party Benefits

First-party benefits, other than death benefits, are payments equal to basic economic loss, reduced by the following:

(a) 20 percent of the eligible injured person's loss of earnings from work to the extent that an eligible injured person's basic economic loss consists of such loss of earnings;

(b) amounts recovered or recoverable on account of personal injury to an eligible injured person under State or Federal laws providing social security disability or workers' compensation benefits, or disability benefits under article 9 of the New York Workers' Compensation Law;

(c) the amount of any applicable deductible, provided that such deductible shall apply to each accident, but only to the total of first-party benefits otherwise payable to the named insured and any relative as a result of that accident.

Basic Economic Loss

Basic economic loss shall consist of medical expense, work loss, other expense and, when death occurs, a death benefit as herein provided.  Except for such death benefit, basic economic loss shall not include any loss sustained on account of death.  Basic economic loss of each eligible injured person on account of any single accident shall not exceed $50,000, except that any death benefit hereunder shall be in addition thereto.

11 N.Y.C.R.R. § 65-1.1(d) (footnote omitted).  The above definition of "basic economic loss" in

Regulation 68 – including the "medical expense" component – corresponds to the term as used in

Section 5102(a) of the New York Insurance Law.

The two representative no-fault insurance policies that have been filed in the instant cases both include the "Mandatory Personal Injury Protection Endorsement" set forth above.  (2016 Geico Policy (22 Cr. 20, Dkt. No. 234-2) at 18-21; 2019 Geico Policy (22 Cr. 20, Dkt. No. 234-3) at 18-21)  Both policies state that "[a]ny terms of this policy in conflict with the statutes of New York are amended to conform to those statutes."  (2016 Geico Policy (22 Cr. 20, Dkt. No. 234-2) at 18; 2019 Geico Policy (22 Cr. 20, Dkt. No. 234-3) at 18)

Regulation 68 also sets out a procedure for a policy holder to assign his or her right to no-fault insurance benefits to a healthcare provider, who may then bill the insurer directly using a New York State required form:

> (a) An insurer shall pay benefits for any element of loss other than death benefits, directly to the applicant or, when appropriate, to the applicant's parent or legal guardian or to any person legally responsible for necessities, or, upon assignment by the applicant or any of the aforementioned persons, shall pay benefits directly to providers of health care services as covered under section 5102(a)(1) of the Insurance Law [defining medical expenses that are part of "basic economic loss"] . . . .

> (b) In order for a health care provider/hospital to receive direct payment from the insurer, the health care provider or hospital must submit to the insurer:

> > (1) a properly executed authorization to pay benefits as contained on NYS form NF-3, NF-4 or NF-5 or other claim form acceptable to the insurer. Execution of an authorization to pay benefits shall not constitute or operate as a transfer of all rights from the eligible injured person to the provider; or

> > (2) a properly executed assignment on:

> > > (i) the prescribed verification of treatment by attending physician or other provider of service form (NYS form NF-3) . . . .

11  N.Y.C.R.R. § 65-3.11(a)-(b).

B.     <u>Anti-Fraud Regulations</u>

Between 1992 and 2001, reports of suspected automobile insurance fraud
increased by 275%, the bulk of the increase occurring in no-fault insurance fraud.
Reports of no-fault fraud rose from 489 cases in 1992 to 9,191 in 2000, a rise of
more than 1700%.  No-fault fraud accounted for three quarters of the 16,902
reports of automobile-related fraud received by the Insurance Department's
Frauds Bureau in 2000, and more than 55% of the 22,247 reports involving all
types of insurance fraud.  In 1999, the Superintendent established a No-Fault Unit
within the Frauds Bureau to focus specifically on no-fault fraud and abuse.  By
one estimate, the combined effect of no-fault insurance fraud has been an increase
of over $100 per year in annual insurance premium costs for the average New
York motorist.

<u>Med. Society</u>, 100 N.Y.2d at 861.

The New York Superintendent of Insurance became particularly concerned with

"medical mills, [which] would . . . generate stacks of medical bills for each passenger, detailing

treatments and tests that were unnecessary or never performed."  <u>Id.</u>  "[I]n an effort to combat

this widespread abuse," <u>id.</u> at 862, Regulation 68 contains provisions aimed at "medical mills"

and their fraudulent practices.

In one such provision, Regulation 68 excludes from the definition of "basic

economic loss" any medical expense incurred at a medical practice that is owned or controlled

by non-physicians.  This provision effectively incorporates the New York Business Corporation

Law, which provides that "[a] professional service corporation may issue shares only to

individuals who are authorized by law to practice in this state a profession which such

corporation is authorized to practice and who are or have been engaged in the practice of such

profession in such corporation or a predecessor entity, or who will engage in the practice of such

profession in such corporation within thirty days of the date such shares are issued."  Moreover,

"[n]o individual may be a director or officer of a professional service corporation unless he is

authorized by law to practice in this state a profession which such corporation is authorized to

8

practice and is either a shareholder of such corporation or engaged in the practice of his profession in such corporation."  N.Y. Bus. Corp. Law §§ 1507(a), 1508(a).

"[M]edical professional corporations" are within the scope of these provisions of the Business Corporation Law, Fromcheck v. Brentwood Pain & Med. Servs., P.C., 254 A.D.2d 485, 486 (2d Dept. 1998), which reflect a longstanding New York policy against lay ownership of medical practices.  See Matter of Co-operative Law Corp., 198 N.Y. 479, 484 (1910); People v. Woodbury Dermatological Institute, 192 N.Y. 454 (1908).

