UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

- against -

BRADLEY PIERRE,
MARVIN MOY,
WILLIAM WEINER,
ARTHUR BOGORAZ, and
JEAN PIERRE,
                              Defendants.

**MEMORANDUM
OPINION & ORDER**

(S2) 22 Cr. 19 (PGG)

PAUL G. GARDEPHE, U.S.D.J.:

Defendant William Weiner moves (1) for the early return of subpoenas pursuant

to Rule 17(c) of the Federal Rules of Criminal Procedure; and (2) to dismiss the Indictment, or in

the alternative, for a bill of particulars.  For the reasons stated below, his motions will be denied.

## BACKGROUND

### I.    THE CHARGES AGAINST WEINER

This case involves allegations of no-fault insurance fraud.  The Government

alleges that from approximately 2008 to 2021, Weiner and his co-defendants participated in a

scheme to procure the identity of motor vehicle accident victims via bribery, and then steer the

accident victims to corrupt no-fault medical clinics, which billed insurance companies for

unnecessary procedures and falsely represented to insurers that they were owned and controlled

by physicians, when in fact they were not.  ((S2) Indictment (Dkt. No. 191))

According to the Government, Weiner – who is a radiologist – was one of the

"No-Fault Physicians" and medical "Specialists" who participated in the insurance fraud scheme:

The No-Fault Physicians are licensed medical physicians who gave control of their
medical practices to [non-physician] BRADLEY PIERRE, the defendant, engaged
in unnecessary and excessive medical treatments, and falsified clinical findings of
injury in reports. . . .

The Specialists are licensed physicians who conducted the specialized medical care prescribed by the No-Fault Clinics, such as MRIs and X-rays. The Specialists include, among others, WILLIAM WEINER, the defendant, who is a licensed doctor of osteopathy who incorporated the MRI facility Nexray Medical Imaging PC ("Nexray" or the "MRI Facility") as part of the scheme. WEINER falsified clinical findings of injury in MRI reports that were submitted to insurance companies.

(Id. ¶ 10)

The (S2) Indictment charges that Weiner participated in (1) a conspiracy to commit healthcare fraud between 2008 and 2021, in violation of 18 U.S.C. §§ 1347 and 1349 (Count One); (2) a conspiracy to commit money laundering between 2008 and 2021, in violation of 18 U.S.C. § 1956(h) (Count Two); and (3) a conspiracy to defraud the United States – i.e., the Internal Revenue Service (the "IRS"), between 2016 and 2020, in violation of 18 U.S.C. § 371 (Count Five). (Id. ¶¶ 1-38, 45-48) According to the Government, Weiner (1) conspired to commit insurance fraud in connection with Nexray by, inter alia, concealing the nature of Nexray's relationship with co-defendant Bradley Pierre and falsifying MRI reports; (2) laundered Nexray's proceeds through "phony financing arrangements" with Pierre; and (3) conspired to reduce Nexray's taxable income and his own by, inter alia, causing Nexray to over-report expenses. (Id. ¶¶ 19-21, 26, 28)

## II.   <u>PROCEDURAL HISTORY</u>

The Indictment was filed on January 11, 2022, and the (S2) Indictment was filed on June 26, 2023. (Dkt. Nos. 1, 191)

On October 18, 2022, Weiner moved for early return of Rule 17(c) subpoenas and to dismiss the Indictment. (Dkt. Nos. 106, 109) The Court heard oral argument on April 28, 2023, and conducted an evidentiary hearing regarding the Rule 17 motion on May 19, 2023. (Dkt. Nos. 162, 164, 187) The Court has also considered the parties' supplemental briefing and

post-hearing submissions regarding the Rule 17 motion.  (Dkt. Nos. 140, 144, 146, 174, 178, 206)

## DISCUSSION

## I.    MOTION FOR EARLY RETURN OF RULE 17(C) SUBPOENAS

Weiner asks this Court to authorize the early return of Rule 17(c) subpoenas addressed to the Liberty Mutual Insurance Company and the National Insurance Crime Bureau. In the subpoenas, Weiner seeks the following materials from each entity:

> All communications between you, or your current or former employees, and the United States (including recordings or documents reflecting or memorializing oral communications) regarding Dr. Weiner or Nexray Medical Imaging, PC ("Nexray").

(Revised Crime Bureau Subpoena (Dkt. No. 146-1) at 5; Revised Liberty Mutual Subpoena (Dkt. No. 146-2) at 5)[1]

Weiner states that he may use responsive material in connection with a possible motion to suppress under the Fifth Amendment and Kastigar v. United States, 406 U.S. 441 (1972).  Such a motion would be directed at statements Weiner made during a February 10, 2021 examination under oath conducted by Liberty Mutual.  Weiner contends that the materials he seeks may show that the Government instigated the February 2021 deposition of Weiner and that it instructed Liberty Mutual as to what questions should be posed to Weiner.  (Weiner Br. (Dkt. No. 110) at 4)  Weiner contends that the materials he seeks "are critical to evaluating and litigating whether the Government violated [his] constitutional rights by directing and controlling some or all aspects of the parallel civil investigations of [him] undertaken by the [National Insurance Crime Bureau] and Liberty Mutual."  (Id. at 1; Weiner Reply Br. (Dkt. No. 130) at 11)

---

[1]  The page numbers of documents referenced in this opinion correspond to the page numbers designated by this District's Electronic Case Files ("ECF") system.

A.      **Background**[2]

1.      **New York No-Fault Insurance Law and Regulations**

Because New York's no-fault insurance law and its implementing regulations, N.Y. Ins. Law. § 5102 et seq.; 11 N.Y.C.R.R. § 65 et seq., provide the context for the charges against Weiner and his co-defendants, relevant provisions of the insurance law and related regulations are discussed below.

a.      **No-Fault Insurance Claims by Non-Physician-Owned Clinics**

As explained in this Court's July 12, 2023 opinion denying Defendants' omnibus motion to dismiss, New York law requires no-fault insurers to include a "Mandatory Personal Injury Protection Endorsement" in their policies, pursuant to which the no-fault insurers generally cover claims for "basic economic loss" up to $50,000.  "Basic economic loss" includes medical expenses incurred by insured motor vehicle accident victims.  New York law provides that insureds may assign their claims to the medical clinics at which they seek treatment.  In such circumstances, the medical clinic bills the no-fault insurer directly.  See United States v. Pierre, No. 22 CR. 19 (PGG), 2023 WL 4493511, at *3-4 (S.D.N.Y. July 12, 2023).

"[M]edical expenses incurred at medical clinics that are owned or operated by non-physicians are not considered 'medical expenses' or 'basic economic loss' within the meaning of the New York Insurance Law, [however,] and are thus outside the scope of no-fault insurance policies."  Id. at *5.  The applicable regulation "excludes such claims from the legal definitions of 'medical expenses' and 'basic economic loss' because non-physician-owned and - operated clinics are associated with 'medical mills'" – i.e., clinics engaged in fraud that

---

[2]  The factual background is derived primarily from the testimony of former Liberty Mutual Senior Special Investigator John Di Minno and FBI Special Agent Joseph Infusino at the May 19, 2023 evidentiary hearing, exhibits offered at that hearing, and matters of public record.

"'generate stacks of medical bills for each [accident victim], detailing treatments and tests that were unnecessary or never performed.'" Id. at *4-5 (quoting Med. Society of State of New York v. Serio, 100 N.Y.2d 854, 862 (2003)). Moreover, "[t]he New York Court of Appeals [has held] that insurers may withhold reimbursement from fraudulently incorporated[, non-physician-owned] medical clinics" that submit assigned claims, regardless of whether the claims are for necessary medical procedures performed by licensed physicians. Id. at *6-7; see State Farm Mutual Auto. Ins. Co. v. Mallela, 4 N.Y.3d 313 (2005).

### b.   Examinations Under Oath

"The [New York] no-fault regulations provide an insurance carrier with the ability to investigate a claim prior to paying or denying the claim by demanding . . . an examination under oath." Alev Med. Supply, Inc. v. Progressive Ins. Co., 27 Misc. 3d 1220(A), 910 N.Y.S.2d 760 (Dist. Ct. 2010). The "Conditions" section of the Mandatory Personal Injury Protection Endorsement found in all New York no-fault insurance policies provides as follows:

> Proof of Claim – Medical, Work Loss, and Other Necessary Expenses: In the case of a claim for health service expenses, the eligible injured person or that person's assignee or representative shall submit written proof of claim to the Company, including full particulars of the nature and extent of the injuries and treatment received and contemplated, as soon as reasonably practicable but, in no event later than 45 days after the date services are rendered. . . . Upon request by the Company, the eligible injured person or that person's assignee or representative shall . . . as, may reasonably be required, submit to examinations under oath by any person named by the Company and subscribe the same.

11 N.Y.C.R.R. § 65-1.1(d).

"It is well settled that an appearance at an examination under oath or independent medical examination 'is a condition precedent to the insurer's liability on the policy,' and an insurer can deny a claim retroactively to the date of loss for a claimant's failure to attend an examination under oath." Active Care Med. Supply Corp. v. ELRAC Inc., 93 N.Y.S.3d 624 (N.Y. Civ. Ct. 2017) (quoting Stephen Fogel Psychological, P.C. v Progressive Cas. Ins. Co., 35

A.D.3d 720, 722 (2d Dept. 2006)).  Similarly, a "failure to answer all relevant questions at the [examination under oath], as required by the provisions of the applicable insurance policies, constitutes a material breach of contract."  <u>Country-Wide Ins. Co. v. Gotham Med., P.C.</u>, 50 Misc. 3d 712, 716 (N.Y. Cnty. Sup. Ct. 2015), <u>aff'd</u>, 154 A.D.3d 608 (1st Dept. 2017).

An examination under oath is a "formal proceeding" that is "[t]aken under oath" and "[t]ranscribed."  Liberty Mutual typically retains outside counsel to conduct examinations under oath.  (May 19, 2023 Tr. (Dkt. No. 187) at 71, 73 (Di Minno))

### c.   <u>Special Investigations Units</u>

Section 409 of the New York Insurance Law provides that

[e]very insurer writing private or commercial automobile insurance, workers' compensation insurance, or individual, group or blanket accident and health insurance policies issued or issued for delivery in this state . . . shall . . . file with the superintendent a plan for the detection, investigation and prevention of fraudulent insurance activities in this state and those fraudulent insurance activities affecting policies issued or issued for delivery in this state. . . .

The plan shall provide . . . for a full-time special investigations unit and staffing levels within such unit.   Such unit shall be separate from the underwriting or claims functions of an insurer, and shall be responsible for investigating information on or cases of suspected fraudulent activity and for effectively implementing fraud prevention and reduction activities pursuant to the plan filed with the superintendent. . . .

Persons employed by special investigations units as investigators or by an independent provider of investigative services under contract with an insurer shall be qualified by education or experience which shall include an associate's or bachelor's degree in criminal justice or related field, or five years of insurance claims investigation experience or professional investigation experience with law enforcement agencies, or seven years of professional investigation experience involving economic or insurance related matters. . . .

The plan shall provide for . . . [the] interface of special investigation[s] unit personnel with law enforcement and prosecutorial agencies and with the financial frauds and consumer protection unit of the department of financial services.

N.Y. Ins. Law. §§ 409(a), (b)(1), (b)(3), (c)(1).

As required by the Insurance Law, Liberty Mutual maintains a Special

Investigations Unit.  Liberty Mutual "expects [the] members of [its] Special Investigations Unit

. . . . [to] establish an extensive network with law enforcement agencies. . . .  [a]nd to work in

collaboration [with law enforcement] in the investigation of suspicious [claims]."  (May 19, 2023

Tr. (Dkt. No. 187) at 57-58 (Di Minno))

### d.     The Crime Bureau

The National Insurance Crime Bureau ("Crime Bureau") is "an insurance industry

trade association organized as an Illinois not-for-profit corporation."  Shapiro v. Goldman, No.

14 CIV. 10119 (NRB), 2016 WL 4371741, at *3 (S.D.N.Y. Aug. 15, 2016), aff'd, 696 F. App'x

532 (2d Cir. 2017).  The Crime Bureau describes itself as "the nation's premier not-for-profit

organization dedicated exclusively to fighting insurance fraud and crime."  National Insurance

Crime Bureau, Who We Are, available at https://www.nicb.org/about-nicb.  According to the

Crime Bureau, its

> . . . membership includes more than 1,200 property-casualty insurance companies,
> vehicle rental companies, auto auctions, vehicle finance companies, self-insured
> organizations and strategic partners.
>
> Beyond our membership, our nearly 400 employees work with law enforcement
> agencies, technology experts, government officials, prosecutors, international
> crime-fighting organizations and the public to lead a united effort to prevent and
> combat insurance fraud and crime.

Id.

The Crime Bureau "serves as a clearing house for data from insurance companies

concerning claims made against insurance policies."  Universal Open MRI of the Bronx, P.C. v.

State Farm Mut. Auto. Ins., 12 Misc. 3d 1151(A), 819 N.Y.S.2d 852 (Civ. Ct. 2006).  In that

capacity, the Crime Bureau requests information from and shares information with its "member

companies," including Liberty Mutual.  It also "serve[s] as a conduit . . . between law

enforcement and the insurance industry," "respond[ing] to law enforcement inquiries or requests for specific information," and "help[ing] to coordinate and collect information from other insurance companies."  (May 19, 2023 Tr. (Dkt. No. 187) at 55-56 (Di Minno))

### 2.     Liberty Mutual's Prior Investigation of and Lawsuit Against Weiner

In about 2010, Liberty Mutual's Special Investigations Unit began "an investigation . . . in regard[] to Nexray, [then] located on the Grand Concourse [in the Bronx]" and in the Rego Park neighborhood of Queens.  The investigation focused on whether non-physicians Yan Moshe and Reuven Alon were the true owners of Nexray.  As discussed above, their ownership of Nexray would violate New York law and permit Liberty Mutual to withhold reimbursement of no-fault claims that had been assigned to Nexray.  Senior Special Investigator John Di Minno participated in that investigation.  (May 19, 2023 Tr. (Dkt. No. 187) at 11 (Di Minno))

As part of the investigation, in November 2011 Liberty Mutual "took an [examination under oath ('EUO')] of Dr. Weiner in regard[] to who controlled that Nexray facility."  Liberty Mutual also conducted "numerous [examinations under oath] of claimants [who had undergone] MRIs at Nexray."  (Id. at 11-12)

Di Minno prepared a "Project Plan" for the Nexray investigation.[3]  As to Weiner, the Project Plan states:

**Person #1:**  WILLIAM WEINER, D.O.

**Reason:   Allegedly does not own/control corporations i.e.: Nexray Medical Imaging**

---

[3]  The "Project Plan" is not dated, but it appears to have been prepared after November 2012, because it refers to a lawsuit that was filed as of then.  (Nexray Project Plan, Government Exhibit ("GX") 5 (Dkt. No. 190-6) at 7)

**Plan:  acquire information that these allegations are true**

**Results:**  Dr. Weiner appeared for an Examination Under Oath on November 2, 2011.  His testimony on numerous key points did not match other aspects of Liberty's investigation.  Dr. Weiner's testimony showed that he had no control over Nexray and/or that he had no knowledge regarding its operations.

