UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

- against -

BRADLEY PIERRE,
MARVIN MOY,
WILLIAM WEINER,
ARTHUR BOGORAZ, and
JEAN PIERRE,
                              Defendants.

**MEMORANDUM**
**OPINION & ORDER**

(S3) 22 Cr. 19 (PGG)

PAUL G. GARDEPHE, U.S.D.J.:

On October 18, 2022, Defendant William Weiner moved for the early return of

pretrial subpoenas pursuant to Rule 17(c) of the Federal Rules of Criminal Procedure. (Dkt. Nos.

106, 109) Weiner asked this Court to authorize Rule 17(c) subpoenas directed to Liberty Mutual

Insurance Company and the National Insurance Crime Bureau (the "Crime Bureau") in order to

"evaluat[e] and litigat[e] whether the Government violated his constitutional rights by directing

and controlling some or all aspects of the parallel civil investigations of him undertaken by the

Crime Bureau and Liberty Mutual," including in connection with a February 10, 2021

examination under oath conducted by Liberty Mutual. United States v. Pierre, 2023 WL

7004460, at *2 (quotation and alterations omitted). "Weiner state[d] that he [might] use

responsive material in connection with a possible motion to suppress under the Fifth Amendment

and Kastigar v. United States, 406 U.S. 441 (1972)." Id.

On October 24, 2023, this Court issued a 61-page Memorandum Opinion and

Order denying Weiner's application. (Pierre, 2023 WL 7004460)

On October 27, 2023, Weiner moved for "an order: (i) scheduling a Kastigar

hearing to complete the evidentiary record; (ii) authorizing the return of subpoenas to Liberty

Mutual and the Crime Bureau in advance of the <u>Kastigar</u> hearing; (iii) authorizing [Rule 17(c)] subpoenas to [Liberty Mutual investigator] James Beadle and [Crime Bureau investigator] Thomas McCourt to testify at the hearing; and (iv) directing the Government to obtain and produce any and all <u>Brady</u> material that is held by Liberty Mutual and the Crime Bureau, and for other related relief." (Def. Mot. (Dkt. No. 259)) The Government opposes Weiner's application. (Dkt. No. 261)

For the reasons stated below, Weiner's application will be denied.

## BACKGROUND[1]

## I. THE WEINER INVESTIGATION

Weiner is a radiologist who incorporated Nexray Medical Imaging, PC, a medical clinic. He is charged with conspiracy to commit healthcare fraud, conspiracy to commit money laundering, and conspiracy to defraud the United States through false and fraudulent tax returns in connection with a long-running no-fault insurance fraud scheme. The Government alleges that the true owner and operator of Nexray Medical is co-Defendant Bradley Pierre. <u>Pierre</u>, 2023 WL 7004460, at *1 (citing (S2) Indictment (Dkt. No. 191) ¶¶ 1-38, 45-48))

Since 2010, Liberty Mutual has investigated Dr. Weiner's involvement in fraudulent insurance claims submitted to the company. In November 2012, Liberty Mutual sued Weiner and Nexray Medical for fraud in the Eastern District of New York alleging, <u>inter alia</u>, that Weiner had lied about the true ownership of Nexray Medical during an examination under oath conducted by Liberty Mutual. In January 2016, the lawsuit involving Liberty Mutual,

---

[1] The relevant facts are discussed in detail in the October 24, 2023 Memorandum Opinion & Order (<u>Pierre</u>, 2023 WL 7004460) at *2-14) and are merely summarized below.

Weiner, and Nexray Medical was settled.  Id. at *4-6 (citing Liberty Mutual Ins. Co. v. Nexray Medical Imaging, P.C., 12 Civ. 5666 (E.D.N.Y.)).

        In 2013, the Westchester County District Attorney's Office and the New York State Police initiated "a years-long investigation into a sprawling network of no-fault insurance fraud schemes in New York and New Jersey."  Id. at *6.  The FBI and U.S. Attorney's Office for the Southern District of New York took over the investigation in late 2016 or early 2017.  FBI Special Agent Joseph Infusino was assigned to the case.  As part of the investigation, he communicated periodically with John Di Minno, a member of Liberty Mutual's Special Investigations Unit who had conducted the 2010 investigation into Weiner and Nexray Medical. Liberty Mutual, through Di Minno, cooperated with the Government's investigation and "provided Agent Infusino with documents concerning suspected no-fault insurance fraud, even though no subpoena had [yet] been issued."  Id.

        In 2020, the Government served a series of grand jury subpoenas on Liberty Mutual seeking information concerning individuals and clinics suspected of no-fault insurance fraud.  The first subpoena, dated March 9, 2020, did not seek information as to Weiner and Nexray Medical, but Liberty Mutual produced documents relating to Weiner and Nexray Medical because the subpoena sought information regarding two individuals associated with Nexray Medical who had been co-defendants of Weiner and Nexray Medical in Liberty Mutual's 2012 lawsuit.  The next two subpoenas, dated May 19 and 31, 2020, sought documents concerning Weiner and Nexray Medical.  Di Minno – who was responsible for Liberty Mutual's subpoena response – periodically spoke with Agent Infusino and Assistant U.S. Attorney ("AUSA") Mathew Andrews about the documents Liberty Mutual produced, and responded to their questions and requests.  Id. at *6-8.