Regulation 68, in turn, defines the "[m]easurement of no-fault benefits," including "[m]edical expenses" – which, as explained above, are part of "basic economic loss" under the New York Insurance Law, see N.Y. Ins. Law § 5102(a)(1) – in a manner consistent with the Business Corporation Law.  Pursuant to the definition of "medical expenses" in Regulation 68, "[a] provider of health care services is not eligible for reimbursement under section 5102(a)(1) of the Insurance Law if the provider fails to meet any applicable New York State or local licensing requirement necessary to perform such service in New York or meet any applicable licensing requirement necessary to perform such service in any other state in which such service is performed."  N.Y.C.R.R. § 65-3.16(a)(12).

In sum, medical expenses incurred at medical clinics that are owned or operated by non-physicians are not considered "medical expenses" or "basic economic loss" within the meaning of the New York Insurance Law, and are thus outside the scope of no-fault insurance policies.

The New York Superintendent of Insurance has explained that Regulation 68 excludes such claims from the legal definitions of "medical expenses" and "basic economic loss" because non-physician-owned and -operated clinics are associated with "medical mills":

> Medical mills are commonly "doc-in-a-box" clinics in which businessmen essentially pay for the use of physicians' licenses so that they can fraudulently incorporate as medical PCs, skirting State laws proscribing the corporate practice of medicine.
>
> . . . .
>
> An interpretation of Section 65-3.16(a)(12) that allows insurers in carefully circumscribed circumstances to inquire into whether a medical PC was fraudulently formed is consistent with one of the cardinal purposes underlying the Superintendent's promulgation of the revised Regulation 68. That regulation was intended to combat No-Fault fraud and abuse perpetrated largely by medical mills, which . . . often are fraudulently formed medical PCs. Such PCs use sophisticated structures to create an appearance of compliance, often "renting" physicians' licenses in order to obtain facially valid certificates of authority. . . .

Superintendent's <u>Amicus Curiae</u> Brief in <u>State Farm Mut. Auto. Ins. Co. v. Robert Mallela</u>, 4

N.Y.3d 313 ("<u>Mallela</u> <u>Amicus</u> Br.") (<u>available at</u> 22 Cr. 20, Dkt. No 239) at 19-20, 30.

Accordingly, New York Insurance Form NF-3, which healthcare providers must

submit to insurers to collect reimbursement for assigned claims, <u>see</u> 11 N.Y.C.R.R. § 65-3.11(b),

requires that healthcare providers provide the following information: "If the provider of service

is a professional service corporation or doing business under an assumed name (DBA), list the

owner and professional licensing credentials of all owners." N.Y. Ins. Form NF-3 at 2, <u>available</u>

<u>at</u> https://www.dfs.ny.gov/system/files/documents/2019/01/nofault_3.pdf.

Form NF-3 warns a medical clinic that where it misrepresents to an insurer that it

is owned or controlled by a physician – and thereby obtains payment from an insurer for medical

services – it is committing "a fraudulent insurance act, which is a crime." (<u>Id.</u> at 3)

### C.    ***State Farm Mutual Automobile Insurance Co. v. Mallela***

Following the implementation of Regulation 68, State Farm sued certain no-fault

doctors and medical clinics in the Eastern District of New York. State Farm sought a declaration

that, per Regulation 68, it did not have to pay any claim that had been submitted by a non-

physician-owned practice, because any such claim was fraudulent. The dispute reached the

Second Circuit, which concluded that New York law was ambiguous as to whether clinics owned by non-physicians were entitled to reimbursement. The Second Circuit therefore certified the following question to the New York Court of Appeals:

> Is a medical corporation that was fraudulently incorporated under N.Y. Business Corporation Law §§ 1507, 1508, and N.Y. Education Law § 6507(4)(c) entitled to be reimbursed by insurers, under New York Insurance Law §§ 5101 et seq., and its implementing regulations, for medical services rendered by licensed medical practitioners?

State Farm Mutual Auto. Ins. Co. v. Mallela, 372 F.3d 500, 510 (2d Cir.), certified question accepted, 3 N.Y.3d 687 (2004), and certified question answered, 4 N.Y.3d 313 (2005).

In determining that the answer to the certified question was no, the New York Court of Appeals describes the parties' dispute as follows:

> According to the complaint, the unlicensed defendants paid physicians to use their names on paperwork filed with the State to establish medical service corporations. Once the medical service corporations were established under the facially valid cover of the nominal physician-owners, the nonphysicians actually operated the companies. To maintain the appearance that the physicians owned the entities, the nonphysicians caused the corporations to hire management companies (owned by the nonphysicians), which billed the medical corporations inflated rates for routine services. In this manner, the actual profits did not go to the nominal owners but were channeled to the nonphysicians who owned the management companies.

> Notably, State Farm never alleged that the actual care received by patients was unnecessary or improper. The patients insured by State Farm presumably received appropriate care from a health professional qualified to give that care. State Farm's complaint centers on fraud in the corporate form rather than on the quality of care provided.

Mallela, 4 N.Y.3d at 319-20.

The New York Court of Appeals goes on to hold that insurers may withhold reimbursement from fraudulently incorporated medical clinics:

> We . . . answer that such corporations are not entitled to reimbursement.

> Insurance Law § 5102 et seq. requires no-fault carriers to reimburse patients (or, as in this case, their medical provider assignees) for "basic economic loss."