(Nexray Project Plan, GX 5 (Dkt. No. 190-6) at 4 (emphasis in original))

The Nexray Project Plan also contains information concerning Yan Moshe and Reuven Alon.  (Id. at 5-6)

On November 16, 2012, as a result of this investigation, Liberty Mutual filed a lawsuit against Nexray, Weiner, Moshe, Alon, and others in the Eastern District of New York, seeking (1) a declaration that it did not have to pay the defendants' claims; and (2) the return of payments it had already made to the defendants.  See Liberty Mutual Ins. Co. v. Nexray Medical Imaging, P.C., Cmplt., 12 Civ. 5666 (Dkt. No. 1) (E.D.N.Y. Nov. 16, 2012).  In its complaint, Liberty Mutual contends that its payments to Nexray had been "caused by the defendants (a) wrongfully misrepresenting that the PC Defendants [such as Nexray] were solely owned by licensed physicians pursuant to New York's licensing laws, thereby engaging in the corporate practice of medicine; (b) splitting fees with unlicensed persons in violation of New York's licensing laws; and (c) billing for services provided by independent contractors."  Id. ¶¶ 1-2.

Liberty Mutual's complaint further alleges that

[t]he Clinic Controllers [including Moshe and Alon], who illegally and secretly operate, control, and own the PC Defendants [such as Nexray], have owned both properties throughout the entire existence of the PC Defendants at those locations.  For years, there has been a revolving door of professional corporations and their purported owner physicians at both offices, changing whenever [Liberty Mutual] and other insurers investigated the existing corporations; however, the Clinic Controllers remain a constant presence at the offices, providing the PC Defendants with patients, employees, and imaging equipment.  The Clinic Controllers paid kickbacks for referrals to the PC Defendants.  The referrals came from corrupt no-fault clinics where the managers and/or the referring doctors (many of whom are convicted felons or have been disciplined or indicted) have

ongoing relationships with the Clinic Controllers, to ensure a never-ending supply of patients to subject to . . . expensive tests.

Id. ¶ 4.

Liberty Mutual's complaint also alleges in detail that Weiner lied at his November 2011 examination under oath regarding his relationship with the clinic controllers, and that he entered into "sham agreements" to conceal the clinic controllers' ownership and control of Nexray.  Id. ¶¶ 50-63.

On December 30, 2015, Liberty Mutual, Weiner, and Nexray entered into a confidential settlement agreement regarding this lawsuit and submitted a stipulation of dismissal, which the court so ordered on January 5, 2016.  Liberty Mutual Ins. Co. v. Nexray Medical Imaging, P.C., Stip. of Dismissal and Order, 12 Civ. 5666 (Dkt. Nos. 85-86) (E.D.N.Y. Dec. 30, 2015 and Jan. 5, 2016).

### 3.     The Beginning of the Government's Investigation

The instant prosecution of Weiner arises out of a years-long investigation into a sprawling network of no-fault insurance fraud schemes in New York and New Jersey.  The investigation culminated in three multi-defendant no-fault insurance fraud cases before this Court:  United States v. Rose, 19 Cr. 789; United States v. Gulkarov, 22 Cr. 20; and the instant case.  The investigation began in 2013 and was initially conducted by the Westchester County District Attorney's Office and the New York State Police, see United States v. Rose, No. 19 CR. 789 (PGG), 2021 WL 2117119, at *2 (S.D.N.Y. May 24, 2021), before being referred to the U.S. Attorney's Office for the Southern District of New York and the FBI.

At the May 19, 2023 evidentiary hearing, FBI Special Agent Joseph Infusino testified that the Federal investigation began in "late 2016 [or] early 2017," and that he was involved from the outset.  "[T]he initial targets of the investigation" included "Nathaniel Coles

10

[and] Anthony Rose[, Sr.]," both of whom were charged in the <u>Rose</u> case.  (May 19, 2023 Tr. (Dkt. No. 187) at 99)

### 4.    The Government's Early Communications with Liberty Mutual

The Government's contact with Liberty Mutual began shortly after the Federal investigation was initiated.  Liberty Mutual's Special Investigations Unit served as the liaison between the Government and Liberty Mutual.  (<u>Id.</u> at 113)  Agent Infusino had his "first interaction with Mr. Di Minno [in] approximately 2017," and subsequently maintained "[p]eriodic" contact with Di Minno by phone and email.  (<u>Id.</u> at 113-14)

In connection with these communications, Di Minno provided Agent Infusino with documents concerning suspected no-fault insurance fraud, even though no subpoena had been issued.  (<u>See</u> May 31, 2019 Di Minno email (Dkt. No. 174-1) (attaching a summary of a "site visit" to MetroPain Specialist PC – a suspected fraudulent no-fault clinic associated with Rolando Chumaceiro, a defendant in <u>Gulkarov</u> – with a cover email stating "[a]s you requested"); Jan. 30, 2020 Di Minno email 1 of 2 (Dkt. No. 174-3) (attaching a document entitled "New York fraud ring analysis," which discusses certain attorneys associated with no-fault insurance fraud); Jan. 30, 2020 Di Minno email 2 of 2 (Dkt. No. 174-4) (attaching a complaint involving Weiner's attorney Russell Friedman; stating that "[t]his is a great old suit to be aware of and consider making [law enforcement] aware of"); Feb. 28, 2020 Di Minno email (Dkt. No. 174-5) (attaching 2008 Geico complaint filed against suspected clinic controller Yan Moshe))

5.     **Government Subpoenas Issued to Liberty Mutual**

a.     **The Government's March 9, 2020 Subpoena**

On March 9, 2020, the Government served a grand jury subpoena on Liberty

Mutual.  (Mar. 9, 2020 Subpoena, GX 1 (Dkt. No. 190-2))  The subpoena includes the following

instructions:

> For the period of January 1, 2015 to present, please provide any materials or
> documentation in your possession, custody, or control relating to the topics in
> Section I below for the facilities, entities, or individuals listed in Section II below.
>
> **I. Materials to Be Provided**
>
> - For the facilities, entities, or individuals listed in Section I, please provide
>   the following information:
>
> - Any Examinations Under Oath ("EUOs") for the below-listed facilities,
>   entities, or individuals (or providers or sub-providers at these facilities)
>
> - Any EUO[s] or recorded interviews of claimants identifying suspected
>   fraud
>
> - Any [Special Investigations Unit ("SIU")] investigations
>
> - Reports for any clinic inspections
>
> - The amount your insurance company has been billed and paid.

(Id. at 4) (emphasis in original).

The subpoena lists thirteen "facilities/entities" and twenty-five "individuals,"

including Yan Moshe and Reuven Alon, the alleged "clinic controllers" who were Weiner's co-

defendants in Liberty Mutual's 2012 lawsuit.[4]  The subpoena does not name Weiner or Nexray.

(Id. at 4-5)

---

[4]  Other individuals listed in the subpoena are Bradley Pierre, Jean Pierre, and Marvin Moy –
Weiner's co-defendants in the instant case – and Gulkarov defendants Alexander Gulkarov,
Romain Israilov, Peter Khaimov, Rolando Chumaceiro, and Marcelo Quiroga.  (Id.)

The cover letter accompanying the subpoena includes the following request:

The Government hereby requests that you voluntarily refrain from disclosing the existence of the subpoena to any third party.  While you are under no obligation to comply with our request, we are requesting you not to make any disclosure in order to preserve the confidentiality of the investigation and because disclosure of the existence of this investigation might interfere with and impede the investigation.  **If you intend to disclose the existence of this subpoena to a third party, please let me know before making any such disclosure.**

(Id. at 2 (emphasis in original))  Agent Infusino testified that this language is standard "boilerplate" in cover letters accompanying subpoenas.  (May 19, 2023 Tr. (Dkt. No. 187) at 130)

Because Di Minno had been involved in Liberty Mutual's previous investigation resulting in a lawsuit against some of the same individuals named in the subpoena – including Moshe and Alon – he was assigned to respond to the Government's subpoena.  (Id. at 63-64 (Di Minno))  Because the subpoena was "very broad" and called for "[a] huge amount of paperwork," Di Minno had "follow-on conversations with the [G]overnment from time to time about what the [G]overnment might be looking for in response to the subpoena."  (Id. at 9-11)

For example, on March 10, 2020 – the day after Liberty Mutual received the Government's first subpoena – Di Minno emailed Assistant U.S. Attorney Mathew Andrews regarding the subpoena.  Di Minno stated:  "Mat[], are you [free] any time today[?]  I have [my colleagues] Bill Mitzeliotis and Jim Beadle, who can update you on all of those individuals and providers and what to look for."  In their email correspondence, Di Minno and Andrews schedule a call, which occurred later that day.  (Mar. 10, 2020 Di Minno email, GX 2 (Dkt. No. 190-3) at 3)  At the May 19, 2023 hearing, Di Minno testified that his reference to "what to look for" meant "help[ing] [Andrews] understand the relationship between the individuals and the clinics that are mentioned in the subpoena."  Di Minno believed that a dialogue with Andrews would assist Liberty Mutual in identifying documents responsive to the subpoena.  (May 19, 2023 Tr.

(Dkt. No. 187) at 16-18)  In addition to "subpoena compliance," Di Minno used the call with

Andrews "to explain what no fault was" and to "to help the [G]overnment understand how the

no-fault industry works."  (Id. at 62-63)

Pursuant to the subpoena, Di Minno began providing responsive documents to the

Government.  On occasion, Di Minno discussed certain documents with Andrews by phone or

Skype.  (See, e.g., Mar. 20, 2020 Di Minno email, Defense Exhibit ("DX") 7 (Dkt. No. 190-16)

(Di Minno emailing Andrews the "New York fraud ring analysis"); Apr. 9, 2020 Di Minno

emails, DX 17 through DX 19 (Dkt. Nos. 190-19 through -28) (Di Minno emailing Andrews

several "EUO summaries of people who [were] treated at Starrett City," one of the no-fault

clinics the Government was investigating, and arranging a Skype "EUO review" with Andrews

for later that day to discuss the numerous examinations under oath that were responsive to the

subpoena))

Although Weiner and Nexray were not listed in the Government's first subpoena

to Liberty Mutual, Di Minno construed information about them as responsive to the subpoena,

because "the subpoena asked for [information about] Yan Moshe . . . and Reuven Alon," who

"were also named in [Liberty Mutual's 2012] suit [against Weiner and Nexray]."  (May 19, 2023

Tr. (Dkt. No. 187) at 13-14)  Accordingly, shortly after the March 10, 2020 call, Di Minno

emailed Andrews a copy of Liberty Mutual's 2012 complaint against Weiner and Nexray.  In the

email, Di Minno described Nexray as "a Yan Moshe location."  (Mar. 10, 2020 Di Minno email,

DX 5 (Dkt. No. 190-14) at 2)  On April 1, 2020, Di Minno sent Liberty Mutual's complaint to

Agent Infusino, stating "Joe, as you requested."  (Apr. 1, 2020 Di Minno email, GX 3 (Dkt. No.

190-4) at 3)  Although Di Minno and Infusino testified that the "request" to which the email

refers is the March 9, 2020 subpoena (May 19, 2023 Tr. (Dkt. No. 187) at 21 (Di Minno), 103

(Infusino)), Infusino further testified that he "likely would have requested this document" during a phone call with Di Minno (Id. at 119).  Weiner's November 2011 examination under oath was included in the examination under oath materials Di Minno sent to the Government before the April 9, 2020 "EUO review" Skype call.  (Id. at 23-24, 81-83)

> **b.      The Government's May 19, 2020 and May 31, 2020 Subpoenas**

On May 19, 2020, the grand jury issued a second subpoena to Liberty Mutual, in which the Government for the first time requested information about Weiner and Nexray.  (May 19, 2020 Subpoena, DX 20 (Dkt. No. 190-29))  The instructions for the subpoena provide as follows:

> For the period of January 1, 2012 to present, please provide any materials or documentation in your possession, custody, or control relating to the topics in Section I below for the facilities, entities, or individuals listed in Section II below.
>
> **I.  Materials to Be Provided**
>
> For the facilities, entities, or individuals listed in Section I, please provide the following information:
>
> - Any Examinations Under Oath ("EUOs") for the below-listed facilities, entities, or individuals (or providers or sub-providers at these facilities)
> - Any SIU investigations
> - Any deposition transcripts
>
> **II.  Facilities, Entities, or Individuals that Are Subjects of the Subpoena**
>
> Entities
>
> - Nexray Medical Imaging PC
>
> Individuals
>
> - William Weiner, MD
> - Gulchehra ("Gulya") Zulunov

(Id. at 4) (emphasis in original).