"On June 2, 2020, Liberty Mutual's Special Investigations Unit opened a new investigation into Weiner and Nexray.  According to Liberty Mutual's case file, the investigation was conducted by SIU investigator James Beadle. . . . Di Minno testified . . . [at the May 19, 2023 evidentiary hearing discussed below] that the Government never 'gave [Beadle] any instructions or directives with regard to Liberty's [new] investigation.'"  Id. at *9 (quoting May 19, 2023 Tr. (Dkt. No. 187) at 37))

On February 10, 2021 – as part of its investigation of Weiner and Nexray Medical – Liberty Mutual conducted an examination under oath of Weiner.  That morning, Di Minno emailed Agent Infusino, and called both Agent Infusino and AUSA Andrews.  In these communications, Di Minno informed the Government that Dr. Weiner was "[c]oming in" that day for an examination under oath, and Di Minno asked whether the Government "ha[d] any questions that we should ask the [d]octor?"  Agent Infusino and AUSA Louis Pellegrino returned Di Minno's call and informed Di Minno that the Government would "not be supplying any questions for [Weiner's examination under oath]."  AUSA Pellegrino also told Di Minno that Liberty Mutual "needed to conduct their [examination under oath] as they would normally conduct any other [examination under oath]."  Id. at *10-12.[2]

Liberty Mutual's counsel conducted Weiner's examination under oath later that day.  Weiner was represented by counsel.  "Liberty Mutual did not warn Weiner that it might share the transcript of his deposition with law enforcement, nor did Liberty Mutual tell Weiner that he was already under investigation by law enforcement."  Id. at *13.  When Weiner was questioned about his relationship with co-defendant Bradley Pierre, he denied that Pierre

---

[2]  As discussed below, this account of AUSA Pellegrino's response to Di Minno's query is based on the testimony of Di Minno and Agent Infusino at the May 19, 2023 evidentiary hearing – testimony that this Court found "fully credible."  Id. at *26.

controlled Nexray Medical.  Liberty Mutual provided the Government with a transcript of Weiner's examination under oath.  Id. at *13-14.

In the (S2) Indictment, the Government contends that Weiner gave false testimony at his examination under oath regarding Bradley Pierre's control over Nexray Medical, and that he did so at Bradley Pierre's direction and in furtherance of the charged scheme to defraud Liberty Mutual.  Id. at *13 & n.7 (citing (S2) Indictment (Dkt. No. 191) ¶ 21).

In addition to Liberty Mutual, the Government sought assistance from the Crime Bureau, an insurance industry not-for-profit trade association that "requests information from and shares information with its member companies, including Liberty Mutual"; "serves as a conduit between law enforcement and the insurance industry"; "respond[s] to law enforcement inquiries or requests for specific information"; and "help[s] to coordinate and collect information from other insurance companies."  Id. at *4 (quotations and alterations omitted).  The Crime Bureau – through investigator Thomas McCourt – provided the Government with, inter alia, contact information for insurance company employees, various spreadsheets involving insurance claims filed by Nexray Medical, and information concerning Nexray Medical's locations.  Id. at *14.

## II.    THE RULE 17(c) LITIGATION

In his application for authorization to serve Rule 17(c) subpoenas, Weiner sought the following materials from Liberty Mutual and the Crime Bureau:

> All communications between you, or your current or former employees, and the United States (including recordings or documents reflecting or memorializing oral communications) regarding Dr. Weiner or Nexray Medical Imaging, PC ("Nexray").

Id. at *2 (quotation and citation omitted).  Weiner argued that the requested materials might support a hypothetical Kastigar motion to suppress:  "Such a motion would be directed at

statements Weiner made during [the] February 10, 2021 examination under oath conducted by Liberty Mutual.  Weiner contends that the materials . . . [might] show that the Government instigated the February 2021 deposition of Weiner and that it instructed Liberty Mutual as to what questions should be posed to Weiner."  Id. (quoting Weiner Rule 17(c) Br. (Dkt. No. 110) at 4).

The proposed Rule 17(c) subpoenas were the subject of extensive motion practice involving hundreds of pages of legal analysis and multiple rounds of briefing.  (See Dkt. Nos. 109, 110, 121, 130, 140, 144, 146, 174, 178, 206)  On April 28, 2023, the Court heard oral argument concerning Weiner's application.  (Dkt. No. 162)

On May 19, 2023, the Court conducted an evidentiary hearing concerning Weiner's Rule 17(c) subpoena requests.  The Government called Agent Infusino and Di Minno to testify.  Weiner's counsel cross-examined both witnesses at length, and numerous exhibits were received.  (May 19, 2023 Tr. (Dkt. No. 187))

Agent Infusino and Di Minno testified repeatedly and credibly – both on direct and on cross-examination – that the Government did not (1) ask Liberty Mutual to open an investigation into Weiner in 2020; (2) direct Liberty Mutual's 2020-21 investigation of Weiner; (3) request that Liberty Mutual conduct the February 2021 Weiner examination under oath; or (4) provide questions for Liberty Mutual to ask during that proceeding.  Pierre, 2023 WL 7004460, at *10-12 & nn. 5-6 (quoting Agent Infusino's and Di Minno's testimony concerning these issues).