Interpreting the statute, the Superintendent of Insurance promulgated 11 N.Y.C.R.R. § 65-3.16(a)(12) (effective April 4, 2002) and excluded from the meaning of "basic economic loss" payments made to unlicensed or fraudulently licensed providers, thus rendering them ineligible for reimbursement.[FN2]

. . . .

[FN2]  See 11 N.Y.C.R.R. § 65-3.16(a)(12) ("A provider of health care services is not eligible for reimbursement under section 5102(a)(1) of the Insurance Law if the provider fails to meet any applicable New York State or local licensing requirement . . ."). In his amicus brief, the Superintendent asserts that he promulgated this rule to combat rapidly growing incidences of fraud in the no-fault regime, fraud that he has identified as correlative with the corporate practice of medicine by nonphysicians.

. . . .

If State Farm's allegations are true, as we must construe them to be at this stage, the defendant companies undisputedly fail to meet the applicable state licensing requirements, which prohibit nonphysicians from owning or controlling medical service corporations.  Furthermore, a fraudulently incorporated medical company is "[a] provider of health care services" within the meaning of the regulation.

(1) Defendants contend they are entitled to reimbursement even if fraudulently licensed.  They first argue that the actual care that patients received was within the scope of the licenses of those who treated the patients.  Defendants posit that this licensing compliance brings them within the regulatory framework for reimbursement.  We disagree.  The fact remains that the reimbursement goes to the medical service corporation that exists to receive payment only because of its willfully and materially false filings with state regulators.

Defendants also argue that the quoted regulation conflicts with the prompt payment goals of the no-fault statutes.  The Second Circuit treated this issue as a difficult policy balance:  on the one hand, there is our State's prohibition against lay ownership of shares in medical corporations (and the accompanying potential for fraud), and on the other, our encouragement of prompt payment of insurance claims, as reflected in the statutes.

(2)  The regulation is valid.  We are guided by the well-established principle of administrative law that the Superintendent's interpretation, if not irrational or unreasonable, will be upheld in deference to his special competence and expertise with respect to the insurance industry, unless it runs counter to the clear wording of a statutory provision.  Where, as here, the Superintendent has properly crafted a rule within the scope of his authority, that rule has the force of law and represents the policy choice of this State.

The Superintendent's regulation allowing carriers to withhold reimbursement from fraudulently licensed medical corporations governs this case.  We hold that

on the strength of this regulation, carriers may look beyond the face of licensing documents to identify [a] willful and material failure to abide by state and local law.

Id. at 320-21 & n.2 (quotation and further footnote omitted).

Mallela thus teaches that where a medical clinic misrepresents to an insurer that it is owned or controlled by a physician in order to obtain payment for medical services, the clinic defrauds the insurer.

### III.   WHETHER THE GOVERNMENT'S FRAUDULENT INCORPORATION THEORY PROVIDES A BASIS FOR A FEDERAL FRAUD CONVICTION

Defendants contend that "it is well established in the Second Circuit that an alleged misrepresentation suffices to establish the intent to harm requisite for a mail fraud conviction only if the misrepresentation 'went to an essential element of the bargain between the parties.'  The core of the 'bargain between parties' in determining the intent to injure element of mail fraud is the commercial exchange between them."  (Gulkarov Br. (22 Cr. 20, Dkt. No. 146) at 14 (quoting United States v. Shellef, 507 F 3d 82, 108 (2d Cir. 2007)) (emphasis in Gulkarov Br.))  Defendants argue that here, any misrepresentations regarding clinic ownership do not demonstrate an intent to harm, because the insurers were obligated in any event to reimburse the patients who had assigned their rights to the clinics.  (Id. at 17-19)  Defendants also argue that the Government's fraudulent incorporation theory of liability is foreclosed by Ciminelli v. United States, 143 S. Ct. 1121 (2023), in which the Supreme Court rejected the Second Circuit's "right to control" theory of fraud.  (May 18, 2023 Gulkarov Ltr. (22 Cr. 20, Dkt. No. 230))

As discussed below, Defendants' arguments are not persuasive, because (1) this Circuit's precedents recognize the "fraudulent incorporation" theory of no-fault insurance fraud; (2) the nature and purpose of the alleged misrepresentations evince a scheme to defraud insurers

of money or property within the meaning of Section 1347; and (3) the cases Defendants cite

involve significantly different factual circumstances.

A.    **Second Circuit Law**

As an initial matter, Defendants' arguments for dismissal fail because courts in

this Circuit have consistently acknowledged that the same "fraudulent incorporation" theory

charged here provides the basis for a federal fraud conviction.

For example, in United States v. Zemlyansky, 945 F. Supp. 2d 438 (S.D.N.Y.

2013), as here, the Government charged defendants with conspiracy to commit healthcare fraud

by, inter alia, falsely representing in no-fault claims to insurers that their medical clinics were

physician-owned and -operated.  The defendants "move[d] to strike portions of the Indictment

insofar as they [were] based on the Government's theory of 'fraudulent incorporation,' arguing

that the theory [was] legally insufficient to support a conviction for mail fraud or health care

fraud. . . ."  Id. at 444.  Like the defendants in the instant cases, the Zemlyansky defendants

"argue[d] that the fraudulent incorporation theory is legally insufficient because it does not

establish any intent to cause injury to the insurers."  Id. at 448.