The next day, May 20, 2020, Di Minno again sent Andrews Liberty Mutual's 2012 complaint against Weiner and Nexray.  Andrews responded:  "Very interesting.  What was the outcome of the litigation?  Did you guys also do any subsequent[] EUOs with Weiner/Nexray?"  (May 20, 2020 Di Minno email, GX 4 (Dkt. No. 190-5) at 2)  Di Minno does not "recall if [he] responded" to Andrews' query.  (May 19, 2023 Tr. (Dkt. No. 187) at 26)

On May 31, 2020, the grand jury issued a third subpoena to Liberty Mutual, which specifies a date range of January 1, 2008 to the present.  Other than the expanded date range, the May 31, 2020 subpoena is identical to the May 19, 2020 subpoena.  (May 31, 2020 Subpoena, GX 6 (Dkt. No. 190-7))

The cover letters accompanying the May 19, 2020 and May 31, 2020 subpoenas include the same request that Liberty Mutual "voluntarily refrain from disclosing the existence of the subpoena to any third party."  (May 19, 2020 Subpoena, DX 20 (Dkt. No. 190-29) at 2; May 31, 2020 Subpoena, GX 6 (Dkt. No. 190-7) at 2)

On June 2, 2020, Liberty Mutual's Special Investigations Unit opened a new investigation into Weiner and Nexray.  According to Liberty Mutual's case file, the investigation was conducted by SIU investigator James Beadle.  As to the "[r]easons for [o]pening the investigation," the case file states:  "[q]uestionable ownership and control issues, [q]uestionable referral patterns from questionable medical facilities, [and] [p]ossible independent contractor issues."  (Liberty Mutual Case File, GX 7A (Dkt. No. 190-9) at 11 (list formatting altered))  The case file contains Beadle's notes concerning the investigative steps he took, including emails among Liberty Mutual personnel and public records searches.  The case file – which contains Beadle's notes through June 16, 2020 –  makes no mention of the Government.  (Id., passim)  Because Di Minno believed the case file was responsive to the Government's second subpoena,

he emailed it to AUSA Andrews on June 17, 2020, and arranged a Skype call to discuss it.  Di

Minno testified, however, that the Government never "gave [him] any instructions or directives

with regard to Liberty's [new] investigation."  (June 17, 2020 Di Minno email, GX 7 (Dkt. No.

190-8) at 3-4; May 19, 2023 Tr. (Dkt. No. 187) at 37)

### 6.     <u>Weiner's February 10, 2021 Examination Under Oath</u>

#### a.     <u>Request to Appear</u>

In a November 18, 2020 letter to Nexray, Liberty Mutual – through its outside

counsel Michael Callinan – requests that Nexray appear for an examination under oath on

December 17, 2020:

> The examination will consist of questions pertaining to the status of Nexray
> Medical Imaging, PC's corporate entity, the medical condition of the eligible
> injured party, the nature and extent of the treatment, services and/or supplies
> rendered to the eligible injured party, by the individuals employed and/or retained
> by Nexray Medical Imaging, PC, facility for said treatment.  We will also inquire
> as to the relationship of the professional corporation with any, and all other
> corporations, both professional and non-professional.  It is requested that Nexray
> Medical Imaging, PC be produced for an Examination Under Oath.  Please appear
> with the relevant medical charts for the claimants referenced below along with the
> materials listed on the attached rider.
>
> . . . .
>
> Kindly be informed that pursuant to the applicable motor vehicle policy of
> insurance, Nexray Medical Imaging, PC, has an obligation to cooperate in the
> investigation of all claims.  This duty is also imposed by Regulation 68.  Since
> Nexray Medical Imaging, PC, is an Assignee of Benefits, the obligation to
> cooperate in our investigation falls upon Nexray Medical Imaging, PC, and its
> employees.
>
> . . . .
>
> Your client's failure to appear for the Examination Under Oath will constitute a
> breach of the policy contract and may be regarded as a willful attempt to obstruct
> the company's right to investigate.  This can and may result in a denial of no-fault
> billing submitted by or on behalf of Nexray Medical Imaging, PC, regarding the
> claim(s).

> Finally, it should be noted that absolutely no no-fault bills for the claim(s) from Nexray Medical Imaging, PC, will be processed until such time as this investigation is completed and our verification of the information needed is resolved.

(Nov. 18, 2020 Callinan Ltr. (Dkt. No. 206-9) at 2, 4)

Liberty Mutual's letter does not disclose that Liberty Mutual may share the transcript of the examination under oath with law enforcement authorities, nor does it warn Weiner that he is under investigation by the Government.

In a series of letters between December 14, 2020 and January 26, 2021, Callinan adjourns the examination under oath to February 10, 2021, and lists additional claims that Liberty Mutual may ask about at the examination under oath.  (Dkt. Nos. 206-10 through -16)

### b.    Communications Between the Government and Liberty Mutual on the Morning of February 10, 2021

In a February 10, 2021, 9:23 a.m. email to Agent Infusino, with the subject line "Nexray Coming in [f]or EUO Today," Di Minno writes:  "We have [an] EUO schedule[d] for . . . today at 11am; do you have any questions that we should ask the [d]octor?"  (Feb. 10, 2021 Di Minno email, GX 8 (Dkt. No. 109-10) at 3)

According to the Government, Di Minno also called both AUSA Andrews and Agent Infusino on the morning of February 10:

> [O]n the morning of February 10, 2021, John Di Minno called AUSA Mathew Andrews and notified AUSA Andrews for the first time that Liberty Mutual had scheduled an EUO of William Weiner for later that same day.  AUSA Andrews did not provide any questions to Mr. Di Minno.  AUSA Andrews told Mr. Di Minno that AUSA Andrews needed to confer with AUSA Pellegrino.  AUSA Andrews then called AUSA Pellegrino and told him that Mr. Di Minno had called.  AUSA Pellegrino called Special Agent Joseph Infusino, and together they returned Mr. Di Minno's call.

(May 17, 2023 Govt. Ltr. (Dkt. No. 174-31) at 2)  The record does not reflect whether Di Minno called Andrews before or after the 9:23 a.m. email to Infusino.

The Government further represents that

SA Infusino recalls that shortly after receiving the Email, but before he could speak with the U.S. Attorney's Office, Di Minno called SA Infusino to ask whether the Government had any questions for the Nexray/Weiner EUO. . . . Agent Infusino did not provide any questions and stated that he needed to speak with the assigned AUSAs.

(May 23, 2023 Govt. Ltr. (Dkt. No. 172) at 1)

At the evidentiary hearing, both Di Minno and Agent Infusino testified about Di

Minno's February 10, 2021, 9:23 a.m. email to Infusino.  Di Minno testified as follows:

Q. Do you recall sending this email?

A. Yes.

Q. And what is the reason that you sent it?

A. We sent it to see if he had any questions regarding the doctor before the EUO.

Q. Now, if the government had ever previously sent you questions to ask Weiner before this email, would you have sent this email?

A. No.

. . . .

Q. Do you recall whether you had any further communications with the government, either by phone or email or any other method, regarding this question that you posed?

A. No.

Q. When you say no, are you saying you did not or you don't recall?

A. I did not.

Q. Did AUSA Andrews ever give you any instructions about investigating Dr. Weiner?

A. No.

Q. Did Agent Infusino ever give you any instructions about investigating Dr. Weiner?

A. No.

Q. Would you have remembered it if the government had provided you with questions to ask Dr. Weiner?

A. Absolutely.

Q. Why?

A. We would remember any questions regarding outside of the normal EUO scope.

Q. Now, just to be clear, did you ever transmit any questions to any person at Liberty for them to ask Weiner at an EUO?

A. No.

Q. Did Agent Infusino ever give you any instructions about how to proceed with your investigation?

A. No.

Q. He never asked you about – he never informed you about proceeding, about how you should proceed?

A. No.

Q. Did you previously tell us that he had a conversation – you had a conversation with him where he would tell you to proceed as normally?

A. Yes.  The only reason I had a conversation with the government was if I had a question that was, they were to say about investigations and such, they would say do normally, your normal investigation and proceed as you normally proceed, as you would in any investigation that Liberty Mutual did.

Q. OK.  I want to break that down, to be clear, though.  So you had conversations with the government about proceeding with your investigation?

A. Yes.

Q. Who were those conversations with?

A. Either with Agent Infusino or Mathew Andrews.

Q. And what was the sum and substance of what they told you?

A. They just – the only thing they told us, to proceed as you would normally proceed in your investigation.

Q. What did you understand that to mean?

A. Do our investigation as we normally handle them.

Q. And were you told that on one occasion or more than one occasion?

A. More than one occasion.

Q. And do you remember specifically when that was?

A. Not really, no.

Q. Did anyone from the government – anyone, FBI, U.S. Attorney's Office, anyone – ever give you any contrary advice?

A. No.

Q. And do you have any notes, emails, reports, documents or any other materials memorializing any of these conversations with the government?

A. No.

Q. Did you ever have any such materials?

A. No.

Q. Why not?

A. I didn't need any.  I mean I was just getting the subpoenas, the information from the subpoenas.  That's what I did.  I didn't take notes.

Q. You did not take notes of any of these conversations?

A. No, no.

. . . .

[cross-examination]

Q. [D]o you remember [sending the February 10, 2021 email to Infusino]?

A. I don't remember doing it, but I had to send it.  I had to.  It was in my name, so –

Q. Do you remember calling AUSA Andrews on that same morning?

A. No, I don't remember calling him.

Q. Did you?

A. No.  I don't believe so.  I don't remember calling him.

Q. Are you sure?

A. I don't remember calling him.

(May 19, 2023 Tr. (Dkt. No. 187) at 38-41, 89-90)[5]

       Agent Infusino testified as follows concerning Di Minno's email:

Q. Prior to this email, did you know that Liberty Mutual had scheduled an EUO of William Weiner?

---

[5]  More broadly, Di Minno testified that the Government did not – at any point – direct Liberty Mutual's investigation of Weiner and Nexray:

> Q. In connection with these conversations [between the Government and Liberty Mutual], did the government instruct you to do anything?
> A. No.
> Q. In connection with these conversations, did the government instruct you to investigate anyone?
> A. No.
> . . . .
> Q. Now, did Special Agent Infusino ever give you any instructions or directions about what to investigate?
> A. No.
> Q. Did he ever ask you to do anything for the government other than produce documents or information responsive to subpoenas?
> A. No.
> Q. Did Special Agent Infusino ever advise you about how Liberty Mutual should proceed with any insurance investigations it was conducting?
> A. No.
> . . . .
> Q. And did the government ever . . . ask Liberty to open [the June 2020] investigation [of Weiner]?
> A. No.
> . . . .
> Q. Do you recall whether the government ever gave you any instructions or directives with regard to Liberty's investigation?
> A. No.
> Q. If you had been given such instruction, would you have remembered them?
> A. Yes.
> Q. Why?
> A. Because I would have – they would have [stood] out in regard[] to our investigations.  We really don't take any, from law enforcement, we don't take any, you know, questions they want us to ask, or whatever.  We do our own investigations.  We're not an arm of law enforcement, really.

(May 19, 2023 Tr. (Dkt. No. 187) at 17, 21-22, 36-37)

A. No, I did not.

Q. What happened after you received this email?

A. After I received this email, I made contact with you, Mr. Andrews.  We ended up speaking on the phone with [Assistant U.S. Attorney Louis] Pellegrino, who was also on the phone.  I informed you both about this, the email that I received from Mr. Di Minno, and at that time we discussed that – and we were in agreement – that we were – we would not instruct Liberty Mutual to do anything, we will not provide them any questions and we needed to reach out to John Di Minno to notify him of that.

Q. Did you reach out to John Di Minno?

A. Yes. I reached out to him along with AUSA Pellegrino.

Q. What did AUSA Pellegrino say on that phone call?

A. During the conversation, AUSA Pellegrino told Mr. Di Minno that the government will not be supplying any questions for the EUO and that Liberty Mutual needed to conduct their EUO as they would normally conduct any other EUO.  Mr. Di Minno said he understood that. Mr. Pellegrino then, again, advised Mr. Di Minno that he needed to – Liberty Mutual needed to do what they would normally do through a EUO, and the government will not be providing any guidance or any questions for that EUO.  Again, Mr. Di Minno agreed that he understood.  After that, I asked Mr. Di Minno did he under – did he understand, and he further said that he did.  I asked him if he had any questions.  He said he did not, and that concluded the phone call.

Q. Did Mr. Di Minno express any confusion on that phone call?

A. No.

Q. Did Mr. Di Minno say that he had already received questions from the government on the phone call?

A. No.

(Id. at 103-05 ("DiMinno" changed to "Di Minno" throughout); see also id. at 123-28).[6]

_____

[6] More broadly, Agent Infusino testified that he never instructed or encouraged Liberty Mutual to take any particular investigative steps:

> Q. Did you ever request any information from Liberty Mutual outside of these subpoenas?
> A. No.
> Q. Did you ever instruct Liberty Mutual to take any investigative steps?
> A. No.
> Q. Did you ever encourage Liberty Mutual to take any investigative steps?
> A. No.
> Q. Did you ever instruct Liberty Mutual to conduct any EUOs?
> A. No.
> Q. Did you ever encourage Liberty Mutual to conduct any EUOs?
> A. No.
> Q. Did you ever instruct Liberty Mutual to ask any questions during EUOs?
> A. No, I did not.
> Q. Did you ever encourage Liberty Mutual to ask any questions during EUOs?
> A. No.
> . . . .
> Q. Special Agent Infusino, are you aware of any member of the United States Attorney's Office instructing Liberty Mutual to take any investigative steps?
> A. No, I'm not.
> Q. Are you aware of any member of the U.S. Attorney's Office encouraging Liberty Mutual to take any investigative steps?
> A. No, I'm not.
> Q. Are you aware of any member of the U.S. Attorney's Office instructing Liberty Mutual to conduct any EUOs?
> A. No, I'm not.
> Q. Are you aware of any member of the U.S. Attorney's Office encouraging Liberty Mutual to conduct any EUOs?
> A. No.
> Q. Are you aware of any member of the U.S. Attorney's Office instructing Liberty Mutual to ask any particular questions during the EUOs?
> A. No.
> Q. Are you aware of any member of the U.S. Attorney's Office encouraging Liberty Mutual to ask any particular questions during the EUOs?
> A. No.

(Id. at 101-02, 106-07)

c.      **Weiner's Testimony at the Examination Under Oath**

Liberty Mutual's examination under oath of Weiner proceeded on February 10, 2021, at 11:00 a.m.  Weiner was represented by attorney Russell Friedman.  Liberty Mutual did not warn Weiner that it might share the transcript of his deposition with law enforcement, nor did Liberty Mutual tell Weiner that he was already under investigation by law enforcement.