As to Beadle's 2020 investigation of Weiner, Di Minno testified as follows:

Q. And did you ever pass on any instructions or guidance or communications to Investigator Beadle from the government about how he should conduct any aspect of his investigations at Liberty?

A. Not at all.

(May 19, 2023 Tr. (Dkt. No. 187) at 97)

In an October 24, 2023 Memorandum Opinion & Order, this Court denied

Weiner's application for the issuance of Rule 17(c) subpoenas to Liberty Mutual and the Crime

Bureau.  The Court explained that under the standard set forth in United States v. Nixon, 418

U.S. 683 (1974), a party seeking the issuance of a Rule 17(c) subpoena

> "must show:  (1) that the documents are evidentiary and relevant; (2) that they are
> not otherwise procurable reasonably in advance of trial by exercise of due
> diligence; (3) that the party cannot properly prepare for trial without such
> production and inspection . . . and that the failure to obtain such inspection may
> tend unreasonably to delay the trial; and (4) that the application is made in good
> faith and is not intended as a general 'fishing expedition.'"

Pierre, 2023 WL 7004460, at *15 (quoting Nixon, 418 U.S. at 699-700 (citing United States v.

Iozia, 13 F.R.D. 335, 338 (S.D.N.Y. 1952) (Weinfeld, J.)) (footnote omitted).  The Court

emphasized that "strict compliance" with Nixon was necessary given "the procedural context of

the instant case" and how attenuated the proposed Rule 17(c) subpoenas were from trial.  Id. at

*16-19.

The Court went on to examine the two elements of the Nixon standard that the

parties disputed:  relevance and specificity.  As to relevance, this Court rejected the

Government's argument "that even if the requested subpoenas led to the disclosure of material

showing that the Government directed Liberty Mutual's and the Crime Bureau's investigations,

such material would be irrelevant to any Kastigar motion, because any such motion would fail as

a matter of law," given that (1) Liberty Mutual had an independent regulatory interest in its

investigation, (2) the examination under oath was not coercive, and (3) Kastigar does not protect

fraudulent testimony.  This Court explained that – contrary to the Government's argument – if

the Government had "(1) urged Liberty Mutual to require Weiner to appear for an examination

under oath; (2) responded to Di Minno's February 10, 2021 queries by supplying a script for

Liberty Mutual's lawyer to use in questioning Weiner; and (3) instructed Liberty Mutual's lawyer not to warn Weiner that he was under Government investigation," there would be an issue of fact as to whether a <u>Kastigar</u> violation had occurred, which would require a more developed record to resolve.  <u>Id.</u> at *19-23.

        The Court went on to deny Weiner's application for the Rule 17(c) subpoenas, however, because his requests were not sufficiently specific – <u>i.e.</u>, they constituted a "fishing expedition":

> . . . Weiner must demonstrate that there is a non-speculative, factual basis to believe that Liberty Mutual and the Crime Bureau possess documents that would be relevant to a potential motion to suppress – <u>i.e.</u>, documents that demonstrate improper coordination between the Government on the one hand, and Liberty Mutual or the Crime Bureau on the other.  Absent that foundation, he is engaged in the sort of "fishing expedition" precluded by <u>Nixon</u> and its progeny.
>
> . . . .
>
> Di Minno and Infusino's testimony – which this Court found fully credible – demonstrates that the Government did not provide Di Minno with a list of questions or with any guidance or instructions as to Liberty Mutual's investigation of Weiner, including how Weiner's examination under oath should be conducted.  AUSA Pellegrino and Agent Infusino instead instructed Di Minno – as they had throughout the investigation – that Liberty Mutual should conduct its investigation and Weiner's examination under oath as it normally would.  And given that Liberty Mutual had previously investigated Weiner and Nexray – and indeed had brought a lawsuit against Weiner and Nexray alleging fraudulent incorporation – it is entirely plausible that Liberty Mutual's 2020 investigation of Weiner was self-generated.
>
> Based on (1) Di Minno's and Infusino's testimony; (2) the Government's production of its own email communications with Liberty Mutual (and the Crime Bureau); (3) the Government's production of Section 3500 material in connection with the May 19, 2023 evidentiary hearing; and (4) Liberty Mutual's prior investigation and lawsuit against Weiner, there is no reason to believe that Liberty Mutual possesses documents that would demonstrate improper coordination between the Government and Liberty Mutual as to the investigation of Weiner.  Given these circumstances, Weiner has no good faith basis to believe that Liberty Mutual possesses documents that would tend to show a <u>Kastigar</u> violation.  Instead, the proposed Rule 17(c) subpoena to Liberty Mutual appears to be a "fishing expedition" launched in the "mere[] hope that something useful will turn up."