Judge Oetken rejected this argument, and denied defendants' motion to dismiss:

> While fraud does not require actual injury to the victim, it does require "that some
> actual harm or injury was contemplated by the schemer."  United States v.
> D'Amato, 39 F.3d 1249, 1257 (2d Cir. 1994) (citation omitted) (emphasis in
> original); see also United States v. Starr, 816 F.2d 94, 98 (2d Cir. 1987) ("[The
> Government] must, at a minimum, prove that defendants contemplated some
> actual harm or injury to their victims.  Only a showing of intended harm will
> satisfy the element of fraudulent intent.").

> Relying on Judge Sifton's reasoning in State Farm Mut. Auto. Ins. Co. v. Mallela,
> 175 F. Supp. 2d 401 (E.D.N.Y. 2001) ("Mallela I "), Defendants contend that
> "there can be no injury because the insurer has an underlying obligation –
> unrelieved by Regulation 65-3.16(a)(12) or any other provision of New York Law
> – to make direct payment to the insured for treatment rendered by a licensed
> professional."  When a patient assigns his or her claim to a fraudulently
> incorporated PC, Defendants argue, the PC's ineligibility to receive payment (by

virtue of the regulation) results in a "windfall" to the insurer, and "[w]indfalls are not injuries."

This argument lacks merit, most importantly because it fails to account adequately for the New York Court of Appeals' 2005 decision in Mallela. There, the Court of Appeals definitively held that, as a matter of New York law, fraudulently incorporated PCs "are not entitled to reimbursement" by insurers. 4 N.Y.3d at 320. Thus, irrespective of whether a <u>patient</u> would be entitled to reimbursement if he had <u>not</u> assigned his claim to a PC, it is clear (and has been clear since 2005) that where such an assignment has occurred, and where the PC is not owned by a licensed professional, an insurer has a <u>right</u> to refuse payment on the claim. A misstatement about a PC's ownership, if made with the intent to deceive the insurer into making payment it would otherwise withhold, is a misstatement made with the intent to cause injury to the insurer. Whether properly characterized as a "windfall" or not, the insurer's entitlement to withhold reimbursement in these circumstances is an interest in money or property, the deprivation of which can be an injury under the fraud statutes. . . .

The fact that <u>Mallela</u> was a civil case is simply beside the point, as New York law, as construed by the New York Court of Appeals in <u>Mallela</u>, does not create the substantive federal offenses at issue. Rather, the Court here looks to New York law simply to determine whether a material misrepresentation has been made and whether it was made with the intent to defraud. On those issues, <u>Mallela</u> is crystal clear.

Id. at 448 (emphases in original; record citations omitted).

Zemlyansky's co-defendant, physician Tatyana Gabinskaya, was subsequently convicted at trial. Judge Oetken denied Gabinskaya's post-trial motions for a judgment of acquittal and a new trial, and the Second Circuit affirmed her conviction. United States v. Gabinskaya, No. 12-CR-171 JPO, 2015 WL 845716 (S.D.N.Y. Feb. 26, 2015), aff'd, 829 F.3d 127 (2d Cir. 2016).

While the post-trial litigation focused on a jury instruction that is not implicated here, the Second Circuit had no difficulty in finding the evidence sufficient to sustain Gabinskaya's convictions for healthcare fraud and conspiracy to commit healthcare fraud:

The evidence adduced at trial was sufficient for a rational jury to find Gabinskaya's knowing and willful participation in the scheme as the straw owner of [the] Clearview [clinic]. As discussed above, Gabinskaya signed the necessary paperwork in order for her coconspirators to open and operate Clearview, but did

15

not exercise any control over its operations, or participate in its business or medical decisions.  Gabinskaya did not see patients or supervise employees.  Rather, the clinic was controlled and operated solely by [non-physicians] Zemlyansky and Danilovich.  Nor did Gabinskaya fund Clearview's operations or share in the profits or the risk of loss, instead receiving a fixed payment of $1,500 per week.

Gabinskaya's knowledge of the fraudulent nature of the scheme was also sufficiently proved.  Most tellingly, Gabinskaya falsely testified during [an examination under oath conducted by an insurance company] that she worked at the clinic two to three times per week, supervised employees, and interviewed patients, including Adelaida Martinez, testimony which was directly contradicted by other evidence admitted at trial.  Such false testimony permits a reasonable jury to infer consciousness of wrongdoing.  Gabinskaya's perjurious statements were all designed to portray Gabinskaya as involved in or controlling Clearview's operations, as is necessary under New York State law.  The jury was entitled to conclude from Gabinskaya's false testimony during the [examination under oath], along with the totality of the evidence, that Gabinskaya understood that, in order for Clearview lawfully to submit no-fault insurance claims, she, as a licensed physician, had to be not merely its paper owner but rather its actual owner, and that she knowingly participated in the fraudulent scheme with the intent to further its aims by misrepresenting her role at Clearview.  Gabinskaya's challenge to the sufficiency of the evidence therefore fails.

Gabinskaya, 829 F.3d at 132.