At the deposition, Weiner responded to numerous questions about, inter alia, Nexray's finances and his business relationship with Bradley Pierre, the lead defendant in the instant case and the alleged true owner of Nexray Medical Imaging PC.  (Feb. 10, 2021 Weiner Dep. (Dkt. No. 190-11), passim; Superseding Indictment (Dkt. No. 191) ¶ 19 ("Bradley Pierre received the majority of Nexray's proceeds; controlled Nexray's bank accounts; influenced the hiring and firing of Nexray's employees; identified the locations for Nexray's facilities; negotiated the rent for Nexray's leases; and chose the attorneys that would represent Nexray in arbitration, litigation, and sworn depositions before insurance companies."))

The Government contends that Weiner gave the following false and misleading testimony at his Liberty Mutual deposition regarding his relationship with Bradley Pierre, and that he did so in furtherance of the charged scheme to defraud Liberty Mutual (Govt. Rule 17 Opp. (Dkt. No. 121) at 13-14):

Q. Do you know Bradley Pierre?

A. I do.

Q. How do you know Bradley?

A. He is a funder.

(Feb. 10, 2021 Weiner Dep. (Dkt. No. 190-11) at 71-72)

Q. Does Mr. Pierre do any kind of marketing for you?

A. No, sir.

Q. Does Mr. Pierre take any efforts to refer patients to you?

A. Not that I know of.

(Id. at 92)

Q. How did you find that space [in which Nexray is located]?

A. One of the referring doctors that I got work from over the years contacted me, Dr. Marvin Moy.  He was already in the space – looking at the space.  He told me about it.

(Id. at 40-41)  (The Government contends that Weiner deliberately omitted Bradley Pierre's role

in choosing Nexray's location.  ((S2) Indictment (Dkt. No. 191) ¶ 19))

Q. When a carrier issues payment, is that mailed to you directly at Nexray, or is it sent somewhere else?

A. It's mailed to Nexray. . . .

Q. Who has access to that box?

A. Myself and [Nexray operations manager] Steve [Paleocostas].  I don't have the P.O. Box in front of me.

Q. Does your wife have access to the box?

A. Only if – I mean, I have a key to the box, so in that sense, she would have access if I gave her the key.

Q. Does Mr. Pierre have access?

A. No.

(Id. at 103-04)

Q. Who pointed you to [accountant Albert] Haft?

A. Well, I've known him for a long time.  I mean, [my attorney] Russell [Friedman] knew him from high school.  My wife's closest friend went to high school with him.  He is [a] local guy in the neighborhood, so I heard about him from different sources.

Q. Other than Mr. Friedman, what other sources did you hear about [the accountant] by?

26

A. Like I said, his wife and my wife's best friend grew up together, so we've known him for a long time.

(Id. at 69-70)  (The Government contends that Weiner deliberately omitted Bradley Pierre's role in selecting Nexray's accountant, Albert Haft, who has pleaded guilty to a superseding information charging him with conspiracy to defraud the United States in connection with false tax returns.  (Govt. Rule 17 Opp. (Dkt. No. 121) at 14); (S1) Information (Dkt. No. 95))[7]

### 7.   Communications Between the Government and Liberty Mutual After Weiner's Examination Under Oath

Agent Infusino and Di Minno spoke by telephone later in the day on February 10, 2021 – after Weiner's examination under oath – regarding a different matter.  Agent Infusino recalls that, "[d]uring that conversation, Di Minno told SA Infusino something to the effect of, 'he showed up for the EUO,' but there was no further conversation regarding Weiner or Nexray."  (May 23, 2023 Govt. Ltr. (Dkt. No. 172) at 2)

---

[7]  The alleged false statements set forth above provide the basis for paragraph 21 of the (S2) Indictment:

> BRADLEY PIERRE, the defendant, further arranged for the No-Fault Physicians, including . . . WILLIAM WEINER, the defendant[], to lie under oath to insurance companies to conceal the healthcare fraud scheme.  Under the No-Fault Law, insurance carriers have the right to subject medical providers to Examinations under Oath ("EUOs") when they suspect that providers have submitted fraudulent claims. During the process, the physician is placed under oath and asked questions relevant to the claim at hand, including whether the medical practice is under the control of nonphysicians.  BRADLEY PIERRE and the No-Fault Physicians were aware that insurance companies would deny reimbursement for the No-Fault Clinics if the No-Fault Physicians testified truthfully about the medical necessity of treatments and BRADLEY PIERRE's control of the Clinics.  [BRADLEY] PIERRE accordingly arranged for the No-Fault Physicians to falsely state under oath, among other things, that BRADLEY PIERRE was solely a lender for the No-Fault Clinics and BRADLEY PIERRE played no role in referring patients to the No-Fault Clinics.

((S2) Indictment (Dkt. No. 191) ¶ 21)

On April 8, 2021, Di Minno sent Agent Infusino and AUSA Andrews a signed version of the transcript of Weiner's February 10, 2021 examination under oath.  (Apr. 8, 2021 Di Minno email, GX 9 (Dkt. No. 190-11) at 3 ("Mat[] and Joe, per your request, the signed [Weiner] EUO."))

On May 25, 2021, the grand jury issued a fourth subpoena to Liberty Mutual. (May 25, 2021 Andrews email, GX 11 (Dkt. No. 190-13))[8]  Di Minno testified that – aside from forwarding the subpoena to the relevant Liberty Mutual personnel – the Government did not "direct [him] to do anything else in response to receiving this subpoena."  (May 19, 2023 Tr. (Dkt. No. 187) at 46)

In a September 11, 2021 email, AUSA Andrews asked Di Minno "the physical location of where the questioner [for the Weiner examination under oath] was located."  (Sept. 11, 2021 Andrews email, GX 10 (Dkt. No. 190-12) at 3)  Di Minno testified that he "didn't respond" to this query.  (May 19, 2023 Tr. (Dkt. No. 187) at 44-45)

### 8.     Communications Between the Government and the Crime Bureau

In a November 11, 2019 email thread, AUSA Andrews and Thomas McCourt, a Crime Bureau investigator, discuss Bradley Pierre.  McCourt also gives Andrews the contact information for a member of Liberty Mutual's legal department.  (Dkt. No. 110-4)

On March 9, 2020, McCourt provided AUSA Andrews with Di Minno's contact information, so that the Government could direct a subpoena for Liberty Mutual to Di Minno. (Dkt. No. 110-5 at 2)

In a June 26, 2020 email thread, Andrews asks McCourt for a "spreadsheet documenting all the MRI facilities to which Rutland [a medical clinic owned by co-defendant

---

[8]  Only the cover letter, and not the subpoena itself, was introduced at the evidentiary hearing.

Marvin Moy] has referred patients."  McCourt provides a spreadsheet showing "a run of claims where Rutland and Nexray are both in the claim."  (Dkt. No. 110-10 at 2)

In a July 11-12, 2020 email thread, Andrews asks McCourt for "[t]he addresses from which Nexray has submitted bills," "[t]he date range for which Nexray submitted bills for each location," and to "check if Nexray did an EUO with an insurance company called Mid-Century in 2017."  (Dkt. No. 174-14 at 2)

### 9. Discovery Regarding the Government's Communications with Liberty Mutual and the Crime Bureau

The Government and Weiner engaged in extensive negotiations regarding the Government's production of documents reflecting its communications with Liberty Mutual and the Crime Bureau.  (See Sept. 13, 2022 Def. Ltr. (Dkt. No. 121-3); Sept. 30, 2022 Govt. Ltr. (Dkt. No. 110-3); Oct. 24, 2022 Govt. Ltr. (Dkt. No. 114); Oct. 26, 2022 Def. Ltr. (Dkt. No. 115); Oct. 26, 2022 Govt. Ltr. (Dkt. No. 116))

The parties eventually agreed on protocols for the Government's search and production, including the Government's use of a "specialized search function" to identify any email communications with email users using Liberty Mutual's or the Crime Bureau's email domains and the Government's "produc[tion] [of] any email communications with [the Crime Bureau] containing the terms 'Weiner' or 'Nexray.'"  In a November 2, 2022 letter, the Government informed the Court that the parties had "reached agreement on a path forward, and, accordingly, agree[d] that the Court need not take any further action with respect to [Weiner's] concerns [regarding the Government's production]."  (Nov. 2, 2022 Govt. Ltr. (Dkt. No. 117) at 1)  And at a December 20, 2022 conference, Weiner's counsel stated that he was "reasonably

satisfied that the [G]overnment's production of the [G]overnment's records [was] essentially complete." (Dec. 20, 2022 Tr. (Dkt. No. 136) at 15)[9]

### B.   **Legal Standards**

Rule 17(c) of the Federal Rules of Criminal Procedure provides that

[a] subpoena may order the witness to produce any books, papers, documents, data, or other objects the subpoena designates.  The court may direct the witness to produce the designated items in court before trial or before they are to be offered in evidence.  When the items arrive, the court may permit the parties and their attorneys to inspect all or part of them.

Fed. R. Crim. P. 17(c)(1).

A court may quash a Rule 17(c) subpoena "if compliance would be unreasonable or oppressive."  Fed. R. Crim. P. 17(c)(2).  "Enforcement of a pretrial subpoena duces tecum must necessarily be committed to the sound discretion of the trial court since the necessity for the subpoena most often turns upon a determination of factual issues."  United States v. Nixon, 418 U.S. 683, 702 (1974).

"Rule 17(c) was not intended to provide an additional means of discovery" in a criminal case.  Bowman Dairy Co. v. United States, 341 U.S. 214, 220 (1951).  Moreover, a Rule 17(c) subpoena must meet the tests of "(1) relevancy; (2) admissibility; [and] (3) specificity."  Nixon, 418 U.S. at 700.

A party seeking the issuance of a Rule 17(c) subpoena

must show:  (1) that the documents are evidentiary and relevant; (2) that they are not otherwise procurable reasonably in advance of trial by exercise of due diligence; (3) that the party cannot properly prepare for trial without such production and inspection . . . and that the failure to obtain such inspection may

---

[9]  The Government also provided Section 3500 material for Di Minno and Infusino in advance of the evidentiary hearing, which Weiner's counsel utilized on cross-examination.  (See, e.g., May 19, 2023 Tr. (Dkt. No. 187) at 61-62 (Weiner's counsel asking about statements Di Minno had made to prosecutors in previous meetings))

tend unreasonably to delay the trial; and (4) that the application is made in good
faith and is not intended as a general "fishing expedition."

Id. at 699-700 (citing United States v. Iozia, 13 F.R.D. 335, 338 (S.D.N.Y. 1952) (Weinfeld, J.))

(footnote omitted).

   "While the specificity requirement is intended 'to provide the subpoenaed party or

other party having standing with enough knowledge about what documents are being requested

so as to lodge any objections on relevancy or admissibility,' this requirement also 'ensures that a

Rule 17(c) subpoena will not be used as a 'fishing expedition to see what may turn up.'"  United

States v. Avenatti, No. (S1) 19 CR. 373 (PGG), 2020 WL 86768, at *4 (S.D.N.Y. Jan. 6, 2020)

(quoting United States v. Libby, 432 F. Supp. 2d 26, 32 (D.D.C. 2006)).[10]

---

[10]  Citing United States v. Tucker, 249 F.R.D. 58, 66 (S.D.N.Y. 2008), and United States v.
Weigand, 520 F. Supp. 3d 609, 612 (S.D.N.Y. 2021), Weiner argues that "[the Nixon] standard
does not apply here.  Rather, the appropriate standard is whether a subpoena is '(1) reasonably
construed as material to the defense and (2) not unduly oppressive for the producing party to
respond.'"  (Def. Rule 17 Br. (Dkt. No. 110) at 6-7 (quoting Weigand, 520 F. Supp. 3d at 612))

While Nixon does not address whether its standard "appl[ies] in its full vigor when the subpoena
duces tecum is issued to third parties rather than to government prosecutors," Nixon, 418 U.S. at
699 n.12, the "overwhelming majority of courts in this District, along with the Second Circuit[ in
a summary order] . . . , [have] applie[d] the Nixon standard to review . . . trial subpoena[s] served
upon . . . third part[ies]."  United States v. Cole, No. 19 CR. 869 (ER), 2021 WL 912425, at *3
(S.D.N.Y. Mar. 10, 2021) (citing United States v. Bergstein, 788 F. App'x 742, 746 (2d Cir.
2019) (summary order); United States v. Skelos, No. 15 Cr. 317 (KMW), 2018 WL 2254538, at
*1 (S.D.N.Y. May 17, 2018); United States v. Avenatti, No. 19 Cr. 373 (PGG), 2020 WL
508682, at *3 (S.D.N.Y. Jan. 31, 2020); United States v. Percoco, No. 16 Cr. 776 (VEC), 2018
WL 9539131, at *2 (S.D.N.Y. June 14, 2018)).

Tucker and Weigand are thus outliers.  Moreover, this Court has consistently applied the Nixon
standard to Rule 17(c) subpoenas issued to third parties, see, e.g., Avenatti, 2020 WL 86768, at
*4; Avenatti, 2020 WL 508682, at *4; United States v. Mirzoyan, 10 Cr. 895 (PGG) (Dkt. No.
804) (S.D.N.Y. June 11, 2014); United States v. Vaughan, 10 Cr. 233 (PGG) (Dkt. No. 22)
(S.D.N.Y. Dec. 17, 2010)), and will do so here.

C. **Analysis**

 1. **Whether a Rule 17(c) Subpoena May Be Issued**
   **in Connection with an Anticipated Motion to Suppress**

This Court has not previously considered an application for a Rule 17(c) subpoena in connection with a potential motion to suppress premised on a possible <u>Kastigar</u> violation. (<u>See</u> Dec. 20, 2022 Tr. (Dkt. No. 136) at 33)  The question thus arises whether the relief Weiner seeks is available in the context of a potential motion to suppress.

 a. <u>**Rule 17(c)'s Text and Early Case Law**</u>

Rule 17(c) provides that "[t]he Court may direct the witness to produce the designated items in court <u>before trial</u> or before they are to be offered in evidence."  Fed. R. Crim. P. 17(c)(1) (emphasis added).  Rule 17(c) is thus trial-focused, and does not contemplate the issuance of a subpoena in connection with a pretrial hearing.  <u>Compare</u> Rule 17(e)(1) ("A subpoena requiring <u>a witness to attend a hearing or trial</u> may be served at any place within the United States.") (emphasis added).