. . . .

The record does demonstrate that Liberty Mutual – through Di Minno – sought to assist the Government's investigation from the outset.  Liberty Mutual (1) voluntarily produced documents before receiving a subpoena; (2) suggested that the Government review particular documents that might be helpful to the Government's investigation; (3) provided specific documents to the Government upon request; and (4) had phone and Skype calls with the Government in which Di Minno walked through the materials Liberty Mutual had produced pursuant to the subpoena.  And Weiner is correct in asserting that "Liberty [Mutual's] questioning [at the February 10, 2021 Weiner examination under oath] pursued the precise 'fraudulent incorporation' theory on which the Government's indictment is premised."  (Weiner Post-Hrg. Br. (Dkt. No. 174) at 15)  But none of this evidence suggests that the Government was improperly directing Liberty Mutual's investigation of Weiner.

Id. at *25-26 (quoting United States v. Barnes, No. S9 04 CR 186 SCR, 2008 WL 9359654, at *4

(S.D.N.Y. Apr. 2, 2008) (brackets in Pierre)).

Finally, as to the Crime Bureau, the Court held that "there [was] nothing in the record to suggest that the Government controlled, directed, or influenced that entity's investigation of Weiner."  Id. at *27.

## III.   WEINER'S MOTION FOR A *KASTIGAR* HEARING AND RELATED RELIEF

On October 27, 2023, Weiner moved "for a Kastigar hearing and related relief."

Weiner seeks:

a new hearing "to complete the evidentiary record," at which he would call Liberty Mutual Investigator Beadle and Crime Bureau Investigator McCourt;

a Rule 17(c) subpoena directed to Liberty Mutual, seeking

1. A complete copy of the investigative log created by SIU Senior Investigator James Beadle (partial version attached hereto) in connection with Liberty Mutual's investigation of Nexray Medical Imaging, Inc. and Dr. William Weiner that began in 2020.

2. The investigative plan created by Mr. Beadle at the outset of this investigation.

3. Any communications (or notes of conversations) involving Mr. Beadle that mention or refer to the Government's investigation of Dr. Weiner.

a Rule 17(c) subpoena to the Crime Bureau, seeking

1.   A complete copy of all investigative materials obtained or created in
     connection with the Crime [Bureau's] investigation of Nexray Medical
     Imaging, Inc. ("Nexray") and Dr. Weiner "conduct[ed] . . . at Law
     Enforcement's request."  (See Claim File Request attached hereto.)

2.   Any communications between the Government and the Crime Bureau
     concerning the investigation of Nexray and Dr. Weiner.

an "order [directing] the Government to produce any <u>Brady</u> material held by Liberty
Mutual or the Crime Bureau."

(Weiner Br. (Dkt. No. 260) at 2, 7; Proposed Liberty Mutual Subpoena (Dkt. No. 260-1) at 7;

Proposed Crime Bureau Subpoena (Dkt. No. 260-2) at 7)

       Although Weiner acknowledged after the May 19, 2023 evidentiary hearing that

he "ha[d] not yet established a <u>Kastigar</u> violation" (Def. Post-Hrg. Br. (Dkt. No. 174) at 5), he

now contends that a <u>Kastigar</u> hearing is nonetheless warranted because (1) contrary to this

Court's detailed findings in <u>Pierre</u>, "the existing record demonstrates reason to believe that

Liberty Mutual opened its investigation and took the February 2021 [examination under oath] at

the Government's request"; (2) Di Minno did not remember the Government's phone call to him

on the morning of the examination under oath; and (3) Weiner has not had an opportunity to

examine Beadle.  (Weiner Br. (Dkt. No. 260) at 3-4)

       As to Beadle, Weiner disputes this Court's statement that Beadle's "case file –

which contains Beadle's notes through June 16, 2020 – makes no mention of the Government,"

<u>Pierre</u>, 2023 WL 7004460, at *9, pointing out that Beadle's case file reflects that Di Minno told

Beadle that a grand jury subpoena had been issued as to Weiner and Nexray Medical.  (Weiner

Br. (Dkt. No. 260) at 3-4; Beadle Case File (Dkt. No. 260-1) at 15 ("John Di Minno advised he

received a federal grand jury subpoena requesting info on . . . Nexray . . . [and] Weiner."))

Weiner also cites a June 8, 2020 email thread in which Beadle forwards Di Minno an email about

a corporation apparently registered by Weiner, stating "Does FBI know this?  Looks like Weiner

has mngt company now."  Di Minno forwarded Beadle's email to AUSA Andrews, stating "See

Jim's note below most likely funneling money to laypersons."  (<u>Id.</u> at 4; June 8, 2020 email

thread (Dkt. No. 260-3))

   Weiner makes no effort to explain the <u>Kastigar</u> violation that the Government

allegedly committed in connection with the Crime Bureau.