In addition to Zemlyansky and Gabinskaya, there are numerous decisions from other courts in this Circuit holding that the fraudulent incorporation theory sets out a predicate act of mail or wire fraud for purposes of a civil RICO claim.  See, e.g., Gov't Emps. Ins. Co. v. Landow, No. 21CV1440NGGRER, 2022 WL 939717, at *5 (E.D.N.Y. Mar. 29, 2022); Gov't Emps. Ins. Co. v. Ajudua, No. 15-CV-5199 (MKB), 2018 WL 7252961, at *6 (E.D.N.Y. Dec. 18, 2018), report and recommendation adopted sub nom. Gov't Emps. Ins. Co. v. Lurie, No. 15CV05199MKBRLM, 2019 WL 276201 (E.D.N.Y. Jan. 22, 2019); Allstate Ins. Co. v. Harvey Fam. Chiropractic, Physical Therapy & Acupuncture, PLLC, No. 15CV07149SJCLP, 2018 WL 8544440, at *11 (E.D.N.Y. Sept. 21, 2018); Allstate Ins. Co. v. Bogoraz, 818 F. Supp. 2d 544, 551-52 (E.D.N.Y. 2011).

In sum, the law in this Circuit supports the Government's argument that where a clinic misrepresents to an insurer that it is owned and controlled by a physician – and thereby wrongfully obtains payment for medical services – it commits a fraud actionable under federal criminal fraud statutes.

**B.     The Nature and Purpose of the Alleged Misrepresentations**

Even if this Court were writing on a blank slate, however, it would conclude that the nature and purpose of the alleged misrepresentations evince a "scheme or artifice to defraud [a] health care benefit program . . . of . . . money or property."  18 U.S.C § 1347(a).

The Indictments allege that the insurers – the victims of the healthcare fraud conspiracy – participated in New York's no-fault insurance program.  (Pierre Indictment (22 Cr. 19, Dkt. No. 1) ¶ 5; Gulkarov Indictment (22 Cr. 20, Dkt. No. 1) ¶ 6)  The insurers were, accordingly, required by law to include the "Mandatory Personal Injury Protection Endorsement" in their policies.  See 11 N.Y.C.R.R. § 65-1.1(d).  Under the terms of that Endorsement, insurers provide coverage for "basic economic loss," which "consist[s] of medical expense, work loss, [and] other expense . . . .  [and] shall not exceed $50,000."  Id.  As discussed above, the applicable New York State regulation "exclude[s] from the meaning of 'basic economic loss' payments made to unlicensed or fraudulently licensed providers."  Mallela, 4 N.Y.3d at 320 (citing 11 N.Y.C.R.R. § 65-3.16(a)(12) ("A provider of health care services is not eligible for reimbursement under section 5102(a)(1) of the Insurance Law if the provider fails to meet any applicable New York State or local licensing requirement necessary to perform such service in New York or meet any applicable licensing requirement necessary to perform such service in any other state in which such service is performed.")).

The representative policies that have been filed in this case indicate that (1) no-fault insurers' policies do, in fact, contain the Mandatory Personal Injury Protection

Endorsement, including the language in that Endorsement referring to "basic economic loss"; and (2) the terms of the policies incorporate applicable New York law.  (2016 Geico Policy (22 Cr. 20, Dkt. No. 234-2) at 18-21; 2019 Geico Policy (22 Cr. 20, Dkt. No. 234-3) at 18-21) Therefore, when the insurers issued policies to insured drivers providing coverage for "basic economic loss," that term meant that the insurers would not reimburse non-physician-owned clinics to whom claims had been assigned, because claims for medical expenses submitted in that context were not claims for "basic economic loss."

> Here, the Government alleges that the medical clinics with which Defendants are affiliated "were not owned, operated, and controlled by licensed medical practitioners as required by law."  (<u>Pierre</u> Indictment (22 Cr. 19, Dkt. No. 1) ¶ 13; <u>Gulkarov</u> Indictment (22 Cr. 20, Dkt. No. 1) ¶ 15)  Instead, the clinics were allegedly owned, operated, and controlled by non-physician Defendants.  (<u>Id.</u>)  Accordingly, claims for medical services provided by the clinics – when submitted by the clinics to insurers for reimbursement – were not claims for "basic economic loss" under New York law.  The Indictments allege, however, that the clinics "purport[ed] to be legitimate medical care clinics" – <u>i.e.</u>, physician-owned and -operated – and that the clinic owner-operators persuaded licensed physicians to lie under oath to insurers when asked "whether the[ir] medical practice[s] [were] under the control of nonphysicians."  (<u>Pierre</u> Indictment (22 Cr. 19, Dkt. No. 1) ¶¶ 13, 19; <u>Gulkarov</u> Indictment (22 Cr. 20, Dkt. No. 1) ¶¶ 15, 20)

> In sum, the Government alleges that the Defendant physicians and Defendant owner-operators conspired to misrepresent that their clinics were not subject to the New York State regulation that excludes expenses incurred at non-physician-owned clinics from the definition of "basic economic loss."  Defendants' alleged purpose in making these

misrepresentations was, of course, to obtain payments from the insurers.  Defendants allegedly knew that "[i]nsurance companies would deny all billings for medical treatments from a medical clinic that was not actually owned, operated, and controlled by a licensed medical practitioner." (Pierre Indictment (22 Cr. 19, Dkt. No. 1) ¶ 6; Gulkarov Indictment (22 Cr. 20, Dkt. No. 1) ¶ 7) Accordingly, the Defendants had to misrepresent the ownership status of their clinics in order to obtain payment from the insurers.

   While this case arises in the statutory context of New York's no-fault insurance law, it presents straightforward allegations of insurance fraud – i.e., intentional misrepresentations to insurers about whether claims are for covered loss, in order to obtain payments that would otherwise be denied.  The Indictments thus adequately allege "a scheme or artifice to defraud a[] health care benefit program, or to obtain by means of false or fraudulent pretenses, representations, or promises, . . . money or property owned by, or under the custody or control of, a[] health care benefit program."  18 U.S.C. § 1347(a) (formatting altered).