The seminal early cases addressing Rule 17(c) – which was promulgated in 1949, <u>see</u> Fed. R. Crim. P. 17, Credits – indicate that it was initially understood to provide a mechanism by which parties could obtain and review documents before a trial began.  It was not viewed as a device to expand the scope of Rule 16 discovery.  <u>See</u> <u>United States v. Maryland & Va. Milk Producers Ass'n</u>, 9 F.R.D. 509, 510 (D.D.C. 1949) ("The purpose of this provision is a limited one.  It is to make it possible to require the production before the trial of documents subpoenaed for use at the trial.  Its purpose is merely to shorten the trial.  It is not intended as a discovery provision."); <u>Bowman Dairy</u>, 341 U.S. at 220-22 & n.5 ("Rule 17(c) was not intended to provide an additional means of discovery.  Its chief innovation was to expedite the trial by providing a time and place before trial for the inspection of the subpoenaed materials . . . . [The]

plain words of the Rule . . . [per] their ordinary meaning . . . [evince] the purpose of establishing

a more liberal policy for the production, inspection, and use of materials at the trial. . . . '[W]hile

normally under a subpoena the books and other things called for would merely be brought into

court at the time of the trial, let us say immediately before they are to be offered in evidence,

there is a provision in this rule that the court may, in the proper case, direct that they be brought

into court in advance of the time that they are offered in evidence.'") (quoting G. Aaron

Youngquist, Proceedings of the Inst. on Fed. R. Crim. P. at 167-68 (N.Y.U. School of Law, Inst.

Proceedings, Vol. VI, 1946)).

### b.   Second Circuit Law

There is limited authority in this Circuit supporting the use of Rule 17(c)

subpoenas in connection with pretrial proceedings.

In United States v. Berrios, 501 F.2d 1207 (2d Cir. 1974), the trial judge approved

the defendant's Rule 17(c) subpoena for government records that the defendant sought in

connection with a pretrial evidentiary hearing regarding his claim of selective prosecution.

Although the Second Circuit regarded defendant's selective prosecution argument as weak, it

concluded that issuance of the Rule 17(c) subpoena was within the district court's discretion:

> Notwithstanding the apparent weakness of [defendant's] claim, we recognize that
> the decision to permit a hearing and, in anticipation thereof, to authorize a
> subpoena of evidence in the government's possession, lies largely in the trial
> judge's discretion.  As the Supreme Court has . . . stated in United States v.
> Nixon, "Enforcement of a pretrial subpoena duces tecum must necessarily be
> committed to the sound discretion of the trial court since the necessity for the
> subpoena most often turns upon a determination of factual issues.  Without a
> determination of arbitrariness or that the trial court finding was without record
> support, an appellate court will not ordinarily disturb a finding that the applicant
> for a subpoena complied with Rule 17(c)."

Id. at 1212 (quoting Nixon, 418 U.S. at 702).

In <u>United States v. Stein</u>, No. S1 05 CRIM. 0888 LAK, 2006 WL 1063298 (S.D.N.Y. Apr. 12, 2006), Judge Kaplan approved Rule 17(c) subpoenas in advance of an evidentiary hearing regarding the defendants' Sixth Amendment claim that the Government had improperly interfered with their choice of counsel by pressuring their employer to stop advancing legal fees.  <u>Id.</u> at *2.  And in <u>United States v. Louis</u>, No. 04 CR, 203 (LTS), 2005 WL 180885 (S.D.N.Y. Jan. 27, 2005), and <u>United States v. Maxwell</u>, No. 20-CR-330 (AJN), 2021 WL 1625392 (S.D.N.Y. Apr. 27, 2021), Judges Swain and Nathan entertained the notion that Rule 17(c) could be used as a vehicle to obtain documents for purposes of a suppression hearing, although both denied the respective motions for Rule 17(c) subpoenas under the <u>Nixon</u> standard. See <u>Louis</u>, 2005 WL 180885, at *3-5 (stating that "Rule 17(c) can properly be used to compel the attendance of witnesses [at a suppression hearing] and require the production of documents in connection with such a hearing"; holding that defendant had not satisfied <u>Nixon</u>'s relevance and specificity requirements); <u>Maxwell</u>, 2021 WL 1625392, at *1-3 (citing <u>Louis</u> for the proposition that "at least some courts have held that Rule 17(c) can be used to compel the production of documents in connection with a suppression hearing"; denying Rule 17(c) subpoena requests because defendant had not satisfied <u>Nixon</u>'s specificity and "not otherwise procurable" requirements).

### c.   <u>Application</u>

<u>Nixon</u> and <u>Berrios</u> teach that "the decision to permit a hearing and, in anticipation thereof, to authorize a [Rule 17(c)] subpoena of evidence . . . lies largely in the trial judge's discretion."  <u>Berrios</u>, 501 F.2d at 1212.  These cases also emphasize that "'[w]ithout a determination of arbitrariness or that the trial court finding was without record support, an appellate court will not ordinarily disturb a finding that the applicant for a subpoena complied with Rule 17(c).'"  <u>Id.</u> (quoting <u>Nixon</u>, 418 U.S. at 702).

Here, Weiner seeks the issuance of Rule 17(c) subpoenas in connection with a possible motion to suppress premised on a <u>Kastigar</u> theory:  that the Government directed or encouraged Liberty Mutual to take Weiner's deposition, and told Liberty Mutual what questions to ask and/or what subjects to explore.  (Weiner Br. (Dkt. No. 110) at 4 ("The emails [in the record] show that the Government met with, collaborated with, solicited information from and otherwise actively used the [Crime Bureau] and Liberty Mutual to advance its criminal investigation of Dr. Weiner – including most notably by at least attempting to collaborate on the February 2021 EOU – without disclosing the existence of that criminal investigation to him.  The Proposed Subpoenas seek more detailed information about the nature and extent of this collaboration, which bears directly on whether the activities of the [Crime Bureau] and Liberty Mutual must be imputed to the government for purposes of a suppression motion."))

No motion to suppress has actually been filed, however, and no subpoena has been served.  Weiner instead seeks authorization to serve Rule 17(c) subpoenas seeking discovery of materials from Liberty Mutual and the Crime Bureau in order to make a determination as to whether there are grounds to move to suppress.  (See <u>id.</u> at 1 ("Dr. Weiner seeks these materials because they are critical to evaluating and litigating whether the Government violated Dr. Weiner's constitutional rights by directing and controlling some or all aspects of the parallel civil investigations of Dr. Weiner undertaken by the [Crime Bureau] and Liberty Mutual."))

In exercising the discretion that the <u>Nixon</u> and <u>Berrios</u> courts indicate a trial judge has (<u>see</u> <u>Berrios</u>, 501 F.2d at 1212), this Court must be mindful of the plain text of Rule 17(c) and how the Supreme Court has interpreted that text.  Rule 17(c) was intended to set out a procedure for evidentiary materials to be "produce[d] . . . in court before trial," Fed. R. Crim. P.

17(c)(1), as opposed to "immediately before they are to be offered in evidence," <u>Bowman Dairy</u>, 341 U.S. 220 n.5 (quotation omitted); <u>Maxwell</u>, 2021 WL 1625392, at *1 ("The purpose of Rule 17(c) is to facilitate the trial by designating a time and place prior to trial to obtain and inspect evidentiary material."). The Rule is largely logistical: it is intended to reduce the likelihood that a recess at trial will be necessary to permit the parties to review materials produced in connection with trial subpoenas. Its purpose is not to transform the discovery phase of criminal litigation. <u>See</u> <u>Maryland & Va. Milk Producers</u>, 9 F.R.D. at 510 ("[Rule 17(c)'s] purpose is merely to shorten the trial. It is not intended as a discovery provision."); <u>Maxwell</u>, 2021 WL 1625392, at *1 (Rule 17(c) "is not intended to provide an additional means of discovery or to serve as a general 'fishing expedition'").

Unchecked use of Rule 17(c) in connection with pretrial proceedings that are far in advance of any trial would contravene the Rule's purpose and the Supreme Court's interpretation of the rule, and would "undermine the discovery procedures set forth in Rule 16." <u>Maxwell</u>, 2021 WL 1625392, at *1. Indeed, <u>Nixon</u>'s "rationale for imposing . . . limitations on pretrial (as opposed to trial) subpoenas under Rule 17(c) is that the rule is not intended as a discovery device, and an impermissible discovery motive is much more likely to underlie a subpoena calling for a return well in advance of trial than one issued for return the date trial is set to begin." <u>United States v. Binday</u>, 908 F. Supp. 2d 485, 492 (S.D.N.Y. 2012). The more attenuated the subpoena is from a trial, the greater this concern. <u>Cf.</u> <u>Mirzoyan</u>, 10 Cr. 895 (PGG) (Dkt. No. 804), Slip Op. at 5-11 (denying motion to reconsider previous denial of Rule 17(c) subpoenas in connection with sentencing; citing <u>Bowman Dairy</u> and <u>Maryland & Va. Milk Producers</u> for proposition that Rule 17(c) is intended for use at trial). Here, the attenuation from any trial is extreme, and the requested subpoenas do not even involve a pending motion.

This Court concludes that, in the procedural context of the instant case, issuance of a Rule 17(c) subpoena is appropriate only where the proponent has demonstrated strict compliance with the Nixon factors.  For example, in Stein, 2006 WL 1063298, a Rule 17(c) subpoena were issued as to KPMG in connection with a pending motion to dismiss the indictment and upcoming hearing that involved a novel and significant Sixth Amendment issue: whether the Government had interfered with the defendants' rights to obtain counsel of their choice by pressuring KPMG not to advance attorneys' fees.  The defendants' application for a Rule 17(c) subpoena was supported by compelling evidence that a Sixth Amendment violation may have taken place, including the U.S. Department of Justice's Thompson Memorandum[11] – which appeared to authorize and encourage interference with defendants' rights to obtain counsel of their choice – and the Government's concession

> that the lead prosecutor in this case inquired in February 2004 about KPMG's obligations and plans with respect to payment of legal fees of partners and employees.  Against the background of the Thompson memorandum, the inquiry itself arguably was a signal to KPMG as to action that would promote its chances of avoiding prosecution.

Stein, 2006 WL 1063298, at *1-2.

---

[11]  The Thompson Memorandum articulated principles that should govern Federal prosecutors' decisions whether to charge business organizations.  The Thompson Memorandum directed prosecutors to consider, inter alia, a company's "'timely and voluntary disclosure of wrongdoing and its willingness to cooperate in the investigation of its agents.'"  United States v. Stein, 541 F.3d 130, 136 (2d Cir. 2008) (quoting Mem. from Larry D. Thompson, Deputy Att'y Gen., U.S. Dep't of Justice, Principles of Federal Prosecution of Business Organizations (Jan. 20, 2003), at 11).  In this regard, the Thompson Memorandum directed prosecutors to take into account "'whether the corporation appears to be protecting its culpable employees and agents [and that] a corporation's promise of support to culpable employees and agents, either through the advancing of attorneys' fees, through retaining the employees without sanction for their misconduct, or through providing information to the employees about the government's investigation, pursuant to a joint defense agreement, may be considered by the prosecutor in weighing the extent and value of a corporation's cooperation.'"  Id. (emphasis and alteration in Stein).

In sum, given (1) the Thompson memorandum's statement that advancement of fees could be considered in determining whether a corporation had fully cooperated with the Government's investigation; and (2) the Government's concession that the lead prosecutor had raised the issue of KPMG advancing fees to its partners and employees, and inquired as to KPMG's "plans" with respect to this issue, there was a substantial basis to believe that KPMG would be in possession of documents relevant to the issue of whether the defendants' Sixth Amendment rights had been violated.

As discussed below, the evidentiary record here is quite different. Weiner has not proffered evidence that his constitutional rights were violated (see Weiner Post-Hrg. Br. (Dkt. No. 174) at 5 ("Dr. Weiner has not yet established a Kastigar violation.")), nor has he provided a basis to believe that documents supporting such a claim are in the possession of Liberty Mutual or the Crime Bureau. The requested subpoenas thus constitute the sort of "general fishing expedition" precluded by Nixon and Judge Weinfeld's decision in Iozia, 13 F.R.D. at 338.

## 2. **Whether Weiner Has Satisfied the *Nixon* Factors**

### a. **Relevance**

Weiner argues that "[t]he requested documents [are relevant because they] will bear directly upon the role the Government played in directing or shaping the investigations undertaken by the insurance entities, including the extent to which the Government directed those investigations. Such issues are central to whether the Government violated Dr. Weiner's constitutional rights, including by examining him under oath in February 2021 without first revealing the criminal investigation." (Weiner Br. (Dkt. No. 110) at 8)

The Government argues, however, that even if the requested subpoenas led to the disclosure of material showing that the Government directed Liberty Mutual's and the Crime Bureau's investigations, such material would be irrelevant to any Kastigar motion, because any

such motion would fail as a matter of law.  (Govt. Rule 17 Opp. (Dkt. No. 121) at 23-24 ("[T]he

Court should deny the Subpoena Request because Weiner as a matter of law cannot prove that

Liberty Mutual was a state actor. . . .  Weiner accordingly cannot meet any of <u>Nixon</u>'s

requirements for Rule 17(c) subpoenas because any anticipated suppression motion, as a matter

of law, would be meritless."))