   As to the new proposed Rule 17(c) subpoenas, Weiner notes that the <u>Pierre</u>

decision was issued in an "unusual procedural context."  He further contends that the new

proposed Rule 17(c) subpoenas are "narrowly targeted."  (<u>Id.</u> at 1, 5 (quotation omitted))

   As to the request for <u>Brady</u> material, Weiner argues that

> Liberty Mutual and the Crime Bureau acted as adjunct investigative entities, in
> much the same way that government contractors or state or local police might act.
> Indeed, we understand that the Crime Bureau is a party to a Memorandum of
> Understanding with the FBI that authorizes it to act as a parallel investigative
> agency.  Should the Court find that Liberty Mutual or the Crime Bureau took
> investigative steps at the prosecution's behest or aided the prosecution in devising
> an investigative strategy (and the Crime Bureau's documentation expressly states
> this is the case), then they must be considered part of the prosecution team, and
> the Government's <u>Brady</u> obligations should extend to materials in their
> possession.

(<u>Id.</u> at 8)

   Weiner does not explain how Liberty Mutual served as an "adjunct investigative

entit[y]" here, however.  As to the Crime Bureau, Weiner cites the alleged "Memorandum of

Understanding," but Weiner does not provide the alleged MOU and does not describe it in an

affidavit, declaration, or affirmation.  Weiner also cites a March 27, 2023 "Claim File Request"

from the Crime Bureau's McCourt to Allstate Insurance, requesting a Nexray Medical patient's

"complete no-fault file."  McCourt checked off a box on the claim file request form stating that

the Crime Bureau is "[c]onducting an investigation at Law Enforcement's request."  (Id. at 6-7;

Mar. 27, 2023 Claim File Request (Dkt. No. 260-4) at 4)

## DISCUSSION

## I.    LEGAL STANDARDS

### A.    *Kastigar* Hearing

In the context of an alleged Kastigar violation, "[w]ith regard to both the

evidentiary hearing and discovery of the documents, . . . the burden is on defendants to make a

'substantial preliminary showing' of bad faith before an evidentiary hearing or even limited

discovery is to be held."  United States v. Gel Spice Co., 773 F.2d 427, 434 (2d Cir. 1985)

(quoting United States v. Tiffany Fine Arts, Inc., 718 F.2d 7, 14 (2d Cir. 1983), aff'd, 469 U.S.

310 (1985)).

### B.    Rule 17(c) Subpoenas

The standards for issuance of a Rule 17(c) subpoena are discussed at length in

United States v. Pierre, 2023 WL 7004460, at *15, *19-27.  Suffice it to say that, at bottom, a

Rule 17(c) subpoena must meet the tests of "(1) relevancy; (2) admissibility; [and] (3)

specificity."  Nixon, 418 U.S. at 700.

### C.    The Government's *Brady* Obligations in the Context of Joint Investigations

The prosecution's obligation to disclose Brady material extends to any material in
the possession of any entity that has acted as an "arm of the prosecutor" in a given
case.  United States v. Blaszczak, 308 F. Supp. 3d 736, 741 (S.D.N.Y. 2018)
(quoting United States v. Morell, 524 F.2d 550, 555 (2d Cir. 1975)).  In other
words, where the prosecution "conducts a 'joint investigation' with another state
or federal agency, courts in this Circuit have held that the prosecutor's duty
extends to reviewing the materials in the possession of that other agency for
Brady evidence."  United States v. Gupta, 848 F. Supp. 2d 491, 493 (S.D.N.Y.
2012).  A number of factors are relevant in determining whether the prosecution
conducted a "joint investigation," including whether the other agency:  (1)
participated in the prosecution's witness interviews, (2) was involved in
presenting the case to the grand jury, (3) reviewed documents gathered by or
shared documents with the prosecution, (4) played a role in the development of

prosecutorial strategy, or (5) accompanied the prosecution to court proceedings. See Blaszczak, 308 F. Supp. 3d at 741-42; see also United States v. Martoma, 990 F. Supp. 2d 458, 461 (S.D.N.Y. 2014) (relying on the joint conduct of interviews, exchange of documents, coordination of deposition efforts, and communications regarding the status of fact-gathering to find a joint investigation).

United States v. Middendorf, No. 18-CR-36 (JPO), 2018 WL 3956494, at *4 (S.D.N.Y. Aug. 17, 2018).

## II.   ANALYSIS

As to Weiner's request for a Kastigar hearing, the Court concludes that he has not made the necessary "substantial preliminary showing of bad faith."   Gel Spice Co., 773 F.2d at 434.  For the reasons discussed at length in the October 24, 2023 Memorandum Opinion & Order, there is no evidence that the Government (1) instructed, requested, or encouraged Liberty Mutual to take Weiner's examination under oath; (2) influenced in any fashion the examination conducted by Liberty Mutual's counsel at that proceeding; or (3) otherwise directed, controlled, influenced, or sought to influence Liberty Mutual's 2020-21 investigation of Weiner and Nexray Medical.