### C. Defendants' Arguments

   In arguing that the Government's fraudulent incorporation theory is insufficient to allege a crime under Federal law, Defendants cite to cases in which courts rejected fraud claims where the misrepresentations at issue did not go to the "core of the bargain" between the defendants and their victims:

> The teaching of [the Second Circuit's "core of the bargain"] cases is that in order to determine whether false representations, standing alone – even those misrepresentations which induce a party to enter an agreement – are sufficient to establish the intent to injure element of mail fraud, it is necessary to identify the core economic exchange between the parties. . . .
>
> Here, the commercial exchange at issue is the one between the insured and the insurer:  the No Fault Law requires motorists to purchase personal liability automobile insurance, and in exchange for those premiums, the automobile insurance company must promptly pay claims for medically necessary treatments. When the insured assigns his rights to reimbursement of medically necessary

treatments to a medical provider, the medical provider, as assignee, simply steps into the shoes of the insured. . . .  As an assignee, the medical provider's obligations under the core economic bargain between the insured and the insurer are no greater and no less than that of the insured.

The New York State regulation making a layperson-owned medical corporation ineligible for payment of claims – even for legitimate and necessary treatments – is not part of the contract between the insurer and the insured individuals. It exists independent of the agreement between the insurer and the insured. . . .

The regulation was not promulgated to benefit insurers or to define the bargain between the insurer and insured, but rather to safeguard the State's interest in prohibiting the corporate practice of medicine.  As stated by the New York State Attorney General in his <u>amicus</u> <u>curiae</u> brief in <u>Mallela</u>, this regulation "serves[s] to protect the public and ensure the quality and integrity of medical services provided through PCs, by enforcing the deeply-rooted prohibition against the corporate practice of medicine."  [<u>Mallela</u> <u>Amicus</u> Br. (<u>available</u> <u>at</u> 22 Cr. 20, Dkt. No 239) at 15].  That insurers incidentally benefit from this prohibition, by gaining the right through civil litigation to withhold payment from, or recover payments made to layperson owned medical corporations, does not make that prohibition part of the economic exchange between the insurer and the insured, in whose shoes the assignee medical corporation stands.

Accordingly, the false representation alleged here – that only licensed health care professionals owned the no fault clinics – is not a sufficient basis to establish federal health care fraud because that misrepresentation is not even part of the bargain between the parties, and <u>certainly</u> does not go to the core of the bargain between the insurer and the insured.

(Gulkarov Br. (22 Cr. 20, Dkt. No. 146) at 17-19 (emphases in original))[4]

---

[4]  In support of this argument, Defendants cite the following cases:

- <u>United States v. Regent Office Supply Co.</u>, 421 F.2d 1174, 1180 (2d Cir. 1970) (no intent to defraud where defendants – stationery sales personnel – misrepresented who had referred the sales leads and how they had come into possession of the stationery; defendants had made no "false representations regarding the quality or price of their nationally advertised merchandise," and there was no "suggestion of material benefits which the customer might expect from the transaction beyond the inherent utility of the goods purchased and the discount price at which they were offered");

- <u>United States v. Starr</u>, 816 F.2d 94, 98-99 (2d Cir. 1987) (no intent to defraud where operators of bulk rate mail service misrepresented to customers "that funds deposited with them would be used only to pay . . . postage fees . . . .  [but] used only a portion of those funds to pay postage, [and appropriated] the remainder . . . to their own use";

The "core of the bargain" cases have no application here.  Those cases involve misrepresentations made as part of a sales pitch or contract negotiation.  In such circumstances, a court must determine whether the misrepresentation goes to a core element of the parties' agreement – typically, a matter that relates to the quality or nature of the product or service at issue.  See Regent Office Supply, 421 F.2d at 1180; Starr, 816 F.2d at 98-99; Novak, 443 F.3d at 156-60; Shellef, 507 F.3d at 108-09; Davis, 2017 WL 3328240, at *15-17.

---

defendants "did in fact mail their customers' brochures promptly as promised and caused them to arrive at the correct destination. . . . [and] [t]he agreement for the timely shipment and handling of bulk mail was the basis of the bargain between the Starrs and their customers");

- United States v. Novak, 443 F.3d 150, 156-60 (2d Cir. 2006) (contractors agreed to pay union workers for no-show hours in return for concessions from the union; no fraudulent intent on the part of defendant union manager who concealed from contractors that union workers were kicking back a portion of their pay to him, because "the contractors received all they bargained for, and Novak's conduct did not affect an essential element of those bargains");

- United States v. Shellef, 507 F.3d 82, 108-09 (2d Cir. 2007) (defendant chemical distributor was charged with wire fraud for misrepresenting to chemical supplier that defendant would export regulated chemicals, but instead selling a portion of the chemicals he purchased domestically; indictment did not identify "'discrepancy between benefits reasonably anticipated' and actual benefits received," as necessary to allege that the defendant "misrepresented 'the nature of the bargain'"; insufficient to allege that "misrepresentation[s] induced [the alleged victim] to enter into a transaction it would otherwise have avoided") (quoting Starr, 816 F.2d at 98, and Regent Office Supply, 421 F.2d at 1179); and

- United States v. Davis, No. 13-CR-923 (LAP), 2017 WL 3328240, at *15-17 (S.D.N.Y. Aug. 3, 2017) (defendant contractor's misrepresentations to Port Authority regarding ownership stake and level of participation of contractor's minority-owned joint venture partner "did not go to an essential element of the contract" where contractor completed construction project for which it had been hired; contractual provisions regarding minority-owned business participation were "merely collateral aspects of the building contracts" arising from the Port Authority's "'aspirational' goals" and "[did] not correspond directly to money being paid out by the Port Authority").