### i.       <u>Applicable Law</u>

> To establish a Fifth Amendment violation, a [defendant] must demonstrate "that
> in denying the [defendant]'s constitutional rights, the [private entity]'s conduct
> constituted state action."  <u>Desiderio v. National Ass'n of Securities Dealers, Inc.</u>,
> 191 F.3d 198, 206 (2d Cir. 1999).  That is because the Fifth Amendment restricts
> only governmental conduct, and will constrain a private entity only insofar as its
> actions are found to be "fairly attributable" to the government.
>
> Actions are "fairly attributable" to the government where "there is a sufficiently
> close nexus between the State and the challenged action of the regulated entity."
> <u>Jackson v. Metropolitan Edison Co.</u>, 419 U.S. 345, 351 (1974).  That nexus exists
> either (1) where the state "has exercised coercive power [over a private decision]
> or has provided such significant encouragement, either overt or covert, that the
> choice must in law be deemed to be that of the State"; or (2) where "the private
> entity has exercised powers that are 'traditionally the exclusive prerogative of the
> State.'"  <u>Blum v. Yaretsky</u>, 457 U.S. 991, 1004-05 (1982) (quoting <u>Jackson</u>, 419
> U.S. at 351).
>
> Under the <u>Blum</u> test, even heavily regulated private entities generally are held not
> to be state actors.

<u>D.L. Cromwell Invs. v. NASD Regul., Inc.</u>, 279 F.3d 155, 161 (2d Cir. 2002) (last set of brackets

in <u>D.L. Cromwell</u>; further citations omitted).

The Second Circuit has repeatedly addressed the state actor question in the

context of overlapping governmental and private investigations:

> <u>United States v. Solomon</u>, 509 F.2d 863, 865-69 (2d Cir. 1975) (concluding that the New
> York Stock Exchange's demand that a broker submit to an interview under threat of
> suspension was not state action; "[the] NYSE's inquiry into [the broker] was in
> pursuance of its own interests and obligations, not as an agent of the SEC, [and] [i]t is not
> enough to create an agency relationship that [the defendant]'s conduct violated both a
> rule of [the] NYSE, thereby subjecting him to disciplinary action by that body, and

federal law, with consequent liability to civil and criminal enforcement proceedings by the Government");

D.L. Cromwell Invs., Inc. v. NASD Regul., Inc., 279 F.3d 155, 156-58, 162-63 (2d Cir. 2002) (although the National Association of Securities Dealers ("NASD") had shared documents with the U.S. Attorney's Office for the Eastern District of New York concerning plaintiff investment firm, the firm's executives were not entitled to an injunction prohibiting the NASD from compelling them under threat of sanctions to sit for an interview regarding suspected securities fraud; there was "no direct evidence of . . . government involvement" in the demands for interviews, which were "issued directly from [NASD] as a product of its private investigation, and . . . none of the demands was generated by governmental persuasion or collusion. . . . [NASD] ha[d] a regulatory duty to investigate questionable securities transactions") (quotation omitted);

United States v. Stein, 541 F.3d 130, 150-51 (2d Cir. 2008) (KPMG's refusal to advance legal fees to partners facing investigation and prosecution was state action, because the Government had pressured KPMG not to advance fees; "absent the prosecutors' involvement and the [Department of Justice's] Thompson Memorandum[, which discouraged companies from advancing fees to employees under investigation], KPMG would not have changed its longstanding fee advancement policy or withheld legal fees from defendants upon indictment"; "KPMG was not in a position to consider coolly the risk of indictment, weigh the potential significance of the other enumerated factors in the Thompson Memorandum, and decide for itself how to proceed"); and

Gilman v. Marsh & McLennan Companies, Inc., 826 F.3d 69, 76 (2d Cir. 2016) (Marsh's "interview demands" to employees whose answers might subject them to prosecution for bid-rigging by the New York Attorney General did not "constitute state action that infringed their right against self-incrimination"; Marsh "had good institutional reasons for requiring [the employees] to sit for interviews or else lose their jobs," and "[t]here [was] no evidence that the [New York Attorney General] 'forced' Marsh to demand interviews, 'intervened' in Marsh's decisionmaking, 'steered' Marsh to request interviews, or 'supervised' the interview requests").

### ii.   **Analysis**

The Government contends that

[t]he Second Circuit's decisions in D.L. Cromwell, Marsh, and Stein stand for a simple proposition:  there is "no state action [where] the private actors had independent regulatory interests and motives for making their inquiries and for cooperating with parallel investigations being conducted by the government." Stein, 541 F.3d at 150; see Gilman, 826 F.3d at 77 (holding same).  Where private actors have "preexisting and independent investigatory missions, their cooperation with the government [is] not state action."  Stein, 541 F.3d at 150. Liberty Mutual – which was involved in investigating Weiner long before the Government's investigation began – undeniably met this threshold when it interviewed Weiner during the February 2021 [examination under oath]."

(Govt. Rule 17 Opp. (Dkt. No. 121) at 27)

   The Government's argument sweeps too broadly.  Accepting the Government's logic, if the Government had (1) urged Liberty Mutual to require Weiner to appear for an examination under oath; (2) responded to Di Minno's February 10, 2021 queries by supplying a script for Liberty Mutual's lawyer to use in questioning Weiner; and (3) instructed Liberty Mutual's lawyer not to warn Weiner that he was under Government investigation, that would present no state actor issue, because Liberty Mutual had an independent motive for questioning Weiner.

   In Stein, however, the Second Circuit cited with approval a law review article "observing that D.L. Cromwell and Solomon 'turned in large part on the fact that requests for interviews' were not 'generated by governmental persuasion or collusion.'"  Stein, 541 F.3d at 150 (quoting Lisa Kern Griffin, Compelled Cooperation and the New Corporate Criminal Procedure, 82 N.Y.U. L. Rev. 311, 369 (2007)).  Indeed, in D.L. Cromwell, the Second Circuit pointed out that "none of [NASD's] demands [for interviews] was generated by governmental persuasion and collusion."  D.L. Cromwell, 279 F.3d at 163.  And in Gilman, the court likewise noted that "[t]here [was] no evidence that the [New York Attorney General] 'forced' Marsh to demand interviews, 'intervened' in Marsh's decisionmaking, 'steered' Marsh to request interviews, or 'supervised' the interview requests."  Gilman, 826 F.3d at 76.

   In sum, evidence that the Government directed or encouraged (1) Liberty Mutual's examination under oath of Weiner; or (2) supplied questions to Liberty Mutual for use at the EUO, would in fact be relevant to a motion to suppress based on a Kastigar violation.  Such evidence might indicate a due process violation.  See United States v. Scrushy, 366 F. Supp. 2d 1134, 1137-40 (N.D. Ala. 2005) (granting motion to suppress S.E.C. testimony where

the S.E.C. attorney who conducted the examination "received explicit directions from the U.S. Attorney's office concerning tailoring his examination of Mr. Scrushy, . . . was told areas to avoid to keep Mr. Scrushy in the dark regarding the criminal investigation, and . . . specifically included questions in the examination that he would not have included had the U.S. Attorney's office not contacted the S.E.C. and discussed the criminal investigation") (citing United States v. Parrott, 248 F. Supp. 196, 200 (D.D.C. 1965) ("[T]he danger of prejudice flowing from testimony out of a defendant's mouth at a civil proceeding is even more acute when he is unaware of the pending criminal charge.")).

While there is ample evidence here of Liberty Mutual's independent interest in investigating Weiner, this Court cannot find at this stage, as a matter of law, that the materials Weiner seeks would be irrelevant to any motion to suppress based on a Kastigar violation, or that any such motion would be futile.  A Kastigar motion generally presents a fact-intensive inquiry that requires a fully developed record.  Cf. Meadows v. City of New York, No. 10-CV-286 JG LB, 2011 WL 864832, at *5 (E.D.N.Y. Mar. 11, 2011) ("[T]he determination of whether a private party acted jointly with the State or was compelled by the State to act as it did, and therefore can be deemed a state actor, requires thorough development and analysis of the facts of the case.").

The Government argues, however, that even if it directed Liberty Mutual to conduct the examination under oath, and supplied the questions, the examination under oath was not sufficiently compulsory to amount to a Kastigar violation, and Kastigar does not, in any event, protect perjurious statements.  (Govt. Rule 17 Opp. (Dkt. No. 121) at 29-46)  Neither argument is sufficient to demonstrate at this stage that any Kastigar-related motion by Weiner would be futile.

As to compulsion, the record is not adequate at this stage for this Court to determine as a matter of law whether any "economic threat" to Weiner from (1) refusing to appear for the examination under oath, or (2) refusing to answer potentially incriminating questions at that examination, was "'of sufficiently appreciable size and substance to deprive [Weiner] of his free choice to admit, to deny, or to refuse to answer.'"  United States v. Roberts, 660 F.3d 149, 156 (2d Cir. 2011) (quoting United States v. Montanye, 500 F.2d 411, 415 (2d Cir. 1974)).  "This determination depends on an assessment of the totality of the circumstances," id., and the record is not sufficiently developed to permit that type of inquiry.

As to the Government's contention that "a defendant cannot invoke the Fifth Amendment to suppress his own false or perjurious statements" (Govt. Rule 17 Opp. (Dkt. No. 121) at 36), that principle generally pertains to perjury cases.  See Wheel v. Robinson, 34 F.3d 60, 67 (2d Cir. 1994) ("[I]t is well settled that even constitutional deficiencies in the underlying proceeding do not prevent prosecution for perjury.").  The Government argues, however, that

> it is immaterial that the Government is prosecuting Weiner for his lies and perjury using the healthcare fraud and conspiracy statutes, 18 U.S.C. §§ 1347 and 1349, rather than the perjury statute for grand jury proceedings, 18 U.S.C. § 1623.  The Supreme Court and Second Circuit have consistently held that the Fifth Amendment does not protect lies – particularly lies under oath – regardless of the statute under which the defendant is prosecuted.

(Govt. Rule 17 Opp. (Dkt. No. 121) at 44)

But the cases that the Government cites for this proposition involve false statements to Federal agents and obstruction of justice – offenses that are closely related to perjury.  See Brogan v. United States, 522 U.S. 398, 402-05 (1998) (defendant was convicted of making false statements to a Federal agent, in violation of 18 U.S.C. § 1001; holding that there is no Fifth Amendment right to an "exculpatory no," and describing perjury as an "analogous crime"); United States v. Kumar, 617 F.3d 612, 618 (2d Cir. 2010) (defendant was convicted of

obstruction of justice, in violation of 18 U.S.C. § 1512, for "instruct[ing] [his employer's] general counsel to coach . . . employees to lie; authoriz[ing] [the] general counsel to pay a $3.7 million bribe to an individual to procure his silence, and [lying] to FBI agents and others during his interview at the USAO's office"). The facts and statutory allegations in those cases do not resemble the healthcare fraud charges here.

In sum, the Government's arguments regarding compulsion and the inapplicability of Kastigar to false statements do not alter this Court's conclusion that the materials Weiner seeks – if they exist – would be relevant to a motion to suppress based on a Kastigar violation. Weiner has thus satisfied Nixon's relevancy requirement.

### b.     Whether the Proposed Subpoenas Are Sufficiently Specific

### i.     Applicable Law

Nixon's "specificity requirement . . . ensures that a Rule 17(c) subpoena will not be used as a fishing expedition to see what may turn up." Avenatti, 2020 WL 86768, at *4 (quotation omitted). Under Nixon, "the party seeking production of the materials must 'reasonably specify the information contained or believed to be contained in the documents sought,' rather than 'merely hope that something useful will turn up.'" United States v. Barnes, No. S9 04 CR 186 SCR, 2008 WL 9359654, at *4 (S.D.N.Y. Apr. 2, 2008) (quoting United States v. Sawinski, 2000 WL 1702032, at *2 (S.D.N.Y. Nov. 14, 2000)) (brackets omitted). In other words, "speculative requests constitute the type of fishing expeditions [that] are expressly prohibited under Rule 17." United States v. Rivera, No. 13-CR-149 KAM, 2015 WL 1540517, at *4 (E.D.N.Y. Apr. 7, 2015) (quotation omitted).

Stein and Maxwell are instructive regarding the specificity requirement and Nixon's prohibition on "fishing expeditions" in the context of Rule 17(c) subpoenas requested in support of a pretrial motion.

In Stein,

> [c]ertain defendants ha[d] moved to dismiss the indictment or for other relief on the ground, broadly stated, that the government, through the Thompson [M]emorandum and perhaps otherwise, ha[d] violated defendants' right to counsel by improperly interfering with KPMG's ability to choose to advance to defendants legal fees and other defense costs and, in at least one case, by inducing KPMG to breach an alleged contractual obligation to advance such expenses. Defendants [sought] an evidentiary hearing and limited discovery on these issues.

Stein, 2006 WL 1063298, at *1.

In opposing the Stein defendants' motion to dismiss, one of the AUSAs accused of pressuring KPMG to stop advancing legal fees had submitted a declaration in which he stated that "the Government did not tell KPMG's counsel that KPMG's decision to pay legal fees was improper, nor did we instruct or request KPMG to change its decisions about paying fees, capping the payment of fees, or condition the payment of fees on an employee's or a partner's cooperation." United States v. Stein, Weddle Decl., 5 Cr. 888 (LAK) (Dkt. No. 435) ¶ 3 (S.D.N.Y. Apr. 12, 2006). In deciding whether to conduct a hearing concerning the motion to dismiss and whether to authorize Rule 17(c) subpoenas in connection with that hearing, however, Judge Kaplan had before him the following evidence that the Government had interfered with KPMG's well-established policy of advancing legal fees to partners and employees who had come under government investigation because of their work at KPMG:

> the Thompson Memorandum itself, which states that a "factor to be weighed by the prosecutor" in a charging decision as to a corporation "is whether the corporation appears to be protecting its culpable employees and agents," including "through the advancing of attorney fees." Jan. 2003 Thompson Mem. (available at 5 Cr. 888 (LAK), Dkt. No. 271-3), at 2-3;

> an August 2005 memorandum from anonymous KPMG board members, stating: "KPMG is no longer paying the legal fees for the partners involved in the criminal investigation by the government. . . . . No limitation existed previously. Why the change? Really pretty simple. Leadership bowed to pressure from the DOJ in hopes of staving off an indictment of the firm." Aug. 2005 Anonymous Mem., 5 Cr. 888 (LAK) (Dkt. No. 250-22) at 3; and

a series of letters in which the Government notified KPMG that a defendant is not cooperating with the Government, following which KPMG's counsel (1) threatened that defendant with the cessation of legal fees, and then (2) notified the defendant that payment of his or her legal fees had ended.  May-Nov. 2004 Govt. and Skadden Ltrs., 5 Cr. 888 (LAK) (Dkt. No. 385) at 15-18.