In connection with Weiner's earlier request for the issuance of Rule 17(c) subpoenas, this Court conducted an evidentiary hearing and heard testimony from the central figures on this point – Liberty Mutual investigator John Di Minno and FBI Special Agent and case agent Joseph Infusino.  (May 19, 2023 Tr. (Dkt. No. 187))  Weiner had an ample opportunity to cross-examine these witnesses, and this Court found their testimony fully credible on the issue of whether the Government influenced or sought to influence Liberty Mutual's internal investigation of Weiner and Nexray Medical.  Pierre, 2023 WL 7004460, at *26.

Weiner's new motion provides no reason for revisiting this issue.

Weiner complains that he "has not been permitted to call the witnesses of his choosing," and that he now should be permitted to call James Beadle who – like Di Minno – is

an investigator in Liberty Mutual's Special Investigations Unit.  (Weiner Br. (Dkt. No. 260) at 2-3; Weiner Reply Br. (Dkt. No. 266) at 2 n.2 ("Dr. Weiner was not given an opportunity to call witnesses of his choosing")  But this Court set no limits on who could be called at the evidentiary hearing, and was never asked to consider whether Beadle should be called to testify, because Weiner never expressed any interest in calling Beadle to testify.  (Apr. 28, 2023 Tr. (Dkt. No. 164) at 9; May 19, 2023 Tr. (Dkt. No. 187) at 133-34 ("THE COURT: I asked if the defense had any additional evidence.  MR. KRAMER: No[] additional evidence today."))

The reason for that appears obvious.  It was clear from correspondence and other material produced as part of Rule 16 discovery, as well as from the testimony at the evidentiary hearing, that Di Minno was the Government's primary if not exclusive Liberty Mutual contact with respect to its investigation of Weiner and Nexray Medical.  Di Minno dealt with and fulfilled the Government's subpoena requests, and he was the Liberty Mutual employee who spoke with the AUSAs and the case agent about the subpoenas, the subjects of the subpoenas, and the material that Liberty Mutual produced both before and in response to the subpoenas.[3] (May 19, 2023 Tr. (Dkt. No. 187) at 8, 10-11, 14-18, 101, 113-14)  Accordingly, if the Government had sought to influence Liberty Mutual's investigative steps, Di Minno would have been the recipient of any such approach.  As discussed above and in the October 24, 2023 Memorandum Opinion & Order, the testimony at the evidentiary hearing demonstrates that the Government did not seek to direct or influence Liberty Mutual's investigation of Weiner and Nexray Medical.  Pierre, 2023 WL 7004460, *9-13, *25-27.

---

[3]  Di Minno was assigned to address the Government's subpoenas because he had participated in Liberty Mutual's earlier 2010-15 investigation of and lawsuit against Weiner and Nexray Medical and had prepared a "Project Plan" in connection with that investigation.  (May 19, 2023 Tr. (Dkt. No. 187) at 9-11, 63-64; GX 5 Nexray Project Plan (Dkt. No. 190-6) at 4).

Weiner now seeks permission to call Liberty Mutual investigator Beadle at a
Kastigar hearing, and to serve a Rule 17(c) subpoena on Liberty Mutual for Beadle's full
"investigative log" concerning Weiner and Nexray Medical; his "investigative plan" for Weiner
and Nexray Medical; and any notes or communications "involving Beadle that mention or refer
to the Government's investigation of Dr. Weiner."  (See Weiner Br. (Dkt. No. 260) at 2-3, 5)  In
support of these requests, Weiner notes that on June 2, 2020, Liberty Mutual's Special
Investigations Unit opened a new investigation of Weiner and Nexray Medical, and Beadle was
assigned to conduct that investigation.  (Id. at 3-4; see also Pierre, 2023 WL 7004460, at *9)
Weiner also complains that the Court erred in stating that Beadle's investigative notes "'make[]
no mention of the Government,'" because Beadle's notes indicate that he was aware that the U.S.
Attorney's Office had served a subpoena on Liberty Mutual for information regarding Weiner
and Nexray Medical.  (Weiner Br. (Dkt. No. 260) at 4)

What is relevant to Weiner's claimed Kastigar violation, however, is not whether
Beadle was aware that the U.S. Attorney's Office had served a grand jury subpoena seeking
information concerning Weiner and Nexray Medical.  He clearly was aware of the subpoena, as a
Government exhibit offered at the evidentiary hearing demonstrates.  (See May 19, 2023 Tr.
(Dkt. No. 187) at 34-35; GX 7A Beadle Investigative Notes (Dkt. No. 190-9) at 9) (noting that
"John Di Minno advised he received a federal grand jury subpoena requesting info on . . . Nexray
[and] Weiner")  Instead, what would be relevant to Weiner's Kastigar claim is references in
Beadle's notes – or in other material in the record – showing interactions between him and the
Government, including interactions that could be viewed as Government efforts to direct,
influence, or shape Liberty Mutual's internal investigation of Weiner and Nexray Medical.  But
Weiner has never proffered any such evidence to this Court.  It thus appears that Weiner's