(See Gulkarov Br. (Dkt. No. 146) at 14-17)

Here, by contrast, Defendants were not involved in any sales pitch or negotiation. The contracts at issue – no-fault insurance policies – were issued by the insurers to insured drivers, on terms mandated by New York law.  There was no negotiation about whether clinics owned and operated by non-physicians could obtain payments from insurers, because New York law mandated that they could not.  Defendants' alleged misrepresentations were, therefore, not meant to procure a contract or to persuade a business to purchase a product or service. Defendants instead operated within a framework of statutorily mandated pre-existing insurance contracts that defined what types of losses would be reimbursed.  Defendants allegedly misrepresented that their claims were for covered loss – i.e., they filed false and fraudulent insurance claims.  These circumstances do not in any way resemble the facts in the "core of the bargain" cases, and those cases are therefore of no use in determining the sufficiency of the allegations here.[5]

Defendants argue, however, that "[a]s an assignee, the medical provider's obligations under the core economic bargain between the insured and the insurer are no greater and no less than that of the insured," and "[t]he New York State regulation making a layperson-

---

[5]  The Zemlyansky court concluded as much.  Zemlyansky (1) cites the "core of the bargain" cases on which Defendants rely; (2) characterizes those cases as turning on "the benefit" or "nature" of "the bargain"; and (3) holds that those cases have no application in the context of no-fault insurance fraud predicated on a misrepresentation regarding the ownership of clinics.  See Zemlyansky, 945 F. Supp. 2d at 449 ("[T]he cases cited by Defendants – in which no injury to the victim was intended or contemplated – are inapposite.  Cf. Starr, 816 F.2d at 98 (no fraud where the alleged victims received the benefit of the bargain); United States v. Novak, 443 F.3d 150, 156 (2006) (same); United States v. Regent Office Supply Co., 421 F.2d 1174, 1179 (2d Cir.1970) (a business's making of 'false representations not directed to the quality, adequacy or price of goods to be sold, or otherwise to the nature of the bargain,' but which instead are collateral to the sale, does not constitute a scheme to defraud).").  As discussed above, the Zemlyansky court rejected Defendants' "core of the bargain" cases because "[a] misstatement about a PC's ownership, if made with the intent to deceive the insurer into making payment it would otherwise withhold, is a misstatement made with the intent to cause injury to the insurer." Id. at 448.

owned medical corporation ineligible for payment of claims – even for legitimate and necessary treatments – is not part of the contract between the insurer and the insured individuals." (Gulkarov Br. (22 Cr. 20, Dkt. No. 146) at 18)  This argument is incorrect.

The no-fault insurance policies provide that insurers will cover only "basic economic loss."  As explained above, (1) the New York no-fault insurance law – which the policies at issue incorporate – provides that patients may assign their claims to clinics, see 11 N.Y.C.R.R. § 65-3.11(a)-(b); and (2) "basic economic loss" does not include claims submitted by non-physician-owned clinics.  It is therefore not the case that, as Defendants suggest, the insurers agreed with insureds to cover a type of claim, and then changed their coverage decision once the claim was assigned to a non-physician-owned clinic.  To the contrary, the no-fault insurance policies anticipate that claims made under the policies may be assigned, and from the outset, exclude coverage for assigned claims submitted by non-physician-owned clinics.[6]

---

[6]  At oral argument, Gulkarov's counsel stated:

> I don't think the passage of the state statute, which . . . overlays and imposes on the contractual relationship but doesn't displace certain rights of the parties [– i.e., the insurer and the insured –] means that if the insurer has a right under that regulation that has been imposed, then a federal criminal mail fraud has been committed.  And the reason being it's not material, it's not the center, the very nature, it doesn't go to the core or the essence of the agreement of the parties.  [The] [i]llustration being they still have to pay under the contract if the insured goes to a doctor, a fraudulently incorporated clinic, the insurer still has to pay the individual under the contract who pays money to that fraudulently incorporated organization.

(Apr. 25, 2023 Tr. (22 Cr. 20, Dkt. No. 221) at 66)

It does not follow from the insurer's obligation to pay an insured who may have received services at a non-physician owned clinic, however, that it is immaterial to an insurer whether a non-physician-owned clinic that has submitted an assigned claim has misrepresented its ownership.