Given this evidence, there was a strong basis to believe that a subpoena to KPMG would result in the production of documents relevant to the <u>Stein</u> defendants' Sixth Amendment claims.  Accordingly, Judge Kaplan ordered an evidentiary hearing, and authorized "Defendants [to] serve a Rule 17(c) subpoena on KPMG" in advance of that hearing.  <u>Stein</u>, 2006 WL 1063298, at *2.

In <u>Maxwell</u>, by contrast, Jeffrey Epstein's co-conspirator Ghislaine Maxwell sought "authorization to serve a subpoena [on] the law firm of Boies, Schiller and Flexner LLP," which represented victims of Epstein's and Maxwell's sex trafficking.  Maxwell contended that the materials she sought were relevant to a pending motion to suppress, and would also be relevant at trial.  <u>Maxwell</u>, 2021 WL 1625392, at *1.  The subpoena sought, <u>inter alia</u>, all communications between the Government and any Boies, Schiller partner or employee from 2015 to the date of the subpoena.  As here, Maxwell argued that there had been improper "coordination between the Government and [Boies Schiller]," and that the Government had "not met its discovery obligations."  <u>Id.</u> at *2.  "Maxwell . . . argue[d] that compulsion of the materials' production under Rule 17(c) [was] justified because the materials [she sought had not] been produced by [Boies, Schiller] in response to [a] grand jury subpoena," suggesting "preexisting coordination between the Government and [Boies Schiller]."  <u>Id.</u> at *3.  Judge Nathan rejected Maxwell's conten[tion] that the absence of the documents in that production "suggest[ed] coordination between the Government and [Boies, Schiller]," however, concluding that Maxwell's "theory of preexisting coordination" was "conclusory speculation."  In denying Maxwell's application for a Rule 17(c) subpoena, the court noted that "nothing has transpired

that provides any reason to doubt the good faith representations that have been made to the Court by the AUSAs appearing here."  Id.

In sum, Nixon and its progeny make clear that the proponent of a Rule 17(c) subpoena must proffer a factual basis to believe that the target of the proposed subpoena possesses the materials sought in the subpoena.  Speculation that the targeted party might have such materials is not sufficient.  See United States v. Shea, No. 20 CR. 412-4 (AT), 2022 WL 13847351, at *3 (S.D.N.Y. Oct. 24, 2022) ("Defendant concedes that he does not know whether the materials actually contain exculpatory information. . . . The Court already rejected this argument . . ., and Defendant provides no support for its contention that the Court should revisit its conclusion."); Avenatti, 2020 WL 508682, at *5–6 ("Avenatti has offered only speculation as to what Franklin and Auerbach might have said about Avenatti in text messages and emails transmitted in the nine months following Avenatti's arrest"); United States v. Johnson, No. S5 10 CR 431 CM, 2013 WL 3948454, at *1 (S.D.N.Y. July 24, 2013) ("A general assertion that certain material 'might contain exculpatory information' is insufficient to prevail against a motion to quash under Rule 17(c).") (quoting United States v. Scaduto, 94 CR. 311(WK), 1995 WL 130511 (S.D.N.Y. Mar. 27, 1995)); United States v. Rich, No. S 83 CR. 579 (SWK), 1984 WL 845, at *3 (S.D.N.Y. Sept. 7, 1984) ("[D]efendants state that 'there may be evidence which a defendant might seek to use as part of his or its case in chief, and the documents sought may be of assistance in understanding and explaining certain of the transactions described in the indictment.  However, a mere hope that the documents, if produced, may contain evidence favorable to the defendant's case will not suffice.  Rule 17(c) requires a showing that the materials sought are currently admissible in evidence; it cannot be used as a device to gain

understanding or explanation.") (emphasis in original; internal citations, alterations, and quotations omitted).

### ii.   <u>Analysis</u>

Here, Weiner must demonstrate that there is a non-speculative, factual basis to believe that Liberty Mutual and the Crime Bureau possess documents that would be relevant to a potential motion to suppress – <u>i.e.</u>, documents that demonstrate improper coordination between the Government on the one hand, and Liberty Mutual or the Crime Bureau on the other.  Absent that foundation, he is engaged in the sort of "fishing expedition" precluded by <u>Nixon</u> and its progeny.

As set forth above, Liberty Mutual's Di Minno and Agent Infusino testified under oath – repeatedly – that the Government did not direct, encourage or seek to influence Liberty Mutual's investigation of Weiner.  Di Minno testified as follows:

> Q. In connection with these conversations [between the Government and Liberty Mutual], did the [G]overnment instruct you to do anything?
>
> A. No.
>
> Q. In connection with these conversations, did the government instruct you to investigate anyone?
>
> A. No.
>
> . . . .
>
> Q. Now, did Special Agent Infusino ever give you any instructions or directions about what to investigate?
>
> A. No.
>
> Q. Did he ever ask you to do anything for the government other than produce documents or information responsive to subpoenas?
>
> A. No.
>
> Q. Did Special Agent Infusino ever advise you about how Liberty Mutual should proceed with any insurance investigations it was conducting?

A. No.

. . . .

Q. And did the government ever . . . ask Liberty to open [the June 2020] investigation [of Weiner]?

No.

. . . .

Q. Do you recall whether the government ever gave you any instructions or directives with regard to Liberty's investigation?

A. No.

Q. If you had been given such instruction, would you have remembered them?

A. Yes.

Q. Why?

A. Because I would have – they would have [stood] out in regard[] to our investigations.  We really don't take any, from law enforcement, we don't take any, you know, questions they want us to ask, or whatever.  We do our own investigations.  We're not an arm of law enforcement, really.

(May 19, 2023 Tr. (Dkt. No. 187) at 17, 21-22, 36-37 (Di Minno))

        Agent Infusino offered similar testimony:

Q. Did you ever request any information from Liberty Mutual outside of these subpoenas?

A. No.

Q. Did you ever instruct Liberty Mutual to take any investigative steps?

A. No.

Q. Did you ever encourage Liberty Mutual to take any investigative steps?

A. No.

Q. Did you ever instruct Liberty Mutual to conduct any EUOs?

A. No.

Q. Did you ever encourage Liberty Mutual to conduct any EUOs?

A. No.

Q. Did you ever instruct Liberty Mutual to ask any questions during EUOs?

A. No, I did not.

Q. Did you ever encourage Liberty Mutual to ask any questions during EUOs?

A. No.

. . . .

Q. Special Agent Infusino, are you aware of any member of the United States Attorney's Office instructing Liberty Mutual to take any investigative steps?

A. No, I'm not.

Q. Are you aware of any member of the U.S. Attorney's Office encouraging Liberty Mutual to take any investigative steps?

A. No, I'm not.

Q. Are you aware of any member of the U.S. Attorney's Office instructing Liberty Mutual to conduct any EUOs?

A. No, I'm not.

Q. Are you aware of any member of the U.S. Attorney's Office encouraging Liberty Mutual to conduct any EUOs?

A. No.

Q. Are you aware of any member of the U.S. Attorney's Office instructing Liberty Mutual to ask any particular questions during the EUOs?

A. No.

Q. Are you aware of any member of the U.S. Attorney's Office encouraging Liberty Mutual to ask any particular questions  during the EUOs?

A. No.

(Id. at 101-02, 106-07 (Infusino))

As to Di Minno's email to the Government on the morning of Weiner's examination under oath, in which he inquired as to whether the Government "ha[d] any questions that [Liberty Mutual] should ask the [d]octor" (Feb. 10, 2021 Di Minno email, GX 8

(Dkt. No. 109-10) at 3), Di Minno had no specific recollection as to the Government's response. Di Minno testified, however, that in multiple conversations with the Government he had been told that he should perform his "normal investigation and proceed as [he] normally proceeded." (May 19, 2023 Tr. (Dkt. No. 187) at 40)

Agent Infusino testified that he and AUSA Pellegrino called Di Minno after receiving Di Minno's February 10, 2021 email, and that

> [d]uring the conversation, AUSA Pellegrino told Mr. Di Minno that the government will not be supplying any questions for the EUO and that Liberty Mutual needed to conduct their EUO as they would normally conduct any other EUO.  Mr. Di Minno said he understood that.  Mr. Pellegrino then, again, advised Mr. Di Minno that he needed to – Liberty Mutual needed to do what they would normally do through a EUO, and the government will not be providing any guidance or any questions for that EUO.  Again, Mr. Di Minno agreed that he understood.  After that, I asked Mr. Di Minno did he under – did he understand, and he further said that he did.  I asked him if he had any questions.  He said he did not, and that concluded the phone call.

(Id. at 104-05)

Di Minno and Infusino's testimony – which this Court found fully credible – demonstrates that the Government did not provide Di Minno with a list of questions or with any guidance or instructions as to Liberty Mutual's investigation of Weiner, including how Weiner's examination under oath should be conducted.  AUSA Pellegrino and Agent Infusino instead instructed Di Minno – as they had throughout the investigation – that Liberty Mutual should conduct its investigation and Weiner's examination under oath as it normally would.  And given that Liberty Mutual had previously investigated Weiner and Nexray – and indeed had brought a lawsuit against Weiner and Nexray alleging fraudulent incorporation – it is entirely plausible that Liberty Mutual's 2020 investigation of Weiner was self-generated.

Based on (1) Di Minno's and Infusino's testimony; (2) the Government's production of its own email communications with Liberty Mutual (and the Crime Bureau); (3)

the Government's production of Section 3500 material in connection with the May 19, 2023 evidentiary hearing; and (4) Liberty Mutual's prior investigation and lawsuit against Weiner, there is no reason to believe that Liberty Mutual possesses documents that would demonstrate improper coordination between the Government and Liberty Mutual as to the investigation of Weiner.  Given these circumstances, Weiner has no good faith basis to believe that Liberty Mutual possesses documents that would tend to show a <u>Kastigar</u> violation.  Instead, the proposed Rule 17(c) subpoena to Liberty Mutual appears to be a "fishing expedition" launched in the "mere[] hope that something useful will turn up."  <u>Barnes</u>, 2008 WL 9359654, at *4 (quotation omitted).

Weiner argues, however, that "Liberty [Mutual] and the [Crime Bureau] were willing participants in joint activity with the Government," and that "the Government encouraged Liberty [Mutual] to maintain secrecy about its investigation before questioning Dr. Weiner."  (Weiner Post-Hrg. Br. (Dkt. No. 174) at 8, 16 (capitalization altered))

The record does demonstrate that Liberty Mutual – through Di Minno – sought to assist the Government's investigation from the outset.  Liberty Mutual (1) voluntarily produced documents before receiving a subpoena; (2) suggested that the Government review particular documents that might be helpful to the Government's investigation; (3) provided specific documents to the Government upon request; and (4) and had phone and Skype calls with the Government in which Di Minno walked through the materials Liberty Mutual had produced pursuant to the subpoena.  And Weiner is correct in asserting that "Liberty [Mutual's] questioning [at the February 10, 2021 Weiner examination under oath] pursued the precise 'fraudulent incorporation' theory on which the Government's indictment is premised."  (Weiner

Post-Hrg. Br. (Dkt. No. 174) at 15)  But none of this evidence suggests that the Government was

improperly directing Liberty Mutual's investigation of Weiner.

Liberty Mutual's Special Investigations Unit would be expected – in the ordinary

course – to cooperate with and assist a government investigation of no-fault insurance fraud,

because New York law requires insurance companies to create a fraud prevention plan that

"provide[s] for the . . . [i]nterface of special investigation unit personnel with law enforcement

and prosecutorial agencies."  N.Y. Ins. Law § 409(c)(1).

Moreover "'informal and formal sharing of documents and information between

the government and [Liberty Mutual]'" is not inherently suspect, and interactions of this sort are

not per se inappropriate or suggestive of a state actor issue.  "[A] company is not prohibited from

cooperating, and typically has supremely reasonable, independent interests for conducting an

internal investigation and for cooperating with a governmental investigation."  Gilman, 826 F.3d

at 77 (quoting Stein, 541 F.3d at 150).  Weiner's argument that the proposed Rule 17(c)

subpoena "could reveal more information about . . . whether [Liberty Mutual] took . . . steps to

assist the Government's investigation" (Weiner Post-Hrg. Br. (Dkt. No. 174) at 13) is thus

irrelevant.  The correct inquiry is not whether it is possible that Liberty Mutual and the Crime

Bureau have documents showing a desire or intent to assist the Government's investigation, but

rather whether there is a non-speculative basis to believe that Liberty Mutual and the Crime

Bureau have documents showing that the Government controlled, directed, or improperly

influenced the investigations pursued by these entities.  Evidence of interactions that are lawful

and appropriate are not "red flags," and do not support a finding of improper coordination.

As to Liberty Mutual's questions about fraudulent incorporation during Weiner's

February 10, 2021 examination under oath, given that Liberty Mutual had previously deposed

Weiner concerning this same issue, and then sued Weiner and Nexray for fraud on the basis that

Weiner had lied about Nexray's incorporation during an examination under oath, Liberty

Mutual's questions about fraudulent incorporation at the February 10, 2021 examination under

oath were entirely predictable, and do not suggest that the Government was directing Liberty

Mutual's investigation of Weiner.

Weiner's complaint that the Government sought to keep its interactions with

Liberty Mutual secret (Weiner Post-Hrg. Br. (Dkt. No. 174) at 16-18) is similarly unpersuasive.

In support of this argument, Weiner points to language in the cover letters accompanying the

grand jury subpoenas to Liberty Mutual, in which the Government "requests that [Liberty

Mutual] voluntarily refrain from disclosing the existence of the subpoena to any third party."

(See, e.g., Mar. 9, 2020 Subpoena, GX 1 (Dkt. No. 190-2) at 2)  But the secrecy request is

included with every grand jury subpoena; grand jury proceedings are generally secret, see Fed.

R. Crim. P. 6(e)(2)(B); and the obvious purpose of the secrecy request is to protect the integrity

of the Government's investigation.

In sum, the alleged "red flags" cited by Weiner do not suggest that the testimony

at the evidentiary hearing is unreliable.