expressed desire to call Beadle is nothing more than the sort of "general fishing expedition" precluded by <u>Nixon</u> and Judge Weinfeld's decision in <u>United States v. Iozia</u>, 13 F.R.D. 335, 338 (S.D.N.Y. 1952) – a "fishing expedition" that Weiner seeks to pursue in the hope that something "'may turn up.'"   <u>United States v. Avenatti</u>, No. 19 Cr. 373 (PGG), 2020 WL 86768, at *4 (S.D.N.Y. Jan. 6, 2020) (quoting <u>United States v. Libby</u>, 432 F. Supp. 2d 26, 32 (D.D.C. 2006)).

        What Weiner has largely ignored throughout these proceedings, however, is the "ample evidence . . . of Liberty Mutual's independent interest in investigating Weiner."  <u>Pierre</u>, 2023 WL 7004460, at*22.  As discussed at length in the Memorandum Opinion & Order, Liberty Mutual's Special Investigations Unit first opened an investigation of Weiner and Nexray Medical in 2010 – six or seven years before the Government initiated its investigation.  <u>Id.</u> at *4, 6.  And as discussed above, Di Minno participated in that investigation.  In November 2011, Liberty Mutual "took an [examination under oath ('EUO')] of Dr. Weiner in regard[] to who controlled that Nexray facility," and also conducted "numerous [examinations under oath] of claimants [who had undergone] MRIs at Nexray."  (May 19, 2023 Tr. (Dkt. No. 187) at 11-12)  Di Minno also prepared a "Project Plan" for the Weiner and Nexray Medical investigation at that time. <u>Pierre</u>, 2023 WL 7004460, at *5.  And on November 16, 2012, Liberty Mutual filed a lawsuit against Weiner, Nexray Medical, and others seeking a declaration that it did not have to pay the defendants' claims and seeking the return of payments it had already made.  <u>Id.</u>  In that lawsuit, Liberty Mutual alleged that "Weiner lied at his November 2011 examination under oath regarding his relationship with the clinic controllers, and that he entered into 'sham agreements' to conceal the clinic controllers' ownership and control of Nexray."  <u>Id.</u> (quoting Cmplt. ¶¶ 50-63, <u>Liberty Mutual Ins. Co. v. Nexray Medical Imaging, P.C.</u>, Cmplt., 12 Civ. 5666 (E.D.N.Y. Nov. 16, 2012), Dkt. No. 1)  On December 30, 2015, Liberty Mutual, Weiner, and Nexray

Medical entered into a confidential settlement agreement and stipulation of dismissal resolving the EDNY case.  Pierre, 2023 WL 7004460, at *6.

Given Liberty Mutual's long history with Weiner and its allegations of misconduct against him and Nexray Medical, there is no reason to distrust the testimony from Di Minno and Agent Infusino that the Government did not influence or seek to influence Liberty Mutual's new investigation of Weiner and Nexray.  Liberty Mutual had ample cause to investigate Weiner on its own.  For all these reasons, Weiner's request to call Liberty Mutual investigator Beadle at a Kastigar hearing, and for a Rule 17(c) subpoena directed to Liberty Mutual, will be denied.

Weiner also seeks to call Crime Bureau Investigator Thomas McCourt at a Kastigar hearing, and to issue a Rule 17(c) subpoena to the Crime Bureau for investigative materials and communications with the Government concerning Weiner and Nexray Medical. (Weiner Br. (Dkt. No. 260) at 2, 6-7)  Once again, the necessary "substantial preliminary showing of bad faith" is absent.  Indeed, the record as to the Crime Bureau's involvement with the U.S. Attorney's Office and the FBI is scant.  McCourt provided AUSA Andrews with contact information for Liberty Mutual's legal department and for Di Minno.  As to Weiner and Nexray Medical, Andrews asked McCourt to provide a spreadsheet showing a "'run of claims where Rutland [– a medical clinic owned by co-defendant Marvin Moy –] and Nexray are both in the claim.'"  (Pierre, 2023 WL 7004460, at *14 (quoting Dkt. No. 110-10 at 2)  Andrews also asked McCourt to provide (1) the addresses from which Nexray submitted bills, and the date range for each location from which Nexray submitted bills; and (2) to determine whether Mid-Century – an insurance carrier – had conducted an examination under oath of Nexray personnel in 2017.

(Id.)  Assuming that McCourt provided Andrews with the requested materials, that interaction presents no Kastigar issue.