Defendants' argument that "[t]he regulation was not promulgated to benefit insurers or to define the bargain between the insurer and insured, but rather to safeguard the State's interest in prohibiting the corporate practice of medicine," and that insurers therefore merely "incidentally benefit from this prohibition" (Gulkarov Br. (22 Cr. 20, Dkt. No. 146) at 18), is likewise unpersuasive.  "[T]he fact that the insurer's interest arises from a state regulation (as construed by the New York Court of Appeals in <u>Mallela</u>) does not make it any less of a cognizable interest in money or property. . . . [W]hile the regulation was indeed promulgated for public policy reasons, among those reasons was the goal of combating a type of fraud whose immediate victim is insurers."  <u>Zemlyansky</u>, 945 F. Supp. 2d at 449-50.  And the exclusion of medical expenses incurred at non-physician-owned clinics from the definition of "basic economic loss" is more than an "incidental" benefit to the insurers, because (1) "fraud in the no-fault regime" – a paramount concern for insurers – is "correlative with the corporate practice of medicine by nonphysicians," <u>Mallela</u>, 4 N.Y.3d at 320 n.2; and (2) what constitutes "basic economic loss" is a core component of the policies.  <u>See also id.</u> at 322 (contrasting false certifications of physician ownership with "[t]echnical violations" such as "a failure to hold an annual meeting, pay corporate filing fees, or submit otherwise acceptable paperwork on time").

Defendants also cite to <u>Ciminelli v. United States</u>, 143 S. Ct. 1121 (2023), arguing that this recent decision (1) "confirm[s] that deceit which merely deprives the victim of its right to withhold payment or otherwise control its assets is not federal fraud"; (2) "reject[s] attempts to substitute decisions about property for property itself"; and (3) provides "yet another reminder that federal courts must beware of attempts to use the mail and wire fraud statutes to federalize traditionally state concerns and to criminalize traditionally civil concerns."  (May 18, 2023 Gulkarov Ltr. (22 Cr. 20, Dkt. No. 230))

Ciminelli is a bid-rigging case involving corruption in the "Buffalo Billion" New York State development initiative, which was administered by a non-profit called Fort Schuyler. "Throughout the grand jury proceedings, trial, and appeal, the Government relied on the Second Circuit's 'right to control' theory, under which the Government can establish wire fraud by showing that the defendant schemed to deprive a victim of potentially valuable economic information necessary to make discretionary economic decisions." Ciminelli, 143 S. Ct. at 1125. In reversing the Second Circuit decision affirming the fraud convictions, the Supreme Court held that "[t]he right-to-control theory cannot be squared with the text of the federal fraud statutes, which are 'limited in scope to the protection of property rights.' The so-called 'right to control' is not an interest that had 'long been recognized as property' when the wire fraud statute was enacted." Id. at 1127 (quoting McNally v. United States, 483 U.S. 350, 360 (1987), and Carpenter v. United States, 484 U.S. 19, 26 (1987)).

Because the case had been submitted to the jury only under the right to control theory, the Supreme Court rejected the Government's argument that it should "affirm Ciminelli's convictions on the alternative ground that the evidence was sufficient to establish wire fraud under a traditional property-fraud theory." Id. at 1129.

Ciminelli does not support Defendants' arguments. In Ciminelli, "the Government relied solely on the theory that the scheme defrauded Fort Schuyler of its right to control its assets." 143 S. Ct. at 1125 n.1 (quotation omitted). Here, as in Zemlyansky, the Indictments do not mention the right to control, nor does the Government rely on the right to control theory in its briefing. See Zemlyansky, 945 F. Supp. 2d at 449 ("The Indictment . . . does not rely on a deprivation of the insurers' 'right to control' their property. Rather, it rests simply on the alleged deprivation of their monetary interest in nonpayment of claims – where PC-

claimants are 'ineligible' for payment under New York law.  That monetary interest is a legally cognizable interest in money or property under the mail fraud statute.").[7]

Defendants argue, however, that "Ciminelli confirms that a deceit which merely deprives the victim of its right to withhold payment or otherwise control its assets is not federal fraud."  (May 18, 2023 Gulkarov Ltr. (22 Cr. 20, Dkt. No. 230))  But Defendants ignore that Ciminelli does not reach the question of whether the facts in that case could have supported a conviction for fraudulently obtaining the contracts themselves, rather than depriving the victim of valuable economic information for deciding to whom the contracts would be awarded.  See Ciminelli, 143 S. Ct. at 1129; see also United States v. Bankman-Fried, No. 22-CR-0673 (LAK), 2023 WL 4194773, at *7 (S.D.N.Y. June 27, 2023) (rejecting defendant's reliance on Ciminelli in motion to dismiss wire and bank fraud charges "because each of those counts tracks the relevant statutory language and sufficiently alleges a scheme to obtain money or property"); United States v. Runner, No. 18-CR-0578(JS), 2023 WL 3727532, at *2 (E.D.N.Y. May 30, 2023) ("Defendant cannot use Ciminelli as a shield to prevent the Government from introducing the misrepresentations or omissions underlying the alleged scheme to defraud under the guise of construing those same deceptions as exclusively relevant to a victim's property interest [in] 'mere information' to render them unactionable.").

In sum, the "core of the bargain" cases and Ciminelli do not alter this Court's conclusion that the Indictments adequately allege a conspiracy to commit healthcare fraud.

---

[7]  Similarly, when Zemlyansky's co-defendant Gabinskaya went to trial, the court provided jury instructions that did not mention the right to control theory of liability.  See United States v. Gabinskaya, 12 Cr. 171 (JPO), Oct. 3, 2014 Trial Tr. (Dkt. No. 1324) at 66-69.

## **CONCLUSION**

For the reasons stated above, Defendants' motions to dismiss are denied.  The

Clerk of Court is directed to terminate the motions (22 Cr. 19, Dkt. No. 102; 22 Cr. 20, Dkt. No.

144).

Dated: New York, New York
       July 11, 2023

                                        SO ORDERED.

                                        _____
                                        Paul G. Gardephe
                                        United States District Judge