As to the Crime Bureau, there is nothing in the record to suggest that the

Government controlled, directed, or influenced that entity's investigation of Weiner.

*     *     *     *

For all these reasons, the Court concludes that – in requesting the Rule 17(c)

subpoenas – Weiner is engaged in a "fishing expedition," and is merely "hoping that something

useful will turn up" in response to the proposed subpoenas.  Because Weiner has not satisfied

<u>Nixon</u>'s specificity requirement, his application for the issuance of Rule 17(c) subpoenas will be denied.[12]

## II.     MOTION TO DISMISS, OR IN THE ALTERNATIVE, <u>FOR A BILL OF PARTICULARS</u>

Weiner argues that the healthcare fraud conspiracy charged in Count One and the money laundering conspiracy charged in Count Two must be dismissed as to him, "because the allegations regarding his conduct lack the specificity required by the Fifth and Sixth Amendments to the United States Constitution."  In the alternative, Weiner argues that the Government should be required to provide a bill of particulars.  (Weiner Dismissal Br. (Dkt. No. 107) at 1)

### A.     <u>The Allegations Against Weiner</u>

The allegations against Weiner in the healthcare fraud and money laundering counts are as follows:

> The No-Fault Physicians are licensed medical physicians who gave control of their medical practices to [non-physician] BRADLEY PIERRE, the [lead] defendant, engaged in unnecessary and excessive medical treatments, and falsified clinical findings of injury in reports. . . .

> The Specialists are licensed physicians who conducted the specialized medical care prescribed by the No-Fault Clinics, such as MRIs and X-rays.  The Specialists include, among others, WILLIAM WEINER, the defendant, who is a licensed doctor of osteopathy who incorporated the MRI facility Nexray Medical Imaging PC ("Nexray" or the "MRI Facility") as part of the scheme.  WEINER falsified clinical findings of injury in MRI reports that were submitted to insurance companies. . . .

---

[12]  Weiner's request that "the Court . . . direct the Government to conduct a thorough review of the case file and to produce promptly any additional relevant materials or communications" (Def. Post-Hrg. Br. (Dkt. No. 174) at 4 n.1) is likewise denied.  The Court expects, of course, that the Government will produce any additional documents it becomes aware of that fall within the scope of its disclosure obligations, but there is no reason to believe at this point that the Government has not met its disclosure obligations.

Nexray purported to be operated and controlled by a licensed physician – WILLIAM WEINER, the defendant. In practice, however, BRADLEY PIERRE received the majority of Nexray's proceeds; controlled Nexray's bank accounts; influenced the hiring and firing of Nexray's employees; identified the locations for Nexray's facilities; negotiated the rent for Nexray's leases; and chose the attorneys that would represent Nexray in arbitration, litigation, and sworn depositions before insurance companies. BRADLEY PIERRE further arranged for a network of no-fault doctors and attorneys to refer patients to Nexray for medical care – oftentimes through bribery – in addition to the No-Fault Clinics under his control.

In order to boost these referrals, BRADLEY PIERRE and WILLIAM WEINER, the defendants, agreed to falsify clinical findings of injuries on MRI reports and pressure radiologists working for Nexray to exaggerate findings of injuries in their own reports. These false clinical findings, in tum, allowed referring physicians and attorneys to bill for additional benefits under the No-Fault Law and obtain larger legal settlements and judgments.

BRADLEY PIERRE, the defendant, further arranged for the No-Fault Physicians, including . . . WILLIAM WEINER, the defendant[], to lie under oath to insurance companies to conceal the healthcare fraud scheme. Under the No-Fault Law, insurance carriers have the right to subject medical providers to Examinations under Oath ("EUOs") when they suspect that providers have submitted fraudulent claims. During the process, the physician is placed under oath and asked questions relevant to the claim at hand, including whether the medical practice is under the control of nonphysicians. BRADLEY PIERRE and the No-Fault Physicians were aware that insurance companies would deny reimbursement for the No-Fault Clinics if the No-Fault Physicians testified truthfully about the medical necessity of treatments and BRADLEY PIERRE's control of the Clinics. [BRADLEY] PIERRE accordingly arranged for the No-Fault Physicians to falsely state under oath, among other things, that BRADLEY PIERRE was solely a lender for the No-Fault Clinics and BRADLEY PIERRE played no role in referring patients to the No-Fault Clinics. . . .

BRADLEY PIERRE, the defendant, purportedly gave loans to . . . WILLIAM WEINER, the defendant[], in return for a percentage of any money later paid by insurance companies. In reality, . . .WEINER directly paid BRADLEY PIERRE in excess of at least $2.4 million of what BRADLEY PIERRE was entitled to receive under the phony agreements. . . .

((S2) Indictment (Dkt. No. 191) ¶¶ 10, 19-21, 26)

In its opposition brief, the Government states that it has made extensive

disclosures to Weiner regarding the evidence it will seek to introduce at trial:

In March 2022, the Government provided Weiner with the witness statements of 34 individuals expected to appear as witnesses at trial. The Government also met with Weiner's counsel in March 2022 and detailed the evidence against Weiner, and identified those portions of the discovery relevant to Weiner, as well as the witnesses who are expected to testify against him.

In April 2022, the Government provided Weiner's counsel with (1) a 24-page expert report documenting Dr. Weiner's falsified MRI readings regarding forty randomly chosen patients, and (2) notes of interviews of Weiner's former colleagues discussing his efforts to pressure them to falsify findings of clinical injury.

In May 2022, the Government provided a list of allegedly false statements Weiner had made during examinations under oath in furtherance of the charged conspiracy.

In June 2022, the Government met again with Weiner's counsel to discuss the Government's evidence against him.

In September 2022, the Government produced the statements of eight additional trial witnesses.

In November 2022, the Government produced a 33-page supplemental expert report that addressed falsified MRI reports regarding an additional 60 randomly chosen patients of Dr. Weiner.

(Govt. Dismissal Opp. (Dkt. No. 142) at 28-29) The Government made these disclosures before a trial date had been set.

At oral argument, the Court "direct[ed] the Government to provide to the Court all of the documentary information it allegedly turned over to Dr. Weiner's counsel," so that the Court could assess "[i]f in fact [the] Government ha[d] made the disclosures it claim[ed] to have made." (Apr. 28, 2023 Tr. (Dkt. No. 162) at 21) The Government subsequently provided this documentary information to the Court. The documents match the description in the Government's opposition brief.

**B.      Legal Standards**

**1.      Motion to Dismiss an Indictment**

"Pursuant to Federal Rule of Criminal Procedure 7, 'the indictment or information must be a plain, concise, and definite written statement of the essential facts constituting the

offense charged.'"  United States v. Vilar, 729 F.3d 62, 80 (2d Cir. 2013) (quoting Fed. R. Crim.

P. 7(c)(1) (alterations omitted)).  "An indictment is sufficient if it 'first, contains the elements of

the offense charged and fairly informs a defendant of the charge against which he must defend,

and, second, enables him to plead an acquittal or conviction in bar of future prosecutions for the

same offense.'"  United States v. Stringer, 730 F.3d 120, 124 (2d Cir. 2013) (quoting Hamling v.

United States, 418 U.S. 87, 117 (1974)).  Thus, "to satisfy the pleading requirements of Rule

7(c)(1), an indictment need do little more than to track the language of the statute charged and

state the time and place (in approximate terms) of the alleged crime."  Id. (internal citation and

quotation marks omitted).  "An indictment returned by a legally constituted and unbiased grand

jury . . . if valid on its face, is enough to call for trial of the charge on the merits."  Costello v.

United States, 350 U.S. 359, 363 (1956).

        Dismissal of an indictment is an "'extraordinary remedy' reserved only for

extremely limited circumstances implicating fundamental rights."  United States v. De La Pava,

268 F.3d 157, 165 (2d Cir. 2001) (citation omitted).  Moreover, "[u]nless the government has

made what can fairly be described as a full proffer of the evidence it intends to present at trial[,]

the sufficiency of the evidence is not appropriately addressed on a pretrial motion to dismiss an

indictment."  United States v. Perez, 575 F.3d 164, 166-67 (2d Cir. 2009) (quotation marks and

alteration omitted).

        **2.**      **Bill of Particulars**

        Rule 7(f) of the Federal Rules of Criminal Procedure permits a defendant to seek

a bill of particulars where necessary to "'prepare for trial, to prevent surprise, and to interpose a

plea of double jeopardy should he be prosecuted a second time for the same offense.'"  United

States v. D'Amico, 734 F. Supp. 2d 321, 335 (S.D.N.Y. 2010) (quoting United States v.

Davidoff, 845 F.2d 1151, 1154 (2d Cir. 1988)).  The decision to grant or deny a bill of

particulars "rests within the sound discretion of the district court."  United States v. Bortnovsky, 820 F.2d 572, 574 (2d Cir. 1987) (per curiam).

"A bill of particulars is not a general investigative tool, a discovery device or a means to compel the government to disclose evidence or witnesses to be offered prior to trial." United States v. Gibson, 175 F. Supp. 2d 532, 537 (S.D.N.Y. 2001) (citing United States v. Strawberry, 892 F. Supp. 519, 526 (S.D.N.Y. 1995)).  "Instead, its purpose is to supplement the facts contained in the indictment when necessary to enable defendants to identify with sufficient particularity the nature of the charges against them."  United States v. Gotti, No. S4 02 CR 743(RCC), 2004 WL 32858, at *8 (S.D.N.Y. Jan. 6, 2004) (citing Bortnovsky, 820 F.2d at 574); accord United States v. Mandell, 710 F. Supp. 2d 368, 384 (S.D.N.Y. 2010) ("The standard for determining whether a bill of particulars is appropriate is based on necessity. . . .").

"Generally, if the information sought by defendant is provided in the indictment or in some acceptable alternate form, no bill of particulars is required."  Bortnovsky, 820 F.2d at 574 (citations omitted).  "The Government d[oes] not[, however,] fulfill its obligation merely by providing mountains of documents to defense counsel[,] who [a]re left unguided as to which documents [the Government will use at trial]."  Id. at 575.

Where a defendant seeks a bill of particulars, "the proper inquiry is not whether the requested information would be helpful to the defense, but rather whether the information is necessary to the defense."  United States v. Dupree, No. 10-CR-627 (KAM), 2011 WL 5976006, at *6 (E.D.N.Y. Nov. 29, 2011) (emphasis in original) (citations omitted).  "It is well settled that defendants need not know the means by which it is claimed they performed acts in furtherance of the conspiracy nor the evidence which the Government intends to adduce to prove their criminal

acts." United States v. Feola, 651 F. Supp. 1068, 1132 (S.D.N.Y. 1987), aff'd, 875 F.2d 857 (2d

Cir. 1989).

      **C.**     <u>**Analysis**</u>

         As this Court stated at oral argument, the Indictment here is

> a speaking indictment, [which] explains in great detail – over 20 pages – the
> alleged fraudulent [n]o-[f]ault insurance scheme in which the Defendants
> allegedly engaged. . . . [I]t appears . . . that the [I]ndictment informs Dr. Weiner of
> the "nature of the accusations against him," and that it provides him with
> "sufficient notice of the core of criminality to be proven against him." . . . As to
> the failure of the [I]ndictment to list each MRI that Dr. Weiner falsified, each
> instance in which he pressured radiologists, and each lie he made during
> Examinations Under Oath, the short answer is that there is no requirement that an
> indictment go into that level of detail.

(Apr. 28, 2023 Tr. (Dkt. No. 162) at 18, 20-21 (quoting Russell v. United States, 369 U.S. 749,

766-67 (1962), and United States v. Pagan, 721 F.2d 24, 27 (2d Cir. 1983)))[13]

         As to Weiner's motion for a bill of particulars, the Court stated that,

> [i]f in fact [the] Government has made the disclosures it claims to have made, the
> breadth and timing of the discovery provided here far exceeds anything required
> under the Federal Rules of Criminal Procedure. . . . [A]t this stage of the
> proceedings, the Government is not required to make an exhaustive presentation
> . . . . [and] assuming the Government's representations are true, the timing and
> breadth of discovery provided here has been quite extraordinary.  [This Court did
> not see discovery of this magnitude and detail] in nine years as a prosecutor in the
> [U.S. Attorney's Office] and [has not] seen anything like this in . . . 15 years . . .
> on the bench.

(Id. at 21-23)

         Having (1) reviewed the discovery materials that the Government was ordered to

produce, and (2) concluding that the discovery that has been produced matches the

---

[13]  The Court's reasoning regarding the Indictment applies a fortiori to the (S2) Indictment (Dkt.
No. 191), which retains the Indictment's factual allegations but which adds new detailed
allegations of tax fraud committed by Weiner.

Government's description in its opposition brief, Weiner's motion to dismiss and motion for a

bill of particulars are denied for the reasons stated on the record at oral argument.[14]

### **CONCLUSION**

For the reasons stated above, Defendant Weiner's pretrial motions are denied.

The Clerk of Court is directed to terminate the motions (Dkt. Nos. 106, 109).

Dated: New York, New York
       October 23, 2023

SO ORDERED.

_____

Paul G. Gardephe
United States District Judge

---

[14] At oral argument, Weiner's counsel stated:

> I believe that there's several more EUOs [at issue than what have been included in the briefing].  If we are dealing with just the three that have been referenced in the briefing, then obviously that's a different situation.  And if those are the three that we're dealing with, I don't think the Court needs to intervene on that with respect to the MRIs.  Of course we need to – if we can reach an agreement on, okay, these are the documents that are at issue, these are the reports that are at issue, then we can sort of then cut out the thousands of other MRIs.  Honestly, that's an effective solution here.  It's essentially getting us to a place where we need to be in order to try the case. So I don't have a problem with sort of trying to find a way to resolve in that way. That makes total sense to me.  We just don't want to get blindsided with a bunch of documents we've never seen before, [which] we never had a chance to evaluate.

(Apr. 28, 2023 Tr. (Dkt. No. 162) at 28-29)

If Weiner and the Government have not already done so, they are directed to meet and confer promptly concerning (1) which examinations under oath and MRI reports the Government intends to introduce at trial; and (2) a schedule for any further expert reports.  In the event that the parties have not reached agreement concerning these issues, they are directed to promptly alert the Court to any remaining dispute.