In seeking to call McCourt at a Kastigar hearing and to subpoena the Crime Bureau for documents, however, Weiner cites testimony from the evidentiary hearing indicating that the Crime Bureau "'serve[s] as a conduit . . . between law enforcement and the insurance industry'" and as a "'central clearing house for insurance-related information.'"  (Weiner Br. (Dkt. No. 260) at 6 (quoting May 19, 2023 Tr. (Dkt. No. 187) 56, 111-12))  Weiner also cites a "Claim File Request" that McCourt sent to Allstate Insurance on March 27, 2023 – requesting a Nexray Medical patient's "complete no-fault file."  McCourt checked off a box on the claim file request form stating that the Crime Bureau is "conducting an investigation at Law Enforcement's request."  (Id. at 6-7; Mar. 27, 2023 Claim File Request (Dkt. No. 260-4) at 4)

The fact that the Crime Bureau serves as a resource for law enforcement agencies seeking to detect and deter insurance fraud does not present a Kastigar issue.  Weiner has not offered evidence that the Crime Bureau – acting as the Government's agent – sought information from him, whether documentary or testimonial.  McCourt's March 27, 2023 claim file request to Allstate Insurance is likewise not probative of a Kastigar violation.  Weiner was first indicted on January 11, 2022, and is being prosecuted for conduct that took place between 2008 and 2021.  (Indictment (Dkt. No. 1); (S2) Indictment (Dkt. No. 191))  Weiner has articulated no theory on which McCourt's March 27, 2023 file request to Allstate could shed light on conduct that took place between the Government and the Crime Bureau prior to January 2022.

In sum, Weiner has presented no basis for (1) calling McCourt at a Kastigar hearing, or (2) serving a Rule 17(c) subpoena on the Crime Bureau.  Weiner has shown "no good faith basis to believe that [either] Liberty Mutual [or the Crime Bureau] possesses documents

that would tend to show a <u>Kastigar</u> violation." <u>Pierre</u>, 2023 WL 7004460, at *26.  Accordingly,

Weiner's applications regarding the Crime Bureau will likewise be denied.

Finally, Weiner contends that Liberty Mutual and the Crime Bureau functioned as

part of the Government's prosecution team, and that accordingly the Court should rule that the

Government's <u>Brady</u> obligations extend to Liberty Mutual and the Crime Bureau.  (Weiner Br.

(Dkt. No. 260) at 7-8; Weiner Reply Br. (Dkt. No. 266) at 3-5)  The court in <u>United States v.</u>

<u>Middendorf</u>, 2018 WL 3956494 (S.D.N.Y. Aug. 17, 2018) sets forth the legal standards for such

a claim as follows:

> The prosecution's obligation to disclose <u>Brady</u> material extends to any material in the possession of any entity that has acted as an "arm of the prosecutor" in a given case. <u>United States v. Blaszczak</u>, 308 F. Supp. 3d 736, 741 (S.D.N.Y. 2018) (quoting <u>United States v. Morell</u>, 524 F.2d 550, 555 (2d Cir. 1975)).  In other words, where the prosecution "conducts a 'joint investigation' with another state or federal agency, courts in this Circuit have held that the prosecutor's duty extends to reviewing the materials in the possession of that other agency for <u>Brady</u> evidence." <u>United States v. Gupta</u>, 848 F. Supp. 2d 491, 493 (S.D.N.Y. 2012).  A number of factors are relevant in determining whether the prosecution conducted a "joint investigation," including whether the other agency:  (1) participated in the prosecution's witness interviews, (2) was involved in presenting the case to the grand jury, (3) reviewed documents gathered by or shared documents with the prosecution, (4) played a role in the development of prosecutorial strategy, or (5) accompanied the prosecution to court proceedings.  See <u>Blaszczak</u>, 308 F. Supp. 3d at 741-42; <u>see also</u> <u>United States v. Martoma</u>, 990 F. Supp. 2d 458, 461 (S.D.N.Y. 2014) (relying on the joint conduct of interviews, exchange of documents, coordination of deposition efforts, and communications regarding the status of fact-gathering to find a joint investigation).

<u>Middendorf</u>, 2018 WL 3956494, at *4.

There is no evidence here that the Government conducted a joint investigation of

Weiner and Nexray Medical with either Liberty Mutual or the Crime Bureau.  There is, for

example, no evidence that (1) the Government jointly interviewed witnesses with Liberty Mutual

or the Crime Bureau; (2) Liberty Mutual or the Crime Bureau assisted the Government in

presenting the case to the grand jury; (3) Liberty Mutual or the Crime Bureau reviewed

documents gathered by the Government; (4) Liberty Mutual or the Crime Bureau played a role in the development of the Government's prosecution strategy; or (5) Liberty Mutual or the Crime Bureau accompanied the Government to court proceedings.  While Liberty Mutual provided documents to the Government – generally in response to a grand jury subpoena – and while the Crime Bureau informally provided limited information to the Government upon request, this assistance to law enforcement did not transform the relationship between the Government and these private agencies such that they can be said to have entered into a joint investigation.

## **CONCLUSION**

For the reasons stated above, Defendant Weiner's motion for a <u>Kastigar</u> hearing and related relief is denied.  The Clerk of Court is directed to terminate the motion (Dkt. No. 259).

Dated:  New York, New York
        December 11, 2023

                                        SO ORDERED.

                                        _____
                                        Paul G. Gardephe
                                        United States District Judge